Slip Op. 19-2

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **STUPP CORPORATION ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiffs,** | |
| **and** | |
| **MAVERICK TUBE CORPORATION ET AL.,** | |
| **Plaintiff-Intervenor and Consolidated Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 15-00334** |
| **UNITED STATES,** | **PUBLIC VERSION** |
| **Defendant,** | |
| **and** | |
| **SEAH STEEL CORPORATION ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the less than fair value investigation of imports of welded line pipe from the Republic of Korea.]

Dated: January 8, 2019

Paul Wright Jameson, Schagrin Associates, of Washington, DC, argued for plaintiffs, consolidated plaintiff intervenors, and consolidated defendant intervenors Stupp Corporation, a Division of Stupp Bros., Inc., TMK IPSCO, and Welspun Tubular LLC USA. With him on the brief was Roger Brian Schagrin.

**PUBLIC VERSION**

Robert Edward DeFrancesco, III, Wiley Rein, LLP, of Washington, DC, argued for plaintiff intervenor, consolidated plaintiff, and consolidated defendant intervenor Maverick Tube Corporation.  With him on the brief were Alan Hayden Price and Adam Milan Teslik.

Elizabeth Anne Speck, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Claudia Burke, Assistant Director, Jeanne E. Davidson, Director, and Chad A. Readler, Acting Assistant Attorney General.  Of Counsel on the brief was Reza Karamloo, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Jeffrey Michael Winton, Law Office of Jeffrey M. Winton PLLC, of Washington, DC, argued for defendant intervenor, consolidated plaintiff, and consolidated defendant intervenor SeAH Steel Corporation.

Henry David Almond and Jaehong David Park, Arnold & Porter LLP, of Washington, DC, argued for defendant intervenor and consolidated defendant intervenor Hyundai Steel Company.  With them on the brief was Sylvia Yun Chu Chen.

Kelly, Judge:  This consolidated action is before the court on several motions for judgment on the agency record filed respectively by Stupp Corporation, a division of Stupp Bros., Inc., TMK IPSCO, and Welspun Tubular LLC USA (collectively "Stupp et al."), SeAH Steel Corporation ("SeAH"), and Maverick Tube Corporation ("Maverick").[1] See Pls. [Stupp et al.'s] Mot. J. R. Pursuant Rule 56.2, July 5, 2016, ECF No. 39; Mot. Pl. SeAH [ ] J. Agency R., July 5, 2016, ECF No. 40; Pl.-Intervenor [Maverick]'s Rule 56.2 Mot. J. Agency R., July 5, 2016, ECF No. 41.  These parties challenge various aspects of the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the less than fair value ("LTFV") investigation of imports of welded line pipe from the

---

[1] On April 28, 2016, the following actions, Stupp Corp. v. United States, Ct. No. 15-00334 (USCIT filed Dec. 30, 2015), SeAH Steel Corp. v. United States, Ct. No. 15-00336 (USCIT filed Dec. 30. 2015), and Maverick Tube Corp. v. United States, Ct. No. 15-00337 (USCIT filed Dec. 30. 2015) were consolidated.  Order [Granting Joint Mot. Consolidate], Apr. 28, 2016, ECF No. 34.

Republic of Korea ("Korea") for the period October 1, 2013, through September 30, 2014,

which resulted in an antidumping duty order ("ADD").  See [Stupp et al.'s] Mem. Supp.

Mot. J. [Agency] R. Pursuant USCIT Rule 56.2 at 4–27, July 5, 2016, ECF No. 39 ("Stupp

et al. Br."); Br. SeAH [ ] Supp. Rule 56.2 Mot. J. Agency R. at 26–50, July 5, 2016, ECF

No. 40 ("SeAH's Br."); Mem. Pl.-Intervenor Maverick [ ] Supp. Mot. J. Agency R. at 12–

43, July 6, 2016, ECF No. 44 ("Maverick's Br."); see Welded Line Pipe From [Korea], 80

Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) (final determination of sales at

[LTFV]), as amended by Welded Line Pipe From [Korea], 80 Fed. Reg. 69,637 (Dep't

Commerce Nov. 10, 2015) (amended final determination of sales at [LTFV]) ("Amended

Final Determination") and accompanying Issues & Decision Mem. for the Final Affirmative

Determination in the [LTFV] Investigation of Welded Line Pipe from [Korea], A-580-876,

(Oct. 5, 2015), ECF No. 30-3 ("Final Decision Memo"); Welded Line Pipe From [Korea]

and the Republic of Turkey [("Turkey")], 80 Fed. Reg. 75,056, 75,057 (Dep't Commerce

Dec. 1, 2015) ([ADD] orders).   On September 28, 2018, this consolidated action was

reassigned to Judge Claire R. Kelly by the Chief Judge pursuant to 28 U.S.C. § 253(c)

(2012) and Rule 77(e)(4) of the Rules of the U.S. Court of International Trade.  See Order

of Reassignment, Sept. 28, 2018, ECF No. 107.

SeAH challenges as contrary to law and unsupported by substantial evidence

Commerce's (i) decision to reject portions of its September 1, 2015 case brief, see SeAH's

Br. at 36–42; (ii) differential pricing analysis, see id. at 26–36, 42–45; and (iii) calculation

of credit expenses on its back-to-back sales.  See id. 46–50.  Stupp et al. challenge as

arbitrary and capricious and unsupported by substantial evidence Commerce's treatment

of Hyundai HYSCO's ("HYSCO")[2] and SeAH's pipe for purposes of product matching.

See Stupp et al. Br. at 4–27.  Maverick challenges Commerce's decision to include certain

local sales in HYSCO's home market sales database as contrary to law and unsupported

by substantial evidence, see Maverick's Br. at 12–35, and Commerce's decision to reject

Maverick's supplemental case brief as an abuse of discretion.  See id. at 35–43.

For the reasons that follow, the court sustains Commerce's (1) differential pricing

analysis; (2) rejection of portions of SeAH's case brief that contained untimely new factual

information; (3) calculation of credit expenses on SeAH's back-to-back sales; and (4)

treatment of grades B and X42 pipe as separate grades for purposes of product matching.

The court, however, remands Commerce's decision to include certain local sales in

HYSCO's home market sales database for further explanation or reconsideration

consistent with this opinion.  The court also finds that Commerce abused its discretion by

rejecting Maverick's supplemental case brief.

## BACKGROUND

On November 14, 2014, in response to petitions filed by domestic producers of

welded line pipe, Commerce initiated an ADD investigation of welded line pipe from

Korea.  See Welded Line Pipe From [Korea] and [Turkey], 79 Fed. Reg. 68,213, 68,213

(Dep't Commerce Nov. 14, 2014) (initiation of [LTFV] investigations) ("Initiation").  On

December 5, 2014, Commerce selected HYSCO and SeAH for individual examination as

---

[2] Prior to the issuance of the final determination, HYSCO completed a merger with the Hyundai Steel Company and no longer uses the HYSCO name.  See Final Decision Memo at 1 n.1. Commerce, however, continued to use the HYSCO name to refer to respondent for the purposes of this investigation.  This court does the same.

mandatory respondents.  See Resp't Selection for [ADD] Investigation of Welded Line

Pipe from [Korea] at 4–5, PD 49, bar code 3245872-01 (Dec. 5, 2014).[3]

Commerce published its preliminary determination on May 22, 2015.  See

generally Welded Line Pipe From [Korea], 80 Fed. Reg. 29,620 (Dep't Commerce May

22, 2015) (preliminary determination of sales at [LTFV] and postponement of final

determination) ("Prelim. Determination") and accompanying Decision Mem. for the

Prelim. Determination in the [ADD] Investigation of Welded Line Pipe from [Korea], A-

580-876, PD 305, bar code 3277027-01 (May 14, 2015) ("Prelim. Decision Memo").

Commerce applied the Average-to-Average ("A-to-A") methodology to all of SeAH's U.S.

sales, explaining that although 40.61% of the sales passed Commerce's Cohen's d test,

the A-to-A methodology could account for the price differences identified.[4]  Prelim.

Decision Memo at 9.  Commerce preliminarily calculated weighted-average dumping

margins of 2.52% for HYSCO, 2.67% for SeAH, and 2.60% for the all-others.  Prelim.

Determination, 80 Fed. Reg. at 29,620.

---

[3] On March 14, 2016, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF Nos. 30–5–6.  All further references to administrative record documents in this opinion will be to the numbers assigned to the documents by Commerce in the indices.

[4] Commerce applied its differential pricing analysis and determined that 77.11% of HYSCO's U.S. sales passed its Cohen's d test, that the A-to-A methodology could not account for the price differences identified, and that application of the Average-to-Transaction ("A-to-T") methodology to all of HYSCO's U.S. sales was appropriate to calculate HYSCO's weighted-average dumping margin.  Prelim. Decision Memo at 8.  No party challenges before this court the results of Commerce's application of the differential pricing analysis to HYSCO's U.S. sales.

On September 1, 2015, SeAH filed a case brief with the agency challenging certain aspects of the agency's preliminary determination.  [SeAH's] Case Br., PD 377–79, bar codes 3301610-01–03 (Sept. 1, 2015) ("SeAH's Rejected Case Br.").  On September 3, 2015, Commerce determined that portions of SeAH's case brief contained "untimely factual information," as defined by 19 C.F.R. § 351.102(b)(21)(iv),(v) (2014),[5] rejected the brief, and allowed SeAH an opportunity to file a redacted version, which SeAH did.  [Letter from Commerce Rejecting SeAH's Sept. 1, 2015 Case Br.] at 1–2, PD 384, bar code 3302027-01 (Sept. 3, 2015) ("Letter Rejecting SeAH's Case Br.").  On September 9, 2015, Commerce rejected Maverick's supplemental case brief in whole, explaining that the brief addressed issues beyond the scope for comment Commerce established.  [Letter from Commerce Rejecting Maverick's Suppl. Br.] at 1, PD 407, bar code 3303866-01 (Sept. 9, 2015) ("Letter Rejecting Maverick's Suppl. Case Br.").

Commerce published its final determination on October 5, 2015, and later amended the determination to account for a ministerial error.  In contrast to the preliminary determination, for the final determination, Commerce found that a lesser percentage, 39.72%, of SeAH's U.S. sales passed Commerce's Cohen's d test, that the A-to-A methodology could not account for the price differences identified, and that the mixed methodology should be applied to SeAH's U.S. sales.[6]  See Final Decision Memo at 4.  Commerce calculated weighted-average dumping margins of 6.23% for HYSCO, 2.53%

---

[5] Further citations to Title 19 of the Code of Federal Regulations are to the 2014 edition.

[6] Commerce continued to find that the A-to-T methodology should be applied to all of HYSCO's U.S. sales.  See Final Decision Memo at 4.

for SeAH, and 4.38% for the all-others.  See Amended Final Determination, 80 Fed. Reg. at 69,638.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012)[7] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an investigation of an antidumping duty order.   The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  **Commerce's Rejection of Portions of SeAH's Case Brief**

SeAH challenges Commerce's rejection of portions of its case brief as contrary to law.  See SeAH's Br. at 36–42; see also Letter Rejecting SeAH's Case Br.  Specifically, SeAH argues that the rejected materials do not fall within the regulatory definition of factual information, see SeAH's Br. at 37–40, and that Commerce abandoned its commitment to allow continuing comment on its differential pricing analysis.  See id. at 40–42.  Defendant argues that Commerce's determination is in accordance with law and is reasonable.  See Def.'s Mem. Opp'n Rule 56.2 Mots. J. Agency R. at 35–39, Nov. 14, 2016, ECF No. 66 ("Def.'s Resp. Br.").  For the reasons that follow, the court sustains Commerce's determination.

---

[7] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Given the breadth of 19 C.F.R. § 351.102(b)(21)(iv)–(v), Commerce's decision to reject SeAH's submissions for containing untimely filed new factual information is in accordance with law and reasonable.  Factual information includes "[e]vidence, including statements of fact, documents and data . . . submitted by any interested party to rebut, clarify or correct such evidence placed on the record by the Department."  19 C.F.R. § 351.102(b)(21)(iv)–(v).[8]   Factual information may include more specific analysis, statistical references, and mathematical formulas presented as part of an expert report, see Apex Frozen Foods Private Ltd. v. United States, 40 CIT __, __, 144 F. Supp. 3d 1308, 1337–41 (2016) ("Apex I"), aff'd, 862 F.3d 1337 (Fed. Cir. 2017) ("Apex II"), as well as print and online academic materials and self-calculated dumping margins based on record evidence.  See Tri Union Frozen Prods., Inc. v. United States, 40 CIT __, __, 163

---

[8] The regulation defines "factual information" as

(i) Evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

(ii) Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

(iii) Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;

(iv) Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by the Department; and

(v) Evidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)–(iv) of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence.

19 C.F.R. § 351.102(b)(21)(i)–(v).

F. Supp. 3d 1255, 1287–88, 1290–92 (2016),[9] aff'd, 741 F. App'x 801 (Fed. Cir. 2018)

(per curiam).[10]  The timeliness of a submission is determined by the type of factual

information proffered.  See 19 C.F.R. § 351.301(c).  A party submitting factual information

described in 19 C.F.R. § 351.102(b)(21)(v) must do so either 30-days before the

preliminary determination or 14-days before verification, whichever date occurs earlier,

and must include with its submission an explanation of why the information is not

encompassed in the categories of 19 C.F.R. § 351.102(b)(21)(i)–(iv) and a "detailed

narrative" about the information submitted and its relevancy.    See 19 C.F.R.

§ 351.301(c)(5).

    In its case brief to the agency, SeAH relied on citations to academic articles and

texts and the following documents:

> the output of running its U.S. sales data through the "Univariate" process
> in the SAS computer software that Commerce uses to run the
> [Differential Pricing Analysis] and its margin-calculation programs, (2) a
> data file that was based on the U.S. sales data SeAH had previously
> submitted, but in which the actual sales prices had been replaced by ten
> sets of purely random numbers, (3) a copy of the computer program that
> had been used to insert the random numbers into the data file, (4) a
> summary of the results of running these random numbers through the
> [Differential Pricing Analysis], and (5) a statement by the computer
> consultant that had prepared the data file and run it through the
> [Differential Pricing Analysis], explaining what she had done.

---

[9] SeAH argues that Apex I and Tri Union are distinguishable because the respondents in both of
those cases admitted that their information constituted new factual information.  SeAH's Br. at 41
n.73.  SeAH's argument is unpersuasive because the Apex I and Tri Union courts did not rely
upon the respondents' admission to determine that the rejected information constituted new and
untimely factual information.

[10] Commerce modified the definition of factual information since Apex I and Tri Union were
decided.  The change is not so significant as to affect the applicability of the reasoning offered in
those cases to this court's analysis.  See generally Apex I, 40 CIT at __, 144 F. Supp. 3d at 1337–
39, 1338 n.28; Tri Union, 40 CIT at __, 163 F. Supp. 3d at 1286 n.20, 1286–87.

SeAH's Br. at 36–37.  In its rejection letter, Commerce explained that SeAH's case brief included new factual information pursuant to either 19 C.F.R. § 351.102(b)(21)(iv) or (v), that SeAH did not satisfy the explanation requirement of 19 C.F.R. § 351.301(c)(5), and that even if SeAH's submission was proper, it was untimely under 19 C.F.R. § 351.301(c)(5) and should have been filed by April 14, 2015.[11]  See Letter Rejecting SeAH's Case Br. at 1.  The regulation defines factual information as "statements of fact, documents and data" submitted "to rebut[.]" 19 C.F.R. § 351.102(b)(21)(iv)–(v).  To create the two databases, SeAH manipulated existing record evidence.  As a result, the databases yielded new outputs.  It was logical for Commerce to consider these new outputs as data intended to rebut existing record evidence.  See Tri Union, 40 CIT at __, 163 F. Supp. 3d at 1287–88.  Likewise, the academic materials SeAH cites provide expert analysis in support of SeAH's challenge to Commerce's differential pricing analysis.  See PSC VSMPO–Avisma Corp. v. United States, 688 F.3d 751, 760–61 (Fed. Cir. 2012); Tri Union, 40 CIT at __, 163 F. Supp. 3d at 1290–91.  Accordingly, Commerce reasonably determined that SeAH's submissions provide statements of fact and data to rebut the

---

[11] Commerce revised the relevant regulations in April of 2013.  See generally Definition of Factual Information & Time Limits for Submission of Factual Info., 78 Fed. Reg. 21,246 (Dep't Commerce Apr. 10, 2013).  The revised regulations "apply to all segments initiated on or after [May 10, 2013]." Id. at 21,246.  This investigation was initiated on November 14, 2014, and therefore, the revised regulations apply.  See generally Initiation, 79 Fed. Reg. at 68,213.  Defendant erroneously cites to the April 1, 2013 edition of the regulations as the version applicable to this investigation.  See Def.'s Resp. Br. at 37.

application of Commerce's differential pricing analysis and constitute factual information.[12]

SeAH argues that in rejecting portions of its case brief, Commerce abandoned its commitment to allow continuing comment on its differential pricing analysis. See SeAH's Br. at 40–42. As this court explained in Tri Union

> Commerce has announced to the public that it plans to further refine its approach as it gains more and more experience. See Differential Pricing Analysis: Request for Comments, 79 Fed. Reg. 26,720, 26,722 (Dep't Commerce May 9, 2014) [ ]. However, Commerce's willingness to further develop its differential pricing analysis is not an invitation to submit factual information at any time in the proceeding and does not mean that the deadlines to submit factual information to the record no longer apply. Interested parties were afforded an opportunity to submit factual information to the record and comment on Commerce's practice during the proceeding. While Commerce has made clear that it is open to comments during the proceeding to inform its practice, it is not an abuse of discretion for Commerce to require that those comments be made in accordance with Commerce's regulatory procedures.

Tri Union, 40 CIT at __, 163 F. Supp. 3d at 1293. SeAH had notice and the opportunity to submit relevant factual information within the applicable deadlines.

---

[12] SeAH attempts to characterize its submission as containing documents similar to documents previously accepted by Commerce to argue that Commerce is treating similar information differently. See SeAH's Br. at 41–42. Whether a submission contains new factual information is a context specific inquiry. Here, Commerce reasonably explained that SeAH's submission used record evidence to derive conclusions that were not previously on the record. See Letter Rejecting SeAH's Case Br. at 1. SeAH also argues that Commerce, in promulgating the relevant regulation, acknowledged that parties may support their arguments with "information [available] in the public realm." See [SeAH's] Reply Br. at 16–17, Jan. 19, 2017, ECF No. 85 (quoting Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296 27,332 (Dep't Commerce May 19, 1997) ("Notice of Final Rules 1997")). In fact, Commerce's statement is a response to comments on the proposed regulation stating that parties "may draw on information in the public realm to highlight any perceived inaccuracies in a report." Notice of Final Rules 1997, 62 Fed. Reg. at 27,332. Here, SeAH relied on the rejected information to advance new arguments, not to highlight inaccuracies.

## II. Application of Commerce's Differential Pricing Analysis

SeAH challenges Commerce's differential pricing analysis as contrary to law and unsupported by substantial evidence.  <u>See</u> SeAH's Br. at 26–36, 42–45.  Specifically, SeAH argues that (i) no evidence supports Commerce's use of the differential pricing analysis, <u>see</u> <u>id.</u> at 26–32; (ii) Commerce's application of Cohen's d is contrary to accepted statistical principles and misunderstands the limits placed on Cohen's d by academia, <u>id.</u> at 33–36; (iii) Commerce did not explain why the A-to-A method could not account for the identified pattern, as required by 19 U.S.C. § 1677f-1(d)(1)(B), <u>see</u> <u>id.</u> 42–45; and (iv)international law prohibits Commerce's use of zeroing.  <u>Id.</u> at 45.  Defendant argues that Commerce's application of the differential pricing analysis is in accordance with law and is supported by substantial evidence.  <u>See</u> Def.'s Resp. Br. at 39–55.  For the following reasons, Commerce's application of the differential pricing analysis is in accordance with law and supported by substantial evidence and is sustained.

In investigations, Commerce ordinarily uses the A-to-A methodology to calculate dumping margins.[13]  <u>See</u> 19 U.S.C. § 1677f-1(d)(1)(A); 19 C.F.R. § 351.414(c)(i).  However, Commerce may use the alternative A-to-T methodology to calculate weighted-average dumping margins where: (i) Commerce finds a pattern of export prices for

---

[13] Under the A-to-A methodology, Commerce compares the weighted-average of the normal value of the merchandise to the weighted-average of the export prices (or constructed export prices) for comparable merchandise.  <u>See</u> <u>id.</u>  Although the transaction-to-transaction methodology ("T-to-T"), which is "a comparison of the normal values of individual transactions to the export prices of individual transactions," is also a statutorily preferred method (under 19 U.S.C. § 1677f-1(d)(1)(A)(ii)), Commerce's regulations provide that T-to-T will be employed only in rare cases, "such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made."  19 C.F.R. § 351.414(c)(2).

comparable merchandise that differ significantly among purchasers, regions, or periods

of time, and (ii) Commerce explains why such differences cannot be taken into account

using the standard A-to-A methodology.  19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii).  The statute

is silent as to how Commerce is to determine whether a pattern of significant price

differences exists.  However, the Statement of Administrative Action ("SAA"), which is "an

authoritative  expression  by  the  United  States  concerning  the  interpretation  and

application"  of  the  Uruguay  Rounds  Agreement  Act,  provides  guidance.   19  U.S.C.

§ 3512(d).  In relevant part, the SAA states that

> the reluctance to use an average-to-average methodology has been based
> on a concern that such a methodology could conceal "targeted dumping."
> In such situations, an exporter may sell at a dumped price to particular
> customers or regions, while selling at higher prices to other customers or
> regions. . . .  New section 777A(d)(1)(B) provides for a comparison of
> average normal values to individual export prices or constructed export
> prices  in  situations  where  an  average-to-average  or  transaction-to-
> transaction methodology cannot account for a pattern of prices that differ
> significantly  among  purchasers,  regions,  or  time  periods,  i.e.,  where
> targeted dumping may be occurring. Before relying on this methodology,
> however,  Commerce  must  establish  and  provide  an  explanation  why  it
> cannot account for such differences through the use of an average-to-
> average  or  transaction-to-transaction  comparison.  In  addition,  the
> Administration intends that in determining whether a pattern of significant
> price differences exist. Commerce will proceed on a case-by-case basis,
> because small differences may be significant for one industry or one type
> of product, but not for another.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-

316, vol. 1, at 842–43 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4177–78.

The  statute  affords  Commerce  discretion  in  determining  whether  a  pattern  of

significant price differences exists.  See Fujitsu General Ltd., 88 F.3d 1034, 1039 (Fed.

Cir.  1996);  Torrington  Co.  v.  United  States,  68  F.3d  1347,  1351  (Fed.  Cir.  1995).

Commerce's methodological choice must be reasonable and its conclusions supported by substantial evidence.  See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."); see Smith-Corona Grp. v. United States, 713 F.2d 1568, 1571 (Fed. Cir. 1983), cert. denied, 465 U.S. 1022 (1984); Fujitsu Gen. Ltd., 88 F.3d at 1039 (granting Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature"); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.")

Commerce determines whether a pattern of significant price differences exists among purchasers, regions, or periods of time with its differential pricing analysis.  See Prelim. Decision Memo at 7; Final Decision Memo at 11.  First, Commerce applies what it refers to as the "Cohen's d test," which measures the degree of price disparity between two groups of sales.  See Final Decision Memo at 11.  Commerce calculates the number of standard deviations by which the weighted-average net prices of U.S. sales for a particular purchaser, region, or time period (the "test group") differ from the weighted-average net prices of all other U.S. sales of comparable merchandise (the "comparison

group").[14]  See id.  The result of this calculation is a coefficient.  See id.  To arrive at the

coefficient, Commerce divides the difference in the means of the net prices of the test

group and comparison group by the pooled standard deviation.[15]  See id.  The coefficient

is the number of standard deviations by which the weighted-average of the comparison

group and the test group differ.[16]  See Prelim. Decision Memo at 7.  A group of sales with

a coefficient equal to or greater than 0.8 is said to "pass" Commerce's Cohen's d test,

which signifies to Commerce that a significant pattern of price differences exists within

that group of sales.  See id.  Commerce then relies on the "ratio test" to measure whether

the extent of significant price differences identified are sufficient to satisfy the statutory

pattern requirement.  See id.; Final Decision Memo at 10.  The "ratio test" compares the

---

[14] As Commerce explained,

> Purchasers are based on the customer codes reported by [respondents]. Regions are defined using the reported destination code (i.e., zip code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the [period of investigation] being examined based upon the reported date of sale. For purposes of analyzing sales transactions by customer, region and time period, comparable merchandise is considered using the product control number and any characteristics of the sales, other than purchaser, region, and time period, that the Department uses in making comparisons between [export price] or [constructed export price] and [normal value] for the individual dumping margins.

Prelim. Decision Memo at 7.  To calculate a coefficient for a particular test group (all sales of the comparable merchandise to a specific purchaser, region, or time period), the test group and comparison group (all other sales of the comparable merchandise) must each have at least two observations and the sales quantity for the comparison group must account for at least five percent of the total sales quantity of the comparable merchandise.  See id.

[15] The pooled standard deviation is derived using the simple average of the variances in the net prices within the test and comparison groups.  See Final Decision Memo at 11.

[16] Commerce quantifies the extent of the differences by one of three thresholds: "small," "medium," or "large."  Prelim. Decision Memo at 7.  A coefficient falling in the "large" threshold is equal to or greater than 0.8.  Id.

combined value of sales that passed the Cohen's d test with the value of all sales.  See

Prelim. Decision Memo at 7–8.  If the value of sales that passed the test accounts for

66% or more of a respondent's total sales, Commerce applies the A-to-T method to all

sales.  See id. at 7.  However, if the value of sales that passed the Cohen's d test is less

than 66%, but more than 33%, Commerce takes a hybrid approach, applying the A-to-T

method to the sales that passed its Cohen's d test and applying the A-to-A method to all

other sales.  See id.  Alternatively, if 33% or less of a respondent's total sales passed

Commerce's Cohen's d test, Commerce will apply the A-to-A method to all sales.  Id. at

8.  Finally, Commerce applies the "meaningful difference" test to determine whether the

A-to-A method can account for the price differences identified.  Id.  If it cannot, Commerce

concludes that there is a meaningful difference between the results and applies the A-to-

T method.[17]  Id.

Commerce's differential pricing analysis, as applied, constitutes a reasonable

methodology for identifying patterns of prices that differ significantly.  See Apex I, 144 F.

Supp. 3d at 1322–35; Apex Frozen Foods Private Ltd. v. United States, 41 CIT __, __,

208 F. Supp. 3d 1398, 1410–17 (2017) ("Apex III"); Tri Union Frozen Prods., Inc. v. United

---

[17] A difference is meaningful if:

> 1) there is a 25 percent relative change in the weighted-average dumping margin
> between the average-to-average method and the appropriate alternative method
> where both rates are above the de minimis threshold, or 2) the resulting weighted-
> average dumping margin moves across the de minimis threshold.

Prelim. Decision Memo at 8.

States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1297–1310 (2016).[18]  SeAH argues that

Commerce's use of Cohen's d contravenes statistical principles and ignores academic

guidance on how Cohen's d should be applied.  See SeAH's Br. at 33–35.  Specifically,

it argues that Cohen's d can only be applied when specific conditions are met,[19] but which

Commerce does not require.[20]  Id. at 35–36.  SeAH's argument fails.  The relevant inquiry

is not whether Commerce applies its differential pricing analysis in accord with experts'

guidance on the use of Cohen's d, but whether Commerce's methodology is lawful and

is a reasonable way of effectuating the goals of the statute.  As the court explained in Soc

Trang,

> [t]he fact that Commerce has adopted a methodology based upon a
> statistical tool known as Cohen's d, and chooses to refer to this
> methodology as Cohen's d, does not diminish the discretion granted to
> Commerce by Congress.  Congress has granted Commerce the discretion
> to construct a methodology to determine if there is a pattern of export prices
> for comparable merchandise that differ significantly among purchasers,
> regions, or periods of time.

---

[18] SeAH argues that because Commerce's differential pricing analysis is not the result of formal rule making, Commerce must justify its use on a case-by-case basis.  See SeAH's Br. at 26–32. Commerce has explained the reasonableness of the specific thresholds it employs in its differential pricing analysis.  See Final Decision Memo at 22–25.  The reasonableness of the steps underlying the analysis, as applied by Commerce, has been addressed by this Court and upheld by the U.S. Court of Appeals for the Federal Circuit.  See Apex II, 862 F.3d at 1345–51; Apex III, 41 CIT at __, 208 F. Supp. 3d at 1410–17; Tri Union, 40 CIT at __, 163 F. Supp. 3d at 1297–1310, aff'd, 741 F. App'x 801 (Fed. Cir. 2018) (per curiam).

[19] SeAH argues that by not requiring normal distribution, equal variances, and equal samples sizes between the databases being compared, Commerce does not account for sampling errors. SeAH's Br. at 33–35.

[20] SeAH argues that Commerce lacks a sufficient number of data points to conduct its differential pricing analysis.  See SeAH's Br. at 35–36.  SeAH's argument is based on extra record evidence which Commerce reasonably rejected as untimely new factual information.

Soc Trang Seafood Joint Stock Co. v. United States, 42 CIT __, __, 321 F. Supp. 3d

1329, 1339 n.13 (2018).  SeAH does not explain why Commerce's present application of

the differential pricing analysis is either unlawful or is unreasonable.

SeAH also argues that Commerce did not explain why the A-to-A methodology

could not account for the pattern of price differences identified.  See SeAH's Br. at 42–

45.  Instead, SeAH contends that Commerce assumes, without explanation, that the A-

to-T methodology is inherently more accurate in identifying masked dumping than the A-

to-A methodology.  Id. at 43.  SeAH argues that the assumption is faulty because a

meaningful difference in the results of the two methodologies can be explained by the use

of zeroing in A-to-T, but not A-to-A.  Id.  Pursuant to 19 U.S.C. § 1677f-1(d)(1)(B), before

employing the A-to-T methodology, Commerce must explain why the price "differences

cannot be taken into account using" either the A-to-A or the transaction to transaction

methodologies.  19 U.S.C. § 1677f-1(d)(1)(B).  In Apex I, the court explained that although

the statutory language and accompanying legislative history suggests that the A-to-A

methodology will, more likely than not, "account for the price differences identified

pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i)[,]" that language was written "when zeroing

under A-A was allowed and indeed the norm in investigations."  Apex I, 40 CIT at __, 144

F. Supp. 3d at 1333 n.24 (citing 19 U.S.C. § 1677f-1(d)(1)(B)(ii); SAA at 843, 1994

U.S.C.C.A.N. at 4178–79).  The A-to-A methodology was able to account for significant

price differences, and in the rare cases it did not, "an explanation would more easily

present itself."  Id.  However, zeroing is no longer utilized in the A-to-A methodology, see

generally Antidumping Proceedings, 71 Fed. Reg. 77,722, 77,723 (Dep't Commerce Dec.

27, 2006) (calculation of the weighted-average dumping margin during an antidumping investigation; final modification), and now provides offsets for negative dumping, "which may mask [ ] price differences rather than account for [them]." Apex I, 40 CIT at __, 144 F. Supp. 3d at 1333 n.24. Accordingly, to fulfill the explanation requirement, "Commerce must draw a connection between the differences and the efficacy of A-A as compared to A-T." Id. Here, Commerce observed that absent zeroing the yields of the A-to-T and A-to-A methodologies would be "identical" and render the statutory language meaningless. See Final Decision Memo at 14. Commerce then presumed, in comparing the weighted-average dumping margins, that the move of the margin across the di minimis threshold represented a meaningful difference. Id. at 4. It is reasonably discernable from Commerce's explanation that the A-to-A methodology could not and was not equipped to uncover the masked dumping that the A-to-T methodology revealed. Commerce's explanation for why the A-to-A methodology cannot account for the pattern of significant price differences is therefore a reasonable interpretation of the statute in light of the circumstances.[21]

---

[21] SeAH also argues that Apex II, which affirmed Apex I, can be distinguished because the Court of Appeals did not hold that comparing the results of the A-to-A methodology to those of the A-to-T methodology reveals that a meaningful difference exists, but only that the difference in the results can "inform" Commerce's decision. See Resp. Pl. [SeAH] to Def.'s Notice Suppl. Auth. at 3–8, Aug. 4, 2017, ECF No. 102. SeAH misreads Apex II. Apex II found Commerce's explanation for its meaningful difference analysis to be reasonable, and further based its rationale on the reasoning provided in Apex I that explained why it is reasonably discernable from Commerce's explanation that the results of the A-to-T methodology, when compared to those of the A-to-A methodology, can unmask dumped sales. Apex II, 862 F.3d at 1346 (citing Apex I, 40 CIT at __, 144 F. Supp. 3d at 1333 n.24).

SeAH also argues that Commerce's use of zeroing in its differential pricing analysis contravenes the United States' obligations under the World Trade Organization's ("WTO") Antidumping Agreement.  See SeAH's Br. at 45 (relying on the holding of a 2016 WTO panel report).  WTO reports do not carry the force of law and the relevant statutory scheme provides a method for implementation of the reports into U.S. law.  Corus Staal BV v. Dep't of Commerce, 395 F. 3d 1343, 1347–49 (Fed. Cir. 2005); 19 U.S.C. §§ 3533, 3538(b)(4).  The WTO report upon which SeAH relies does not affect this proceeding.

### III. Commerce's Calculation of Credit Expenses on SeAH's Back-to-Back Sales

SeAH challenges Commerce's calculation of credit expenses on SeAH's back-to-back sales as contrary to law.  See SeAH's Br. at 46–50.  Specifically, SeAH argues that Commerce has consistently interpreted 19 U.S.C. § 1677a(d)(1) as precluding the deduction of selling expenses incurred outside of the United States from the constructed export price ("CEP").  See id. at 48–50.  Defendant argues that Commerce calculated credit expenses in a manner that was consistent with its past practice.  See Def.'s Resp. Br. at 55–58.  For the reasons that follow, Commerce's calculation of credit expenses on SeAH's back-to-back sales is in accordance with law.

Constructed export price is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise . . . , as adjusted by subsections (c) and (d) [of this section]."  19 U.S.C. § 1677a(b).  Constructed export price shall be adjusted or reduced by, for example, "credit expenses" which are "expenses that result from, and bear a direct relationship to, the sale[.]"  19 U.S.C. § 1677a(d)(1)(B).

Commerce interprets "credit expense" as "the interest expense incurred (or interest revenue foregone) between shipment of merchandise to a customer and receipt of payment from the customer."  Final Decision Memo at 75–76 (quoting Issues & Decisions for the Final Results of the First Admin. Review of the [ADD] Order on Carbon & Certain Alloy Steel Wire Rod from Trinidad & Tobago at Cmt. 6, A-274-804, (Mar. 8, 2005), available at http://ia.ita.doc.gov/frn/summary/trinidad/E5-1128-1.pdf (last visited Oct. 29, 2018) ("Wire Rod from Trinidad & Tobago IDM")).   Imputed credit expense is tied to creditworthiness and credit risk.  See Issues & Decisions for the Final Results of the Fifth Admin. Review [of Certain Hot-Rolled Carbon Steel Flat Prods. from India] at Cmt. 22, A-533-820, (May 30, 2008), available at http://ia.ita.doc.gov/frn/summary/india/E8-12603-1.pdf (last visited Oct. 31, 2018) (explaining that the basis of Commerce's practice for how credit expenses are calculated is the fact "that producers are not entitled to payment for finished goods until they ship the merchandise and issue the commercial invoice."). Accordingly, where goods are made to order and are directly shipped to an unaffiliated U.S. customer, it is reasonable for Commerce to demarcate the date of shipment as the date when the credit risk attaches and the date of payment as the date until which the credit risk is borne.[22]

---

[22] When merchandise does not enter a U.S. affiliate's inventory, the credit period commences when the merchandise leaves the port and terminates upon payment.  Wire Rod from Trinidad & Tobago IDM at Cmt. 6.

In the final determination, Commerce explains that SeAH's merchandise did not enter its U.S. affiliate's inventory and was instead sold directly to unaffiliated U.S. customers. <u>See</u> Final Decision Memo at 76. Accordingly, Commerce calculated SeAH's imputed credit expenses beginning from the date of shipment to the first unaffiliated customer and to the date of receipt of payment, and deducted the resulting amount from the CEP.[23] <u>See id.</u>

Commerce correctly notes that SeAH's attempt to fragment accrual of imputed credit expenses based on the location of the subject merchandise, i.e., when the merchandise is in transit, "conflates inventory carrying costs with imputed credit expenses." Final Decision Memo at 76. Constructed export price may be reduced by inventory carrying costs which Commerce interprets as "interest expenses incurred (or interest revenue for[e]gone) between the time the merchandise leaves the production line at the factory to the time the goods are shipped to the first unaffiliated customer." <u>Id.</u> In calculating inventory carrying costs Commerce excludes time-on-the-water transport costs because such costs are indirect selling expenses related to the sale to the U.S. affiliate and not associated with U.S. economic activity. <u>See</u> Issues & Decision Mem. for the Admin. Review of Stainless Steel Butt-Weld Pipe Fittings from Taiwan at 22, A-583-816, (Dec. 10, 2003), <u>available at</u> http://ia.ita.doc.gov/frn/summary/taiwan/03-31021-

---

[23] SeAH contends that there are two types of sales at issue—one, where the subject merchandise enters the U.S. affiliate's inventory and is then sold to an unaffiliated U.S. customer, and another where the subject merchandise is picked up directly by the unaffiliated U.S. customer at the port. <u>See</u> SeAH's Br. at 46. It is irrelevant that SeAH's U.S. affiliate took title to the goods upon their arrival in the United States and afterwards transferred the goods to the U.S. customer, because the goods were always made to order and were not sold out of the U.S. affiliate's inventory. <u>See</u> Final Decision Memo at 76.

1.pdf (last visited Oct. 29, 2018).  Commerce will not adjust the CEP to account for an expense that is "solely related" to sales to an affiliated U.S. importer.  19 C.F.R. § 351.402(b).  It is reasonably discernable from Commerce's explanation that the cost of carrying inventory does not attach until after the goods actually enter an affiliate's inventory.  Conversely, credit expenses incur while merchandise is en route to the customer and continue to so incur until the customer remits payment.  The fact that payment may be remitted while the merchandise is outside of the United States is not relevant to the inquiry of when a party's credit risk for the merchandise sold terminates.  Accordingly, Commerce's determination is in accordance with law.

## IV. Pipe Grade

Stupp et al. challenge as arbitrary and capricious and unsupported by substantial evidence Commerce's determination that grades B and X42 pipe should not be treated as a single grade for purposes of product matching.[24]  See Stupp et al. Br. at 3–4, 11–27; see also Final Decision Memo at 34.  Specifically, Stupp et al. contend that in light of record evidence that SeAH's and HYSCO's (collectively "respondents") line pipe met the grade specifications of both grade B and X42 pipe, Commerce should have conducted its own inquiry and reclassified respondents' line pipe accordingly.  See Stupp et al. Br. at

---

[24] Commerce relies on control-numbers ("CONNUMs") to match products in the home market with those in the U.S. market.  A CONNUM is a string of numbers, each of which codes for a specific product characteristic.  Product characteristics are unique to the subject merchandise at issue and are selected based on what is commercially meaningful in the U.S. market and has an impact on sale price and cost of production.  See, e.g., Large Residential Washers from the People's Republic of China, 81 Fed. Reg. 1,398, 1,399 (Dep't Commerce Jan. 12, 2016) (initiation of [LTFV] investigation).  Welded line pipe has six product characteristics, one of which is grade.  Preliminary Decision Memo at 10.  Grades B and X42 are among the possible grades for welded line pipe and each is assigned its own identifying code.

11–24.  Defendant argues that Commerce's determination is supported by substantial evidence.  See Def.'s Resp. Br. at 11–16.  For the reasons that follow, Commerce's determination is supported by substantial evidence.

To calculate a dumping margin, Commerce compares "the price at which the foreign like product is first sold" in a comparison market with the export price or the constructed export price.  See 19 U.S.C. § 1677b(a); 19 C.F.R. § 351.401(a).  To identify a "foreign like product," Commerce will initially look for an identical product in the home market and match it to U.S. sales of the subject merchandise.  19 U.S.C. § 1677(16)(A).  In the absence of an identical product, Commerce looks for similar subject merchandise.  19 U.S.C. § 1677(16)(B)–(C).  Commerce uses a "model-match methodology," which is "based on a hierarchy of product characteristics that are commercially significant to the merchandise at issue[,]" to identify similar merchandise.  Maverick Tube Corp. v. United States, 39 CIT __, __, 107 F. Supp. 3d 1318, 1329 (2015) (citing JTEKT Corp. v. United States, 33 CIT 1797, 1805, 675 F. Supp. 2d 1206, 1218 (2009); Fagersta Stainless AB v. United States, 32 CIT 889, 893, 577 F. Supp. 2d 1270, 1276 (2008)).

Commerce's determination is supported by substantial evidence.  During verification, Commerce did not find any discrepancies between the pipe grade reported in respondents' sales databases and the grade listed on sales documentation memorializing customer orders.  See Verification of [HYSCO's] Sales Resps. at 10–11, PD 366, bar code 3299563-01 (Aug. 18, 2015) ("HYSCO's Verification Report"); Verification of [SeAH's] Sales Resps. at 8, PD 368, bar code 3300449-01 (Aug. 24, 2015). Commerce acknowledges that respondents' grade B and X42 pipe have similar

specifications.  Commerce explained, however, that certification requirements for the two

grades differ in minimum chemical composition and yield strength, and that the similarities

petitioners identified in tensile and yield strengths were based on "a small percentage" of

respondents' total period of investigation sales and did not justify recoding the grades.[25]

See Final Decision Memo at 34–35.  Further, Commerce did not find evidence of

respondents producing grade X42 pipe and stenciling it grade B pipe to manipulate the

model matching methodology.

Commerce's determination that grade B and grade X42 pipe are sufficiently

different to warrant separate codes is reasonable.  The relevant statutory scheme directs

Commerce to compare the CEP to the sales price of an identical or similar foreign like

product.  See 19 U.S.C. § 1677b(a); 19 U.S.C. § 1677(16)(A)–(C).  If there are no sales

of identical products in the home market, Commerce uses its model matching

methodology to match products in the U.S. and home market databases that share

commercially significant product characteristics.  For line pipe, pipe grade is a

commercially significant product characteristic.  See Prelim. Decision Memo at 10.  The

specifications for grade B pipe are different than those for grade X42 pipe and record

---

[25] Stupp et al. argue that SeAH's and HYSCO's mill test certificates represent an adequate sample size and demonstrate that respondents' subject merchandise meets the requirements of both grade B and grade X42 pipe.  See Stupp et al. Br. at 23–24.  However, even if Stupp et al. are correct, the mill test certificates only show that it is possible for specifications for grade B pipe to overlap with those for grade X42 pipe.  Stupp et al. have not proffered record evidence demonstrating that the existence of two separate grades is unreasonable and, in fact, agree that the two grades are properly part of Commerce's model matching methodology.  See id.  Instead, their challenge is prospective, i.e., given the similarities in specifications that make up the two grades, a respondent can misreport the grade of its pipe and manipulate the model matching methodology.  Id. at 17–23.  There is no evidence that respondents manipulated the stenciling of the subject merchandise here.

evidence does not support collapsing the grades.  Accordingly, to identify similar products

across the two databases, Commerce must be able to assign different codes to grade B

and X42 pipe.

### V. Inclusion of Certain "Local Sales" in HYSCO's Home Market Database

Maverick challenges Commerce's decision to include certain "local sales"

("challenged sales") in HYSCO's home market database as not in accordance with law

and unsupported by substantial evidence.  See Maverick's Br. at 12–35.  Specifically,

Maverick argues that Commerce's determination is not in accordance with law because

Commerce assessed HYSCO's actual knowledge, rather than its imputed knowledge, of

whether the challenged sales were for export.  See id. at 13–24.  Further, Maverick argues

that Commerce's determination is not supported by substantial evidence given the

circumstances of the sales.[26]    See id. at 24–35.   Defendant argues that Commerce

applied the correct standard, see Def.'s Resp. Br. at 17–22, and that substantial evidence

supports Commerce's decisions to include HYSCO's local sales in the home market

database.  See id. at 22–28.  For the reasons that follow, Commerce's decision is not in

accordance with law and is not supported by substantial evidence.

To calculate a dumping margin, Commerce compares a product's export price or

CEP in the United States with the normal value of the subject merchandise in the home

market.  19 U.S.C. § 1677b(a); 19 C.F.R.  § 351.401(a).  Normal value is

---

[26] Stupp et al. indicate that they support Maverick's arguments challenging Commerce's
determination that HYSCO properly classified the challenged sales.  See Stupp et al. Br. at 4 n.4.

> the price at which the foreign like product is first sold (or, in the absence of
> a sale, offered for sale) for consumption in the exporting country, in the
> usual commercial quantities and in the ordinary course of trade and, to the
> extent practicable, at the same level of trade as the export price or
> constructed export price[.]

19 U.S.C. § 1677b(a)(1)(B)(i).  The foreign like product is comparable merchandise sold

in the home market.  19 U.S.C. § 1677(16).  Commerce determines "if the producer knew

or had reason to know [that] the goods were for sale to an unrelated U.S. buyer, . . . the

producer's sales price will be used as [the] 'purchase price' to be compared with the

producer's foreign market value."    Trade Agreements Act of 1979, Statement of

Administrative Action, H.R. Doc. No. 96-153, Pt. II, at 411 (1979).  To determine whether

a sale is a home market sale, Commerce objectively assesses whether, given the

particular facts and circumstances, a producer would have known that the merchandise

will be sold domestically or for export.  See INA Walzlager Schaeffler KG v. United States,

21 CIT 110, 123–25, 957 F. Supp. 251, 263–64 (1997) (inquiring whether a producer

"knew or should have known that the merchandise was not for home consumption"), aff'd,

108 F.3d 301 (Fed. Cir. 1997), see also Allegheny Ludlum Corp. v. United States, 24 CIT

1424, 1433, 215 F. Supp. 2d 1322, 1330–31 (2000) (inquiring "if the producer 'knew or

should have known that the merchandise was . . . for home consumption based upon the

particular facts and circumstances of the case.'" (quoting INA, 21 CIT at 123–34, 957 F.

Supp. at 264)).  Commerce's review is not limited to documentation submitted by the

producer; it may review petitioner's submissions as well.  INA, 21 CIT at 124, 957 F. Supp.

at 264.  Commerce must diligently inquire into allegations of knowledge and render its

conclusion based on all relevant facts and circumstances.  See Allegheny Ludlum, 24 CIT

**PUBLIC VERSION**

at 1433–35, 215 F. Supp. 2d at 1330–33; <u>INA</u>, 21 CIT at 123–25, 957 F. Supp. at 263–

65; <u>Federal-Mogul Corp. v. United States</u>, 17 CIT 1015, 1019–22 (1993).

Commerce's conclusion that the challenged sales were home market sales fails to

address record evidence that the subject merchandise was exported without further

processing. Specifically, there is record evidence that the subject merchandise is ready

to be used "as is," was sold [[                                        ]], given VAT-free treatment, and

sold to customers who received shipment at facilities near ports. <u>See</u> [Maverick's] Case

Br. at 9–13, CD 433, bar code 3301963-01 (Sept. 1, 2015) ("Maverick's Agency Case

Br.") (citing [Maverick's] Comments on [ ] HYSCO's Suppl. Sec. D. Questionnaire at 11–

14, Exs. 9–22, CD 249–51, bar codes 3282792-01–03 (June 8, 2015) ("Maverick's

Comments")). There is also record evidence that at least some of the customers to whom

HYSCO made the challenged sales were not distributors, resellers, or owners of facilities

with the manufacturing capabilities necessary to further consume the subject

merchandise in the home market. <u>See</u> Maverick's Comments at 11–14, Exs. 4, 9–22.

This evidence suggests that HYSCO knew or should have known that the challenged

sales would be exported without further processing, and therefore must be addressed by

Commerce. Although Commerce addresses and explains why evidence that the

challenged sales were shipped to ports alone is not dispositive, Final Decision Memo at

47–48 (citing Issues & Decision Mem. for the Sixth [ADD] Administrative Review of

Certain Polyester Staple Fiber from [Korea], 72 ITADOC 73,764, (Dec. 3, 2007), at Cmt.

2), Commerce fails to confront the remaining evidence tending to detract from its

determination. <u>See</u> <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951) (noting

that "[t]he substantiality of evidence must take into account whatever in the record fairly

detracts from its weight.").

Commerce explains that HYSCO did not or could not have known that the

challenged sales would be exported without being further manufactured because HYSCO

did not prepare the export licenses and the challenged sales included sales to "at least

one customer that may [have] further manufacture[d] HYSCO's welded line pipe prior to

export." See Final Decision Memo at 45 (citations omitted).  Commerce appears to take

HYSCO's lack of actual knowledge, combined with the possibility of one of HYSCO's

customers further consuming the subject merchandise prior to export, as indicative that

HYSCO did not or could not have known that the challenged sales would be further

processed.  Yet, the sales to this one customer are not among the sales Maverick

challenges, see [Maverick's] Reply Br. at 6, Jan. 19, 2017, ECF No. 83 (citing HYSCO's

Verification Report at 8; Maverick's Agency Case Br. at 9–12), and even if they were,

Commerce has not explained why the existence of this one customer implies a lack of

knowledge when there is also evidence that another customer, whose sales Maverick

does challenge, were exported without being further manufactured.  See id.; HYSCO's

Verification Report at 8.

Commerce and Defendant suggest that any further inquiry as to the disposition of

the subject merchandise after it is delivered would create an unreasonable burden on the

respondents.  Final Decision Memo at 45–46; Def.'s Resp. Br. at 27.  The question is not

what the respondents must do, but what Commerce must do in assessing what the

respondents knew or should have known.  See Allegheny Ludlum, 24 CIT at 1433–35,

215 F. Supp. 2d at 1330–33; <u>INA</u>, 21 CIT at 123–25, 957 F. Supp. at 263–65; <u>Federal-Mogul Corp. v. United States</u>, 17 CIT 1015, 1019–22 (1993).  Commerce must diligently inquire into what the respondents knew or should have known and account for record evidence that detracts from its determination.  Commerce did not do so here.

Further, Commerce could have, but did not, request copies of letters of credit that may have provided details on the challenged sales.  Commerce explains that although it has reviewed letters of credit in past proceedings, such letters are not required under Korean law for a local sale to qualify for a VAT exemption and concluded that here such letters would likely not have been in HYSCO's control.  <u>See</u> Final Decision Memo at 48. Yet, Maverick points to record evidence that at least some of the letters would have been in HYSCO's control.  <u>See</u> Maverick's Br. at 33–34 (citing HYSCO's Verification Report at 8).  In light of such evidence, it is not clear to the court how Commerce could reasonably reach the conclusion it did without at least inquiring about the letters of credit.  On remand, Commerce may want to reopen the record to solicit relevant letters of credit or information related to such letters or further explain its determination.

### VI. Rejection of Maverick's Supplemental Case Brief

Maverick argues that Commerce abused its discretion when it rejected Maverick's September 8, 2015 supplemental case brief.  <u>See</u> Maverick's Br. at 35–43.  Defendant argues that Commerce's decision was in accordance with law and reasonable because Maverick's supplemental case brief raised issues that could and should have been addressed in its primary case brief to the agency.  <u>See</u> Def.'s Resp. Br. at 29–33. Defendant also argues that even if the arguments in Maverick's supplemental case brief

were timely raised, Commerce's determination regarding what HYSCO knew or should have known about certain local sales included in its home market database is supported by substantial evidence.  See id. at 33–35.  For the reasons that follow, Commerce's decision to reject Maverick's supplemental case brief was an abuse of discretion.

The court reviews Commerce's decision to reject corrective information for abuse of discretion.  See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1207 (Fed. Cir. 1995); see also Grobest & I-Mei Industrial (Vietnam) Co. v. United States, 36 CIT __, __, 815 F. Supp. 2d 1342, 1365 (2012).  Although Commerce has the discretion to set and enforce its own deadlines to ensure finality, it may abuse its discretion by rejecting information that would not be burdensome to incorporate and which would increase the accuracy of the calculated dumping margins.  See Grobest, 36 CIT at __, 815 F. Supp. 2d at 1365; see also NTN, 74 F.3d at 1207–08 (holding that Commerce abused its discretion where its decision not to use a "straightforward mathematical adjustment" to correct for certain clerical errors led to "the imposition of many millions of dollars in duties not justified under the statute.").

Commerce's decision was an abuse of discretion.  Commerce requested that HYSCO revise its home market and U.S. sales databases using information already on the record and submit the revised databases by August 31, 2015.  See [Letter from Commerce to HYSCO Requesting Certain Revisions] at 1, Attach., PD 367, bar code 3300336-01 (Aug. 24, 2015) ("Commerce's Letter Requesting Revisions") (explaining that the requested revisions are based on corrections previously presented to Commerce on July 15, 2015, July 29, 2015, and August 5, 2015).  Interested parties' case briefs were

due on September 1, 2015.  Petitioners' request for supplemental and rebuttal briefing

states that HYSCO's revisions to the databases would affect "a rather extensive number

of sales transactions" and that parties should be allowed to address "issues related to

changes made[.]"  [Petitioners'] Req. Suppl. Briefing Schedule at 1–2, PD 373, bar code

3301164-01 (Aug. 31, 2015) ("Petitioners' Req.").   Commerce granted the request,

allowing interested parties to address the "specific revisions made to the respondents'

sales databases" and for subsequent rebuttal briefing.  See Revision to Briefing Schedule,

PD 374, bar code 3301243-01 (Aug. 31, 2015) ("Revised Briefing Schedule").

Accordingly, Commerce allowed parties to address the effects of HYSCO incorporating

into the databases information that was already on the record.

The language of the revised briefing schedule must be read in light of petitioners'

request for supplemental and rebuttal briefing.   The revised briefing schedule was

established to accommodate petitioners' request to address issues arising out of the

revisions HYSCO made to an "extensive" number of sales in its sales databases.  See

Revised Briefing Schedule; Petitioners' Req.   By revising the briefing schedule,

Commerce implicitly recognized that HYSCO's revisions may affect the sales databases

as a whole and that interested parties may not be able to meaningfully address any such

effects in their initial case briefs.  Commerce also granted an opportunity for rebuttal,

which presupposes supplemental briefing offering analysis more meaningful than merely

cross-referencing the revisions made and reporting any clerical errors.  It does not make

sense for Commerce to provide rebuttal to identification of clerical errors.  If Commerce

wanted parties to review the revised databases for clerical errors, it should have been more specific in setting out the scope.

Commerce contends that Maverick's supplemental brief frequently commented on and cited to evidence that was on the record prior to HYSCO's submission of its revised databases. See [Commerce's Rejection of Maverick's Suppl. Case Br.] at 1, n.1, PD 407, bar code 3303866-01 (Sept. 9, 2015). However, in explaining what commentary would have been acceptable, Commerce includes "quantitative analysis commentary based on the specific database revisions[.]" [Commerce's Resp. to Maverick's Req. to Reconsider] at 2, PD 412, bar code 3304271-01 (Sept. 10, 2015). It is reasonable to expect that a revision to one field of a database can have implications for other entries/fields. To meaningfully address the revisions HYSCO made, interested parties must have been able to address how HYSCO's revisions affected the sales reported. Commerce cannot now claim that Maverick exceeded its scope for supplemental briefing by providing analysis on the effect HYSCO's revisions had on the databases. On remand, Commerce must review and place on the record those portions of Maverick's supplemental case brief that address the effect HYSCO's revisions had on the sales databases.

Defendant argues that, even if timely raised, the arguments in Maverick's supplemental case brief do not detract from the reasonableness of Commerce's determination to include certain local sales in HYSCO's home market sales database. See Def.'s Resp. Br. at 33–35. As explained above, to determine whether a respondent properly classified a sale as a home market sale Commerce must diligently inquire into what the respondent knew or should have known regarding the ultimate disposition of

that sale and address any record evidence that would detract from its determination. Here, Maverick's supplemental case brief advances arguments regarding what HYSCO knew or should have known about the ultimate disposition of the challenged sales.  See id.; Maverick's Br. at 39–43.  To the extent that these arguments arise as a result of the revisions HYSCO made to its sales databases and are relevant to what HYSCO knew or should have known about the challenged sales, Commerce must address them in its remand redetermination.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's decision to reject portions of SeAH's case brief is sustained; and it is further

**ORDERED** that Commerce's application of the differential pricing analysis is sustained; and it is further

**ORDERED** that Commerce's calculation of credit expenses on SeAH's back-to-back sales is sustained; and it is further

**ORDERED** that Commerce's decision not to collapse two grade codes for the purposes of model matching is sustained; and it is further

**ORDERED** that Commerce's decision to include certain local sales in HYSCO's home market sales database is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall review and determine which portions of Maverick's supplemental case brief should be retained, consistent with this opinion, and place those portions on the administrative record; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination.

   /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: January 8, 2019
     New York, New York