**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Claire R. Kelly, Judge**

|  |  |  |
|---|---|---|
| STUPP CORPORATION, IPSCO TUBULARS INC., and WELSPUN TUBULAR LLC USA, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| *and* | ) ) | |
| MAVERICK TUBE CORPORATION, | ) ) | |
| *Plaintiff-Intervenor,* | ) ) | |
| *v.* | ) ) | Consol. Court No. 15-00334 |
| UNITED STATES, | ) ) | |
| *Defendant,* | ) ) | |
| *and* | ) ) | |
| SEAH STEEL CORPORATION and HYUNDAI STEEL COMPANY, | ) ) ) | |
| *Defendant-Intervenors.* | ) ) | |

**WELSPUN TUBULAR LLC USA'S REPLY TO SEAH STEEL**
**CORPORATION'S COMMENTS ON THE REMAND REDETERMINATION**

Roger B. Schagrin
Jeffrey D. Gerrish
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W. Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for Welspun Tubular LLC USA*

Date:  August 15, 2022

*Only admitted in New York and New Jersey. Practice limited to matters before federal courts and agencies.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... ii

BACKGROUND AND PROCEDURAL HISTORY ................................................... 2

I.      Commerce's Final Determination in the Investigation ........................................ 2

II.     This Court's Decision in *Stupp I* ....................................................................... 4

III.    The Federal Circuit's Decision in *Stupp II* ........................................................ 5

IV.     Commerce's *Remand Redetermination* ............................................................ 6

ARGUMENT ........................................................................................................... 8

I.      Legal Standards .................................................................................................. 8

        A.      Standard of Review ................................................................................. 8

        B.      Framework for Determining the Appropriate Comparison Method to Calculate
                Dumping Margins ................................................................................... 8

II.     Commerce's *Remand Redetermination* Complies With the Remand Order, Is
        Supported By Substantial Evidence, and Is Otherwise In Accordance With Law ........... 11

III.    SeAH's Objections to Commerce's Use of the Cohen's *d* Test Are Unavailing ............. 18

        A.      The Court Should Disregard Certain Materials Cited in SeAH's Comments
                Because Judicial Review Is Limited to the Administrative Record ..................... 19

        B.      The Court Should Deny SeAH's Request for a Blanket Exception to the
                Exhaustion Requirement ........................................................................ 20

        C.      Commerce Reasonably Concluded That Normality, Sufficient Observation
                Size, and Roughly Equal Variances Relate to the Statistical Significance of
                Results Based on Sampled Data and Do Not Apply to Commerce's Use of the
                Cohen's *d* Test ................................................................................... 21

        D.      SeAH's Arguments Against Commerce's Use of Dr. Cohen's Large Threshold
                Are Baseless ........................................................................................ 24

        E.      The Reasons Why Prices Differ Significantly Among Purchasers, Regions, or
                Time Periods Are Not Relevant ............................................................... 25

F.     SeAH's Other Attempts to Discredit Commerce's Explanation Fail to Identify a True Flaw in the Ability of the Cohen's $d$ Test to Identify and Measure the Magnitude of Price Differences Among Purchasers, Regions, or Time Periods...26

CONCLUSION.................................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Apex Frozen Foods Private Ltd. v. United States,*
  862 F.3d 1322 (Fed. Cir. 2017)................................................................. 8-11, 27, 31

*Apex Frozen Foods Private Ltd. v. United States,*
  144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) ..................................................... 10-11

*Camp v. Pitts,*
  411 U.S. 138 (1973).........................................................................................19

*Chevron U.S.A., Inc. v. Natural Resources Defense Council,*
  467 U.S. 837 (1984)..........................................................................................9

*Corus Staal BV v. United States,*
  502 F.3d 1370 (Fed. Cir. 2007)..........................................................................20

*Daewoo Elec. Co. v. United States,*
  6 F.3d 1511 (Fed. Cir. 1993)........................................................................ 21-22

*Essar Steel, Ltd. v. United States,*
  753 F.3d 1368 (Fed. Cir. 2014)..................................................................... 20-21

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996) ............................................................................9

*JBF RAK LLC v. United States,*
  790 F.3d 1358 (Fed. Cir. 2015) .......................................................................9, 25

*JSW Steel (USA) Inc. v. United States,*
  466 F. Supp. 3d 1320 (Ct. Int'l Trade 2020) ........................................................20

*Kyocera Solar, Inc. v. United States,*
  253 F. Supp. 3d 1294 (Ct. Int'l Trade 2017) ..........................................................8

*Matsushita Elec. Indus. Co. v. United States,*
  750 F.2d 927 (Fed. Cir. 1984)...........................................................................22

*Mid Continent Steel & Wire, Inc. v. United States,*
  940 F.3d 662 (Fed. Cir. 2019)......................................................................15, 17

*Nan Ya Plastics Corp. v. United States,*
  810 F.3d 1333 (Fed. Cir. 2016).........................................................................23

*NSK Ltd. v. United States*,
190 F.3d 1321 (Fed. Cir. 2003)................................................................27

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012) ..................................................................9

*Qingdao Sea-Line Trading Co., Ltd. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014)................................................................20

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006)................................................................23

*Soc Trang Seafood Joint Stock Co. v. United States*,
321 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ............................................11

*Shanxi Hairui Trade Co. v. United States*,
39 F.4th 1357 (Fed. Cir. 2022) ................................................................10

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) ........................................................ *passim*

*Stupp Corp. v. United States*,
435 F. Supp. 3d 1307 (Ct. Int'l Trade 2020) ..............................................4

*Stupp Corp. v. United States*,
413 F. Supp. 3d 1326 (Ct. Int'l Trade 2019) ..............................................4

*Stupp Corp. v. United States*,
365 F. Supp. 3d 1373 (Ct. Int'l Trade 2019) ..............................................4

*Stupp Corp. v. United States*,
359 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ..........................................4-5

*Thai Pineapple Pub. Co. v. United States*,
187 F.3d 1362 (Fed. Cir. 1999)..................................................................9

*Tianjin Wanhua Co., Ltd. v. United States*,
179 F. Supp. 3d 1062 (Ct. Int'l Trade 2016) ............................................23

*Timken v. United States*,
240 F. Supp. 2d 1228 (Ct. Int'l Trade 2002) ............................................27

*Viraj Grp., Ltd. v. United States*,
343 F.3d 1371 (Fed. Cir. 2003)................................................................28

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
   968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014). ...............................................8

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...............................................................8

19 U.S.C. § 1516a(b)(2) .......................................................................19

19 U.S.C. § 1677b-1(a) .....................................................................27-28

19 U.S.C. § 1677f-1(d)(1)(A) ..................................................................8

19 U.S.C. § 1677f-1(d)(1)(B) .........................................................*passim*

19 U.S.C. § 3512(d) ...............................................................................17

28 U.S.C. § 2637(d) ..............................................................................20

**Regulations**

19 C.F.R. § 351.414(b) ...........................................................................3

19 C.F.R. § 351.414(c)(1) .....................................................................10

19 C.F.R. § 351.414(c)(2) .......................................................................8

**Federal Register Notices**

*Differential Pricing Analysis; Request for Comments*,
   79 Fed. Reg. 26,720 (Dep't Commerce May 9, 2014) .............................10

*Lightweight Thermal Paper from the People's Republic of China*,
   73 Fed. Reg. 57,329 (Dep't Commerce Oct. 2, 2008) ...............................28

*Notice: Change in Policy Regarding Currency Conversions*,
   61 Fed. Reg. 9,434 (Dep't Commerce Mar. 4, 1996) ..............................28

*Welded Line Pipe from the Republic of Korea*,
   80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) ......................*passim*

*Welded Line Pipe from the Republic of Korea*,
   80 Fed. Reg. 69,637 (Dep't Commerce Nov. 10, 2015) ..........................2-3

*Welded Line Pipe from the Republic of Korea and the Republic of Turkey*,
   80 Fed. Reg. 75,056 (Dep't Commerce Dec. 1, 2015) ................................................................3

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
   H.R. Rep. No. 103-316, vol. 1 (1994).................................................................................17, 29

Uruguay Round Agreements Act,
   Pub. L. No. 103-465, 108 Stat. 4809 (1994)................................................................................8

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Claire R. Kelly, Judge**

|  |  |  |
|---|---|---|
| STUPP CORPORATION, IPSCO TUBULARS INC., and WELSPUN TUBULAR LLC USA, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| *and* | ) ) | |
| MAVERICK TUBE CORPORATION, | ) ) | |
| *Plaintiff-Intervenor*, | ) ) | |
| *v.* | ) ) | Consol. Court No. 15-00334 |
| UNITED STATES, | ) ) | |
| *Defendant*, | ) ) | |
| *and* | ) ) | |
| SEAH STEEL CORPORATION and HYUNDAI STEEL COMPANY, | ) ) ) | |
| *Defendant-Intervenors*. | ) ) | |

**WELSPUN TUBULAR LLC USA'S REPLY TO SEAH STEEL
CORPORATION'S COMMENTS ON THE REMAND REDETERMINATION**

Welspun Tubular LLC USA ("Welspun Tubular") respectfully submits this reply to

comments filed by SeAH Steel Corporation ("SeAH") regarding the remand redetermination

issued by the U.S. Department of Commerce ("Commerce") in response to the Court's remand

order (ECF No. 192).[1] On remand, in accordance with instructions from this Court and the U.S.

Court of Appeals for the Federal Circuit ("Federal Circuit"), Commerce reviewed over a

---

[1]   SeAH's remand comments are hereinafter referred to as "SeAH's Comments" (ECF Nos.
216 and 217).

thousand pages of academic literature on the Cohen's *d* test and explained that while the statistical concepts of normality, sufficient observation size, and roughly equal variances are relevant when applying the Cohen's *d* test to sampled data to ensure the results are statistically significant, they are not relevant when Commerce applies the Cohen's *d* test to the entire universe of a respondent's U.S. sales to assess whether prices differ significantly. *See generally* Final Results of Remand Redetermination Pursuant to Court Remand, dated April 4, 2022, ECF No. 208-1 ("*Remand Redetermination*"). Welspun Tubular fully supports the *Remand Redetermination* and agrees with Commerce's explanation that its use of the Cohen's *d* test does not violate the assumptions that the literature on the record associates with statistical significance and research involving sampled data. SeAH continues to disagree with the end result but fails to satisfy the high bar of demonstrating that Commerce's methodological choice of using the Cohen's *d* test to determine whether prices differ significantly is an unreasonable exercise of the agency's discretion to fill the gap that Congress left in the statute. As demonstrated below, and contrary to SeAH's contentions, the *Remand Redetermination* complies with the remand order, is supported by substantial evidence, and is otherwise in accordance with law. Therefore, the Court should enter judgment sustaining the *Remand Redetermination*.

## BACKGROUND AND PROCEDURAL HISTORY

### I.   Commerce's Final Determination in the Investigation

This action stems from Commerce's affirmative final determination in the less-than-fair-value investigation of welded line pipe from the Republic of Korea. *See Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) ("*Final Determination*"), and accompanying Issues and Decision Memorandum ("IDM"), as amended by *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 69,637 (Dep't Commerce Nov. 10,

2015). In the investigation, Commerce used its differential pricing analysis to examine each respondent's pricing behavior for its sales of subject merchandise to the United States. The results of that analysis determined the appropriate method for comparing normal value to export price in the dumping margin calculations — either the default method that compares weighted-average normal values to weighted-average export prices and provides offsets for negative individual dumping margins (*i.e.*, the average-to-average or A-A method) or an alternative method that compares weighted-average normal values to the export prices of individual transactions and zeroes out negative individual dumping margins (*i.e.*, the average-to-transaction or A-T method). *See* 19 C.F.R. § 351.414(b).

For SeAH, the results of the differential pricing analysis confirmed that there existed a pattern of export prices that differed significantly among purchasers, regions, or time periods, and the default average-to-average comparison method could not account for that pattern of significant price differences. *See Final Determination* IDM at 4. Because 39.72 percent of the value of SeAH's U.S. sales passed the Cohen's *d* test, Commerce used the "mixed" alternative method to calculate SeAH's dumping margin. *Id.* In other words, it applied the average-to-transaction method to sales that passed the Cohen's *d* test and the average-to-average method to sales that did not. *Id.* Using this comparison method, Commerce calculated a 2.53 percent *ad valorem* weighted-average dumping margin for SeAH. *See Final Determination*, 80 Fed. Reg. at 61,367. On December 1, 2015, following the International Trade Commission's affirmative final material injury determination, Commerce published an antidumping duty order on welded line pipe from Korea. *See Welded Line Pipe from the Republic of Korea and the Republic of Turkey*, 80 Fed. Reg. 75,056 (Dep't Commerce Dec. 1, 2015). SeAH subsequently filed this action to

contest the *Final Determination* and challenged various aspects of the differential pricing analysis, including the Cohen's *d* test.

## II.   This Court's Decision in *Stupp I*

In its initial decision in this action, this Court denied SeAH's motion for judgment on the agency record and, in relevant part, held that Commerce's application of the differential pricing analysis was supported by substantial evidence and in accordance with law. *See Stupp Corp. v. United States*, 359 F. Supp. 3d 1293, 1302-06 (Ct. Int'l Trade 2019) ("*Stupp I*"). The Court explained that the differential pricing analysis "constitutes a reasonable methodology for identifying patterns of prices that differ significantly" and noted that both this Court and the Federal Circuit have upheld the steps underlying the analysis. *Id.* at 1304 and n.18. Addressing SeAH's specific arguments on Commerce's application of the Cohen's *d* test, the Court stated that "the relevant inquiry is not whether Commerce applies its differential pricing analysis in accord with experts' guidance on the use of Cohen's *d*" and concluded that SeAH had failed to explain why Commerce's application of the differential pricing analysis in the investigation was an unlawful or unreasonable way of implementing 19 U.S.C. § 1677f-1(d)(1)(B). *Id.* at 1305. SeAH subsequently filed a motion requesting reconsideration of *Stupp I*, which the Court denied because SeAH failed to demonstrate manifest error with the Court's reasoning for sustaining Commerce's application of the differential pricing analysis. *See Stupp Corp. v. United States*, 365 F. Supp. 3d 1373 (Ct. Int'l Trade 2019). After remanding the case back to Commerce two times on other issues, the Court issued its final judgment. *See Stupp Corp. v. United States*, 413 F. Supp. 3d 1326 (Ct. Int'l Trade 2019); *Stupp Corp. v. United States*, 435 F. Supp. 3d 1307 (Ct. Int'l Trade 2020).

### III.     The Federal Circuit's Decision in *Stupp II*

SeAH appealed *Stupp I* to the Federal Circuit. In its decision in that appeal, the Federal

Circuit recognized that "there is no statutory language telling Commerce how to detect patterns

of significantly differing export prices" and "Commerce therefore has discretion to determine a

reasonable methodology to implement the statutory directive." *Stupp Corp. v. United States*, 5

F.4th 1341 (Fed. Cir. 2021) ("*Stupp II*"). Applying the reasonableness standard, the Federal

Circuit affirmed the specific components of Commerce's differential pricing analysis (*i.e.*, the

Cohen's *d* test, the ratio test, and the meaningful difference test) as a reasonable methodological

choice to administer the antidumping duty law and assess whether the statutory preconditions to

calculate dumping margins using an alternative comparison method under 19 U.S.C. § 1677f-

1(d)(1)(B) are satisfied. *Id.* at 1351-1357. However, the Federal Circuit stated that SeAH's

arguments and statistical literature raise concerns "relating to Commerce's application of the

Cohen's *d* test in this case and, more generally, in adjudications in which the data groups being

compared are small, are not normally distributed, and have disparate variances." *Id.* 1357. Thus,

the only issue remaining in this action is with respect to one aspect of the differential pricing

analysis, the application of certain statistical concepts to the Cohen's *d* test.

According to the Federal Circuit, violating the assumptions of normality, sufficient

observation size, and roughly equal variances that the academic literature associates with the

Cohen's *d* test can subvert the usefulness of the test and produce an upward bias that results in

more sales passing the test. *Id.* at 1357-59. The Federal Circuit noted that Commerce relied on

the results of the differential pricing analysis (and the sales that passed the Cohen' *d* test) in

deciding to apply the mixed method to calculate SeAH's 2.53 percent weighted-average dumping

margin. *Id.* at 1360. Based on these concerns, the Federal Circuit remanded the case back to this

Court "to give Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." *Id.* at 1360. The Federal Circuit also "invite{d} Commerce to clarify its argument that having the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test." *Id.* Importantly, the Federal Circuit did not hold that Commerce's use of the Cohen's *d* test was unlawful. In fact, the Federal Circuit generally approved Commerce's use of "a conventional method for quantifying comparisons across discrete groups: counting the number of divergent sales prices, as identified by an effect-size test, and calculating the population percentage of those divergent sales prices." *Id.* at 1354. On October 8, 2022, the Federal Circuit issued its mandate (ECF No. 191), and this Court issued its order remanding the matter for Commerce to conduct further proceedings in conformity with *Stupp II* (ECF No. 192).

## IV.    Commerce's *Remand Redetermination*

On remand, Commerce reopened the record for the limited purpose of requesting SeAH to submit certain publications referenced by the Federal Circuit in *Stupp II* that were not on the administrative record. *See* Commerce Record Reopening Memo, Remand P.R. 1 (Oct. 29, 2021).[2] SeAH filed a 1,717-page submission with the requested materials. *See* SeAH Factual Information Submission, Remand P.R. 8 and Remand C.R. 12–24 (Nov. 12, 2021). Welspun

---

[2]    Citations to the public record documents are designated as "P.R." (public investigation record) or "Remand P.R." (public remand record). Citations to confidential record documents containing business proprietary information are designated as "C.R." (confidential investigation record) or "Remand C.R." (confidential remand record). Although we cite to confidential record documents to aid the Court in its review, this brief does not contain any business proprietary information.

Tubular subsequently filed a submission that provided excerpts of documents omitted from the public version of SeAH's submission. *See* Welspun Tubular Submission to Rebut, Clarify, or Correct SeAH Factual Information, Remand P.R. 13 (Nov. 19, 2021). Commerce released its draft redetermination and invited interested parties to comment. *See* Draft Results of Redetermination, Remand P.R. 14 (Mar. 8, 2022). In response to requests from SeAH, Commerce extended the deadline for interested parties to submit comments on the draft redetermination until March 21, 2022. *See* Commerce First Extension Memo, Remand P.R. 19 (Mar. 11, 2022); Commerce First Extension Memo Clarification, Remand P.R. 20 (Mar. 12, 2022); and Commerce Second Extension Memo, Remand P.R. 22 (Mar. 15, 2022).

On April 4, 2022, after considering comments submitted by SeAH and Welspun Tubular, Commerce filed its *Remand Redetermination* with the Court. Commerce concluded that the academic materials referenced in *Stupp II* "address circumstances which are outside of the context in which Commerce utilizes its Cohen's *d* test." *Remand Redetermination* at 10. Specifically, the assumptions of normality of distribution, number of observations, and homogeneity of variances "are relevant when using a sample of data to ensure that the sample statistically represents the entire population of data (*i.e.*, the statistical significance of the analysis)." *Id.* As explained throughout the *Remand Redetermination*, Commerce examines the entire population of a respondent's U.S. sales when it applies its differential pricing analysis and calculates the actual effect size using the Cohen's *d* test in less-than-fair-value investigations. The remand also fully addressed SeAH's objections to Commerce's use of the Cohen's *d* test. *See id.* at 33-64. The *Remand Redetermination* made no changes to SeAH's 2.53 percent weighted-average dumping margin.

## ARGUMENT

## I.      Legal Standards

### A.      Standard of Review

The standard of review requires that the Court sustain any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law" 19 U.S.C. § 1516a(b)(1)(B)(i). This standard applies equally to remand redeterminations. *See, e.g.*, *Kyocera Solar, Inc. v. United States*, 253 F. Supp. 3d 1294, 1305 (Ct. Int'l Trade 2017) (applying the same standard of review for a less-than-fair-value investigation to a remand redetermination). Remand redeterminations are also reviewed for compliance with the Court's remand order. *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

### B.      Framework for Determining the Appropriate Comparison Method to Calculate Dumping Margins

In general, the statute provides that Commerce will calculate dumping margins in antidumping duty investigations using the average-to-average method.[3] 19 U.S.C. § 1677f-1(d)(1)(A). The average-to-average method has been the norm for investigations since Congress passed the Uruguay Round Agreements Act. *See Apex Frozen Foods Pvt. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017); *see also* Section 229 of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). However, the statute provides for Commerce to use the average-to-transaction method in an investigation as an alternative to the average-to-average method if certain statutory conditions are met. Specifically, the average-to-

---

[3]      The statute also provides the option to use the transaction-to-transaction comparison method (*i.e.*, comparing the normal values of individual transactions to the export prices of individual transactions), but this method is used only in "unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made." 19 C.F.R. § 351.414(c)(2).

transaction method may be used if "(i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the average-to-average or transaction-to-transaction methods}." 19 U.S.C. § 1677f-1(d)(1)(B). The statute permits the use of the average-to-transaction method to uncover "targeted" or "masked" dumping. *Apex*, 862 F.3d at 1341-42. If the two statutory preconditions are satisfied, "Commerce's decision to consider applying the average-to-transaction method is within its discretionary power." *Stupp II*, 5 F.4th at 1351-52.

As the Federal Circuit has recognized, "there is no statutory language telling Commerce how to detect patterns of significantly differing export prices." *Stupp II*, 5 F.4th at 1354. By not specifying a methodology, Congress "left a gap for {Commerce} to fill." *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). When "a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests," Commerce "may perform its duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (internal quotations omitted). It is well-established that Commerce has the discretion to choose a reasonable methodology to assess whether the statutory criteria under 19 U.S.C. § 1677f-1(d)(1)(B) are satisfied. *Id.*; *Apex*, 862 F.3d at 1345-46. Indeed, Commerce is owed "tremendous deference" because it is the "master of antidumping law" and has expertise in the "complex economic and accounting decisions of a technical nature" required to administer the statute. *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (quoting *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999), and *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996)). The methodology Commerce ultimately adopts is presumed to be

correct. *Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357, 1361 (Fed. Cir. 2022). Thus, Commerce has wide latitude in choosing a methodology, and the chosen methodology must be upheld so long as the choice is a reasonable means of implementing the statute.

Commerce's implementing regulation states that the average-to-average comparison method will be used "unless {Commerce} determines another method is appropriate in a particular case." 19 C.F.R. § 351.414(c)(1). The regulation does not specify which methodology should be used to determine whether to apply the average-to-average or average-to-transaction comparison method under 19 U.S.C. § 1677f-1(d)(1)(B). Instead, Commerce has chosen to conduct the analysis on a case-by-case basis, and Commerce's methodological approach has evolved over time. *Apex Frozen Foods Private Ltd. v. United States*, 144 F. Supp. 3d 1308, 1320 (Ct. Int'l Trade 2016) ("Commerce's approach to uncovering dumping has developed, and continues to develop, over time as foreshadowed by the Supreme Court in *Chenery*."); *see also id.* at n.13 (summarizing the methodologies previously used to address targeted dumping).

For nearly a decade, Commerce's differential pricing analysis has been used in less-than-fair-value investigations as a way to decide whether a respondent's dumping margin should be determined using the default average-to-average or the alternative average-to-transaction method. *Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (Dep't Commerce May 9, 2014) (announcing the development of the differential pricing analysis and its application in the 2013 xanthan gum investigations). Commerce has explained the mechanics of its differential pricing analysis each time it has been applied. *Final Determination* IDM at 7-26. This Court and the Federal Circuit also have provided a detailed description of the analysis. *See, e.g.*, *Apex*, 144 F. Supp. 3d at 1322-37; *Stupp II*, 5 F.4th at 1346-48. The differential pricing analysis is a statutorily consistent and statistically sound methodology that has generally been

upheld. *See, e.g., Stupp II*, 5 F.4th at 1351-57; *Apex*, 144 F. Supp. 3d at 1314-37, *aff'd*, 862 F.3d

1337 (Fed. Cir. 2017); *Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329,

1335-41 (Ct. Int'l Trade 2018).

## II.   Commerce's *Remand Redetermination* Complies With the Remand Order, Is Supported By Substantial Evidence, and Is Otherwise In Accordance With Law

Commerce complied with the Court's order directing Commerce to conduct further

proceedings in conformity with the Federal Circuit's decision in *Stupp II*. ECF No. 192. The

Federal Circuit generally approved the specific components of Commerce's differential pricing

analysis as a reasonable methodological approach to address 19 U.S.C. § 1677f-1(d)(1)(B). *Stupp*

*II*, 5 F.4th at 1351-57. As the Federal Circuit stated:

> At the highest level of abstraction, Commerce is using a conventional method for quantifying comparisons across discrete groups: counting the number of divergent sales prices, as identified by an effect-size test, and calculating the population percentage of those divergent sales prices. We hold that general approach to be reasonable.

*Id.* at 1354. However, based on certain statistical literature on the Cohen's *d* test introduced by

SeAH in the court proceedings, the Federal Circuit expressed concerns with Commerce's

application of the Cohen's *d* test as a preliminary step in the differential pricing analysis to

identify whether and, if so, the extent to which a respondent's prices in the United States differ

among purchasers, regions, or time periods. *Id.* at 1357-60. The Federal Circuit did not hold that

Commerce's use of the Cohen's *d* test was unlawful. Rather, the Federal Circuit remanded the

case for Commerce "to explain whether the limits on the use of the Cohen's *d* test prescribed by

Professor Cohen and other authorities were satisfied in this case or whether those limits need not

be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." *Id.* at

1360. The *Remand Redetermination* reasonably explains that the latter is the case with respect to

Commerce's use of the Cohen's *d* test in less-than-fair-value investigations and that it did not

depart from the statistical literature's description of the appropriate application of the Cohen's *d* test.

In accordance with this Court's order, Commerce conducted the remand proceeding in conformity with the Federal Circuit's decision in *Stupp II*. Specifically, Commerce reopened the record to allow consideration of the academic literature on the Cohen's *d* test that the Federal Circuit referenced in its decision. Commerce Memo Reopening Record, Remand P.R. 1 (Oct. 29, 2021). The requested publications were submitted on the remand record by SeAH and Welspun Tubular. *See* SeAH Factual Information Submission, Remand P.R. 8 and Remand C.R. 12–24 (Nov. 12, 2021); Welspun Tubular Submission to Rebut, Clarify, or Correct SeAH Factual Information, Remand P.R. 13 (Nov. 19, 2021). After considering the new materials on the record and interested party arguments, Commerce concluded that normality, observation size, and homogeneity of variances are statistical concepts that are relevant only when applying the Cohen's *d* test to sampled data to ensure that the calculation of the *estimated* effect size is statistically significant. *See Remand Redetermination* at 10-33. Conversely, these statistical concepts are not relevant when the Cohen's *d* test is used to calculate the *actual* effect size based on the full population of a respondent's U.S. sales. In other words, normality, sufficient observation size, and equal variances are "limits {that} need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." *Stupp II*, 5 F.4th at 1360.

Citing to the academic literature on the record, Commerce addressed the distinction between statistical and practical significance (*Remand Redetermination* at 11-14), the importance of examining the entire universe of data rather than a sample (*id.* at 14-16), the usefulness of Dr. Cohen's thresholds to interpret effect size and the extent of price differences (*id.* at 16-19), the academic materials cited by the Federal Circuit in *Stupp II* on the assumed parameters associated

with the Cohen's *d* test (*id.* at 19-25), and the Federal Circuit's specific concerns on prices in a test group that "hover around the same value." *Id.* at 25-33. Each of these topics is discussed in more detail below to demonstrate that Commerce's explanation on remand is supported by substantial evidence and sufficiently addresses the Federal Circuit's concerns regarding Commerce's use of the Cohen's *d* test.

First, Commerce explained that the differential pricing analysis "uses the Cohen's *d* test to measure the *practical* significance of the difference in the actual real-world pricing, rather than *statistical* significance." *Id.* at 12 (emphasis in original). A statistically significant result means that the difference in the pricing is unlikely to be the result of chance, and a "t-test" is one way to measure statistical significance to test whether the null hypothesis is false. *See id.* (citing publications by Dr. Cohen and Dr. Ellis at Remand P.R. 13). On the other hand, practical significance refers to "the difference between the means of the two sets of data, as measured by an 'effect size' such as the Cohen's *d* coefficient." *Id.* Practical significance is "a true measure of the significance of the difference." *Id.* (citing publication by Professor Coe at Remand P.R. 8). As Commerce explained, statistical significance and practical significance are "independent of one another." *Id.* at 14. Statistical significance is frequently discussed in conjunction with effect size calculations because, in the world of statistical science, effect size generally is an estimated calculation based on a sample of data from a larger population. Calculating the actual effect size based on an entire population is usually not feasible. *See id.* at 13. Accordingly, "{w}hen the results of the analysis are based on sample-based observations, a researcher must consider the statistical significance of the results along with the practical significance of the results." *Id.* In contrast, the Cohen's *d* test used in the differential pricing analysis "relies on the entire universe

or population of sales, which obviates the need for an analysis of statistical significance and the related underlying statistical criteria." *Id.* at 14.

Second, as instructed by the Federal Circuit, Commerce "clarif{ied} its argument that having the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test." *Stupp II*, 5 F.4th at 1360. Commerce explained that the statute requires it "to consider, when addressing the pattern requirement, the pricing behavior to the test group separate from the pricing behavior to the comparison group." *Remand Redetermination* at 15. The test group and the comparison group each include "separate populations of sales prices" that are not sampled and instead represent "all of the sales of the comparable merchandise to each group." *Id.* This means that "the sales to each of these two groups, the test and comparison group, themselves constitute the full population of data in the context of the calculation of the mean, standard deviation, and Cohen's *d* coefficient for the purpose of the pattern requirement." *Id.* Normal distribution, sufficient observations, and equal variances are criteria "related to the statistical significance of sampled data and establish the reliability of an estimated parameter (*e.g.*, mean) based on the sample data to be within a determined confidence interval of the actual parameter." *Id.* There is an inherent risk of error when calculating an estimate based on sampled data. But when the Cohen's *d* test is used as part of Commerce's differential pricing analysis, there is no risk of error because "the calculated parameters are the parameters of the entire population and not an estimate of the parameters based on a sample." *Id.* at 16. Said differently, "the means, standard deviations, and Cohen's *d* coefficients calculated for SeAH are not estimates with confidence levels or sampling errors associated with sampled data, but, rather, are the actual values which describe SeAH's pricing behavior." *Id.* Whether the Cohen's *d* test is applied to a sample or a full population of data is

important because statistical significance (and the associated concepts of normality, sufficient observation size, and equal variances) comes into play only when estimating effect size based on sampled data. Commerce's use of the Cohen's *d* test to calculate the actual effect size based on the entire universe of a respondent's U.S. sales does not violate the assumptions that relate to the test's application to sampled data.

Third, Commerce addressed why Dr. Cohen's thresholds are useful to interpret the effect size and the extent of the price differences in the differential pricing analysis. *Id.* at 16-19. Commerce observed that the Federal Circuit has previously held that the large 0.8 threshold is a reasonable measure to identify significant price differences. *Id.* at 16 (citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673 (Fed. Cir. 2019)); *see also Stupp II*, 5 F.4th at 1356-57 (referencing *Mid Continent* as controlling precedent and declining to reconsider the reasonableness of selecting 0.8 as the cutoff to determine which sales pass the Cohen's *d* test). The live issue with respect to the 0.8 threshold in this case is narrow. In *Stupp II*, the Federal Circuit expressed a concern that the 0.8 threshold may be rendered meaningless if the Cohen's *d* test is used in a manner that does not observe the assumptions of normality, sufficient observation size, and equal variances. *See* 5 F.4th at 1360. In the *Remand Redetermination*, Commerce explained that Dr. Ellis, a professor of statistical research methods who has authored publications on effect size and the Cohen's *d* test, regards Dr. Cohen's thresholds as one of three ways to interpret effect size and has stated that Dr. Cohen's thresholds are widely accepted. *See Remand Redetermination* at 17 (citing publication by Dr. Ellis at Remand P.R. 13). The statistical literature does not tie the usefulness of the thresholds to the criteria for statistical significance that apply to sampled data. As the *Remand Redetermination* correctly points out, Dr. Cohen's thresholds are "derived from real-world observations," and the 0.8 threshold has been

described as "the difference in IQ of a PhD graduate and a college freshman, the difference in IQ between a college graduate and a student with only a 50-50 chance of passing high school, or the difference in height between 13 and 18 year-old girls." *Id.* at 18 (citing publications by Dr. Cohen and Dr. Ellis at Remand P.R. 8 and Remand P.R. 13). For this reason, Commerce concluded that the thresholds (including the large 0.8 threshold) are an acceptable way to measure the extent of the price differences and identify sales with prices that differ significantly.

Fourth, Commerce reviewed the statistical literature specifically referenced in *Stupp II* and confirmed that the assumptions of normality, sufficient observation size, and equal variances concern the application of the Cohen's *d* test to sampled data and need not be followed when Commerce uses the Cohen's *d* test to examine a respondent's entire dataset of sales to the United States. *See id.* at 19-25.  Commerce reached this conclusion because each of the cited publications (*i.e.*, publications authored by Dr. Cohen, Dr. Grissom, Professor Coe, Dr. Lane, Dr. Algina, and Dr. Li at Remand P.R. 8 and Remand P.R. 13) discuss the assumptions in the context of sample data analysis and an estimation of effect size rather than calculating the actual effect size using the entire population of data. *See id.* This interpretation of the evidence is reasonable and should not be disturbed. Commerce further explained that there can be no concerns with bias results (whether upward or downward) and potential false-positives when effect size is calculated based on the entire population. *See Remand Redetermination* at 22-25.

Finally, Commerce addressed why its use of the Cohen's *d* test is not problematic even in the Federal Circuit's hypothetical scenario where there is a small number of observations and little variance in the prices in the test and comparison groups. *See Remand Redetermination* at 25-33; *see also Stupp II*, 5 F.4th at 1359. As Commerce explained, the hypothetical presupposes that there is a problem (*i.e.*, bias or false positives) with Commerce's use of the Cohen's *d* test

16

because it does not adhere to the conditions that apply to sample data analysis. *See Remand Redetermination* at 26. But again, "Commerce's application of the Cohen's *d* test does not rely on sampled data or on estimated parameters, but rather calculates the actual parameters, including the Cohen's *d* coefficient, of the U.S. prices which reflects the actual measure of the significance of the difference in prices between the test and comparison groups." *Id.* at 28. Congress has not defined "significantly" as that term is used in 19 U.S.C. § 1677f-1(d)(1)(B), and Commerce has reasonably filled that gap in the statute by defining significance based on the results of the Cohen's *d* test, a generally recognized statistical measure of effect size, and the test's widely-accepted large 0.8 threshold that signifies a grossly perceptible difference. *Id.* at 30. This interpretation recognizes that "there are many possible definitions of significance ranging from qualitative to quantitative measures." *Id.* It also takes into account the possibility that, as explained in the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, "small differences may be significant for one industry or one type of product." H.R. Rep. No. 103-316, vol. 1, at 843, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ("SAA"); *see also* 19 U.S.C. § 3512(d) (regarding the SAA as an authoritative interpretation and application of the antidumping duty law). The Federal Circuit previously has endorsed Commerce's rationale that "even a small absolute difference in the means of the two groups can be significant (for the present statutory purpose) if there is a small enough dispersion of prices within the overall pool as measured by a proper pooled variance or standard deviation." *Mid Continent*, 940 F.3d at 673. As Commerce explained, the "overall premise" of effect size is that "the significance of the difference between the means of the two groups is based on the variation of the underlying data," and "as the variance of either or both the test and comparison groups is made smaller and

smaller, the denominator will be reduced and the calculated effect size will increase." *Remand Redetermination* at 26 n.90.

Commerce also emphasized that the Cohen's *d* test is a preliminary step in the analysis and that the existence of significant price differences alone does not result in the application of an alternative comparison method in the dumping margin calculations. *See Remand Redetermination* at 30-33. In fact, Commerce found that it applied the alternative average-to-transaction method to roughly 20 percent of all respondents with calculated rates in final determinations issued in calendar year 2015 (the year of the *Final Determination*) and calendar year 2021 (the most recent calendar year prior to the *Remand Redetermination*). *See id.* at 32 and Attach. 1. Thus, the frequency with which Commerce applies some form of the average-to-transaction method indicates that the Cohen's *d* test is not finding significant price differences where none exist and does not result in artificially inflated dumping margins.

For all of these reasons, Commerce has sufficiently addressed the Federal Circuit's concerns and reasonably explained that the statistical concepts of normality, sufficient observation size, and equal variances do not need to be followed when the Cohen's *d* test is used as part of the differential pricing analysis in less-than-fair-value investigations.  The Court should sustain the *Remand Redetermination* because it complies with the remand order, is supported by substantial evidence, and is otherwise in accordance with law.

## III.    SeAH's Objections to Commerce's Use of the Cohen's *d* Test Are Unavailing

Although SeAH disagrees with Commerce's explanation on remand and would prefer a recalculated dumping margin without any application of the average-to-transaction method, SeAH has failed to demonstrate that Commerce's explanation was inadequate or that it failed to address the Federal Circuit's concerns in *Stupp II* about the reasonableness of using the Cohen's

*d* test to identify whether a respondent's prices differ significantly among purchasers, regions, or time periods. For the reasons set forth below, the Court should reject each of SeAH's arguments and sustain the *Remand Redetermination*.

> ### A.   The Court Should Disregard Certain Materials Cited in SeAH's Comments Because Judicial Review Is Limited to the Administrative Record

As an initial matter, SeAH's comments discuss certain materials that were not on the administrative record of the investigation or any of the remand proceedings. Specifically, Welspun Tubular has identified the following portions of SeAH's comments that discuss non-record evidence:

- Page 7 and footnote 18:
    - Hedges and Olkin, *Overlap Between Treatment and Control Distributions as an Effect Size Measure in Experiments*, 21:1 PSYCHOLOGICAL METHODS 61 (2016)
    - Huberty and Lohman, *Group Overlap as a Basis for Effect Size*, 60:4 EDUCATIONAL AND PSYCHOLOGICAL MEASUREMENT 543 (2000)
- Pages 8-9 (including block quote) and footnote 22:
    - Ricca and Blaine, *Notes on a Nonparametric Estimate of Effect Size*, 90:1 JOURNAL OF EXPERIMENTAL EDUCATION 249 (2022)
    - 1 *Oxford Handbook of Quantitative Methods* 388 (2013)
- Page 12 (including block quote) and footnotes 32 and 33:
    - J. Cohen, *A Power Primer*, 112:1 PSYCHOLOGICAL BULLETIN 155 (1992)
- Page 25 and footnote 53:
    - F. Alvarez, A. Atkeson, and P. Kehoe, *If Exchange Rates Are Random Walks, Then Almost Everything We Say About Monetary Policy is Wrong*, FEDERAL RESERVE BANK OF MINNEAPOLIS RESEARCH DEPARTMENT STAFF REPORT (2007).

None of these materials are on the record before the Court. In fact, SeAH's citations to these materials do not include any reference to a public or confidential record document.

The Court's review is limited to the administrative record before Commerce. *See* 19 U.S.C. § 1516a(b)(2); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("{T}he focal point for judicial review should be the administrative record already in existence, not some new record

made initially in the reviewing court."); *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014) ("Our review is limited to the record before Commerce in the particular review proceeding at issue and includes all evidence that supports or detracts from Commerce's conclusion."). SeAH has not asserted any reason why the Court should go beyond the administrative record and consider these materials in its review of the *Remand Redetermination*. Indeed, SeAH has not shown that the record is in any way incomplete or alleged that bad faith or improper behavior on the part of the Government requires supplementation of the record. *See JSW Steel (USA) Inc. v. United States*, 466 F. Supp. 3d 1320, 1328-29 (Ct. Int'l Trade 2020). Therefore, the Court should disregard any portion of SeAH's comments that discuss non-record materials.

### B. The Court Should Deny SeAH's Request for a Blanket Exception to the Exhaustion Requirement

SeAH requests the Court to grant it a blanket exception to the statutory requirement to exhaust administrative remedies. *See* SeAH's Comments at 5-6. In doing so, SeAH concedes that it is raising not just one but numerous arguments for the first time before this Court.[4] Counsel for Welspun Tubular is not aware of any case in which this Court previously has granted a litigant such a broad exception to the statutory requirement to exhaust all administrative remedies. *See* 28 U.S.C. § 2637(d). Generally, this Court takes a "strict view" of the exhaustion requirement in cases that challenge Commerce's antidumping duty determinations. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). There are limited exceptions to the exhaustion requirement, such as when "the party had no opportunity to raise the issue before the agency." *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014) (internal

---

[4]   In the sections below, we directly respond to SeAH's substantive arguments and identify which specific arguments SeAH failed to exhaust at the administrative level.

quotations omitted). SeAH does not claim that it had no opportunity to raise its arguments but merely complains that it had insufficient time to prepare its comments on the draft remand redetermination despite receiving extensions of time to do so. Absent a showing that one of the few and narrow exceptions applies to *each* unexhausted argument, the Court should take a strict view of the exhaustion doctrine and decline to address arguments that SeAH did not properly raise at the agency level.

    **C.**    **Commerce Reasonably Concluded That Normality, Sufficient Observation Size, and Roughly Equal Variances Relate to the Statistical Significance of Results Based on Sample Data and Do Not Apply to Commerce's Use of the Cohen's *d* Test**

As demonstrated above, Commerce reasonably concluded that while the statistical concepts of normality, sufficient observation size, and roughly equal variances are relevant when applying the Cohen's *d* test to sampled data to ensure the estimated effect size is statistically significant, they do not need to be followed when Commerce applies the Cohen's *d* test to the entire universe of a respondent's U.S. sales in less-than-fair-value investigations. SeAH asserts that Commerce has not identified anything in the statistical literature on the record that addresses the application of the Cohen's *d* test to an entire population of data. SeAH's Comments at 6-10. SeAH's argument suggests that Commerce's choice in methodology to fill a gap in the statute is reviewed for substantial evidence. However, the Federal Circuit stated that "the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence." *Stupp II*, 5 F.4th at 1353.

Further, in arguing that Commerce's explanation is not supported by the factual record, SeAH demands more than what substantial evidence requires. The substantial evidence standard asks "'whether the evidence *and reasonable inferences from the record*'" support the agency's conclusion. *See Daewoo Elec. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quoting

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)) (emphasis

added). Commerce drew a reasonable inference from the evidence on the record in concluding

that the limits that exist to ensure that a sample statistically represents the entire population need

not be followed when the entire population (and not a sample) is being examined.

      Dr. Ellis has explained that "'{t}he best way to measure an effect is to conduct a census

of an entire population but this is seldom feasible in practice.'" *Remand Redetermination* at 13

(quoting publication by Dr. Ellis at Remand P.R. 13). Because it typically is not possible to

measure effect size in what Dr. Ellis described as the best way by applying a test like the

Cohen's *d* test to an entire population of data, it is not surprising that the statistical publications

on the record provide guidance to researchers regarding the proper methods for estimating effect

size based on sampled data. In assessing the record, Commerce observed that the publications

discuss the parameters of normality, sufficient observation size, and roughly equal variances in

the context of statistical significance and estimations of effect size based on a representative

sample of data from a larger population. Commerce then made a logical and reasonable inference

that the parameters to estimate effect size using sampled data do not apply when the Cohen's *d*

test is used to calculate actual effect size based on an entire population as Commerce does in its

differential pricing analysis. On the other hand, as Commerce stated, "SeAH seeks to impose

limitations that exist to ensure that a sample accurately estimates the entire population in the

context of the Cohen's *d* test that Commerce applies to the entire population of U.S. prices." *Id.*

at 51-52. The limitations that SeAH seeks to impose do not apply here, and Commerce's

conclusion to this effect is supported by the record evidence and reasonable inferences that

Commerce drew from the record evidence. SeAH has not demonstrated otherwise.

SeAH also states, in a footnote, that it is questionable whether Commerce uses the Cohen's *d* test to examine the entire population of data rather than a sample. *See* SeAH's Comments at 7 n.18. SeAH failed to exhaust its administrative remedies by not including this argument in its comments filed with Commerce on the draft remand redetermination. *See Remand Redetermination* at 49-50 ("{T}he U.S. price data used in the Differential Pricing Analysis generally, and in the Cohen's *d* test specifically, include the full population of U.S. sales prices. SeAH has not contested this fact, let alone provided evidence or argument to the contrary."); *see also Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1350 (Fed. Cir. 2016) (applying the exhaustion doctrine and requiring appellant to raise argument in administrative draft remand comments). Further, it is well-settled that substantive arguments raised in footnotes are deemed waived. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006); *see also Tianjin Wanhua Co., Ltd. v. United States*, 179 F. Supp. 3d 1062, 1067 (Ct. Int'l Trade 2016) ("{T}he court does not entertain substantive arguments raised in footnotes."). Regardless, SeAH is wrong on the merits of this argument because Commerce explained that "the sales to the test group and the sales to the comparison group are not sampled and each constitutes separate populations of sales prices, each of which represents all the sales of the comparable merchandise to each group." *Remand Redetermination* at 15. For example, when examining sales by time period, the test group includes the entire population of sales made during the first quarter and the comparison group includes the entire population of sales made during the other three quarters of the period being examined. Thus, Commerce applies the test to the full population of a respondent's prices for both groups. *Id.* at 49.

### D. SeAH's Arguments Against Commerce's Use of Dr. Cohen's Large Threshold Are Baseless

Commerce addressed the specific concern the Federal Circuit raised regarding Dr. Cohen's thresholds and explained why it is appropriate for Commerce to use them to interpret the effect size and the magnitude of the price differences identified by the Cohen's *d* test in the differential pricing analysis. *See id.* at 16-19. SeAH maintains, however, that Dr. Cohen's thresholds were developed to be used with normal distributions and that Commerce has not justified its use of the thresholds with non-normal data in the differential pricing analysis. *See* SeAH's Comments at 10-11. In so doing, SeAH seeks to impose a limit on the use of the thresholds where none exists.

Commerce explained that "Dr. Cohen specified no limitations for the use of his proposed thresholds to the interpretation of the calculated value of effect size." *Remand Redetermination* at 52. The thresholds were derived from real-world observations and not based on a statistical analysis or mathematical calculation as SeAH suggests. Dr. Cohen illustrated the differences between the thresholds by using differences in IQ and height purely as examples. Contrary to SeAH's contentions, by using IQ and height as illustrative examples, Dr. Cohen did not in any way limit the usefulness of the thresholds as "rules-of-thumb designed for use with heights and IQs and other Normally-distributed data." SeAH's Comments at 15. Dr. Cohen explained that the thresholds are relative and serve as operational definitions. *See Remand Redetermination* at 52 (citing publication by Dr. Cohen at Remand P.R. 13). For example, the large threshold used by Commerce in the differential pricing analysis represents a "grossly perceptible" difference. *Id.* Thus, SeAH's assertion that Commerce was required to "point to some reason for expecting

SeAH's prices to have the same inherent characteristics as the height and IQ data considered by Professor Cohen" is without merit. SeAH's Comments at 14.

E.    **The Reasons Why Prices Differ Significantly Among Purchasers, Regions, or Time Periods Are Not Relevant**

Without citing to any authority, SeAH asserts that the statute requires Commerce to "distinguish between differences that have meaning and those that arise by chance." SeAH's Comments at 21. In the *Remand Redetermination*, Commerce explained that "{i}f the respondent's prices to purchaser A differ significantly as a matter of 'practical significance' from prices to all other purchasers, neither the statute nor academic literature require an additional step of demonstrating an element of causation." *Remand Redetermination* at 46-47. The Federal Circuit has already ruled that 19 U.S.C. § 1677f-1(d)(1)(B) does not require, as a precondition to the application of the alternative average-to-transaction method, that Commerce "determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods." *JBF RAK*, 790 F.3d at 1368. Simply put, Commerce is under no obligation to determine whether the significant price differences identified by the Cohen's *d* test may have occurred by chance or at random.

Commerce went a step further and explained that the price differences for SeAH could not be the result of chance, stating that "{a} company's pricing behavior is foundationally based on corporate strategies and goals, including maximizing profit, within the bounds of supply and demand in the marketplace." *Remand Redetermination* at 45. SeAH itself reported that it was heavily involved in market research, and, thus, its sales prices reflect the company's market research and deliberative pricing decisions. *Id.* SeAH casts Commerce's explanation as "woefully simplistic" but also seemingly concedes that the company's prices are the outcome of SeAH's negotiations with its customers. *See* SeAH's Comments at 23. SeAH states that the

25

negotiations may be affected by "random factors," but none of the cited factors are truly random. They are more accurately characterized as factual circumstances surrounding the negotiation process that inform the purchaser's decision to buy and the seller's decision to sell. Ultimately, SeAH decides to sell subject merchandise at the negotiated price. SeAH also fails to recognize the importance of the fact that Commerce used the Cohen's *d* test to examine the entire population of SeAH's U.S. sales. The resulting Cohen's *d* coefficient is the actual measure of effect size, not an estimation. The bottom line is that "there is no chance that these results are somehow inaccurate or unrepresentative of SeAH's U.S. pricing behavior." *Remand Redetermination* at 50.

> **F.    SeAH's Other Attempts to Discredit Commerce's Explanation Fail to Identify a True Flaw in the Ability of the Cohen's *d* Test to Identify and Measure the Magnitude of Price Differences Among Purchasers, Regions, or Time Periods**

SeAH claims that "evidence on the record *confirms* that SeAH's net U.S. prices (as calculated by Commerce for use in its Cohen's *d* analysis) were directly affected by at least one random factor." SeAH's Comments at 24. Specifically, SeAH argues that Commerce converted prices using daily exchange rates between the Korean Won and U.S. dollar, and "random fluctuations in exchange rates would necessarily have an impact on the observed U.S. prices, even if the respondent were to set its prices at a fixed and inflexible level that did not vary by customer, time period, or region." *Id.* at 25. SeAH is making this argument for the first time before this Court despite having an opportunity to raise the issue before Commerce in its comments on the draft remand redetermination. By failing to exhaust its administrative remedies, SeAH has waived the argument.

Nonetheless, SeAH's hypothetical scenario is of no moment because exchange rates do not represent a random factor. Commerce acknowledged that some factors, such as exchange

rates, may not be controlled by the seller but explained that these factors remain relevant because they are used for determining the net U.S. price in dumping calculations and should also be used for determining the net U.S. price in the differential pricing analysis. *See Remand Redetermination* at 59. In other words, it makes sense to make the same adjustments to the U.S. price for the differential pricing analysis that would need to be made in the dumping calculations. The Federal Circuit has found a similar explanation reasonable in affirming the meaningful difference test. *See Apex*, 862 F.3d at 1349 ("At the very least, we cannot say that Commerce's meaningful difference analysis is unreasonable—intuitively, an analysis that compares the methodologies as they would ultimately be applied 'makes sense.'"). SeAH's hypothetical scenario also does not constitute actual evidence that Commerce's application of the Cohen's *d* test in the underlying investigation was distortive and unreasonable. *See NSK Ltd. v. United States*, 190 F.3d 1321, 1328 (Fed. Cir. 2003); *Timken v. United States*, 240 F. Supp. 2d 1228, 1236 (Ct. Int'l Trade 2002). SeAH reported the gross unit prices for its sales in U.S. dollars, and while it was necessary to convert certain expenses from Korean Won to U.S. dollars (*e.g.*, movement expenses incurred in Korean Won), SeAH does not assert that the sales prices and all other necessary adjustments to the sales prices were identical such that the currency conversion actually had the effect that SeAH describes in its hypothetical. *See* SeAH's Section C Questionnaire Response at 20 and Appendix C-2, P.R. 121 (Feb. 2, 2015) (explaining that the gross unit price per metric ton for each U.S. sale reflects the actual invoice amount in U.S. dollars).

SeAH also argues that Commerce violated 19 U.S.C. § 1677b-1(a) because the differential pricing analysis did not ignore fluctuations in the exchange rates. *See* SeAH's Comments at 28. Again, SeAH did not raise this specific argument in its draft remand comments

submitted to Commerce and thus failed to exhaust its administrative remedies. If the Court ultimately decides to consider the issue, which it should not, Commerce complied with the requirement that foreign currencies be converted into U.S. dollars "using the exchange rate in effect on the date of sale of the subject merchandise." 19 U.S.C. § 1677b-1(a); *see also Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1377-78 (Fed. Cir. 2003). The statute does state that "{f}luctuations in exchange rates shall be ignored," but Commerce has specified the scenarios where fluctuations in daily exchange rates exist and should be ignored. *See Notice: Change in Policy Regarding Currency Conversions*, 61 Fed. Reg. 9,434 (Dep't Commerce Mar. 4, 1996); *Lightweight Thermal Paper from the People's Republic of China*, 73 Fed. Reg. 57,329 (Dep't Commerce Oct. 2, 2008), and accompanying Issues and Decision Memorandum at Comment 6. SeAH has not explained why it is the case that during the period of investigation the daily exchange rate between the Korean Won and the U.S. dollar involves the type of fluctuation that should be ignored. Accordingly, SeAH has not demonstrated that Commerce's currency conversions in determining the U.S. prices for purposes of the differential pricing analysis were inconsistent with the statute.

Using an example of one customer and one product that passed the Cohen's *d* test in Commerce's calculations for SeAH in the *Final Determination*, SeAH argues that an "examination of SeAH's actual prices in this case demonstrates that Commerce has found a 'large' effect even when the price differences are not visually discernible" and that "{v}isual inspection of the actual individual sales prices … does not reveal any actual pattern by customer." SeAH's Comments at 15 and 18. SeAH misunderstands the purpose for which Commerce uses the Cohen's *d* test in its differential pricing analysis. As Commerce explained, "Commerce applies the Cohen's *d* test to determine whether prices differ significantly." *Remand*

28

*Redetermination* at 54. To determine the existence of a pattern, Commerce uses "a different test, the ratio test, which assesses whether the extent of prices that differ significantly constitute a pattern." *Id.* These two distinct components of the differential pricing analysis work in tandem to address the statutory criteria under 19 U.S.C. § 1677f-1(d)(1)(B)(i).

And SeAH is wrong that the Cohen's *d* test generated a "false-positive" when it examined SeAH's sales of control number 1-03-03-06-1 to customer 102020 and to all other customers. SeAH conducts no statistical analysis whatsoever and concludes based on a subjective eye test that the prices to customer 102020 are "clustered precisely in the middle of the prices for sales of that product to other customers." SeAH's Comments at 18. The Cohen's *d* test determines whether price differences are significant in relation to the variances of the individual sales prices within the test and comparison groups:

> The concept of effect size takes into account the language of the SAA, which states Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another. When the variation in prices is used to gauge whether the difference in prices is significant, then the yardstick used to measure the difference are the prices themselves. When there is a large variation in the prices within the groups of prices, then it requires a larger difference in the mean prices to find that the difference is significant than if the variation in the prices within the groups of prices were small, which would require a smaller difference in the mean prices to find the same level of significance. Thus, the difference is measured specific to the industry, product, and the individual company because it is based on the prices of the industry, product, and company themselves whose difference is being gauged.

*Remand Redetermination* at 55 (internal quotations and footnotes omitted). SeAH's example using the prices to customer 102020 simply shows that whether price differences are found to be significant under the Cohen's *d* test depends on the variances of the prices in each of the two populations being compared. Where the variances are small, this means that a small difference in the means will be considered more significant. SeAH states that the difference is not even visible

to the naked eye but does not deny that there are fluctuations in SeAH's sales prices. *See* SeAH's Comments at 19. Commerce uses the Cohen's *d* test and Dr. Cohen's thresholds to interpret the data and objectively assess whether the price fluctuations among customers are significant or insignificant. The difference in the weighted-average prices in SeAH's example was found to be significant (*i.e.*, the Cohen's *d* coefficient exceeded the 0.8 large threshold) based on the variance of the sales prices to customer 102020 and the variance of the sales prices to other customers. SeAH has not shown that Commerce's application of the Cohen's *d* test in this case led to unreasonable results.

Additionally, despite SeAH's contentions, Commerce's use of the Cohen's *d* test does not generate "false-positives" because "{t}he analysis involves the entire population and does not involve samples or estimates." *Remand Redetermination* at 59. SeAH overlooks that Commerce uses the Cohen's *d* test to calculate the *actual* effect size using the entire population of a respondent's U.S. sales rather than an *estimation* of effect size based on sampled data. *Id.* As Commerce explained, "the means, standard deviations, and Cohen's *d* coefficients calculated for SeAH are not estimates with confidence levels or sampling errors associated with sampled data, but, rather, are the actual values which describe SeAH's pricing behavior." *Id.* at 16. Accordingly, the entire premise of SeAH's arguments that "false-positives" may contribute to the decision to use the alternative average-to-transaction methodology is fundamentally flawed. *See* SeAH's Comments at 30-33.

Finally, SeAH contests Commerce's analysis of the investigations from 2015 and 2021 and the conclusion that the alternative average-to-transaction method has been applied to roughly 20 percent of all respondents with calculated rates. SeAH offers its own analysis of investigations from 2015 through 2021 to argue that "the effect of the {differential pricing

analysis} varied considerably from year to year, with the usage of alternative comparisons

peaking at 48.57 percent in 2017." *Id.* at 34. SeAH had the opportunity to submit its rebuttal

analysis in its comments on the draft remand redetermination, but it failed to do so. *See Remand*

*Redetermination* at 61. In any event, when looking at the totals for 2015 through 2021 rather than

any individual year, SeAH's table summary shows that Commerce applied some form of the

average-to-transaction method to less than 25 percent of respondents with calculated rates (70

out of 288). *See* SeAH's Comments at 34. This percentage is consistent with Commerce's

analysis of investigations in 2015 and 2021.

SeAH also states that "Commerce's use of the {differential pricing analysis} transformed

*de minimis* dumping margins into affirmative determinations of dumping in more than 50 percent

of the investigations in which there would have been a negative determination under the A-to-A

methodology." *Id.* at 35. This statement appears to be a collateral attack on the meaningful

difference test, which must fail because this specific component of the differential pricing

analysis is not an issue before the Court and the Federal Circuit has already ruled that the

meaningful difference test is reasonable. *See Apex*, 862 F.3d at 1346. If there is a meaningful

difference because the margin calculated using the average-to-average method is *de minimis* and

the margin calculated using the average-to-transaction method crosses the *de minimis* threshold,

then the average-to-average method is unable to uncover the masked dumping that was occurring

as revealed by the average-to-transaction method. The margin is not "transformed" from *de*

*minimis* to non-*de minimis* in these scenarios. SeAH's analysis of past investigations shows that

the results of the differential pricing analysis drive which comparison method should be used to

determine a respondent's dumping margin. However, the analysis does not identify any flaw in

the Cohen's *d* test and its ability to determine whether prices differ significantly.

31

## <u>CONCLUSION</u>

For the foregoing reasons, Commerce's *Remand Redetermination* complies with the Court's remand order, is supported by substantial evidence, and is otherwise in accordance with law. Accordingly, Welspun Tubular respectfully requests that the Court sustain the *Remand Redetermination*.

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin
Jeffrey D. Gerrish
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for Welspun Tubular LLC USA*

Date:  August 15, 2022

*Only admitted in New York and New Jersey. Practice limited to matters before federal courts and agencies.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing reply contains 9,655 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated: August 15, 2022                    /s/ Roger B. Schagrin
                                          Roger B. Schagrin

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Claire R. Kelly, Judge**

| | |
|---|---|
| STUPP CORPORATION, IPSCO TUBULARS INC., and WELSPUN TUBULAR LLC USA,  )<br><br>*Plaintiffs*,  )<br><br>*and*  )<br><br>MAVERICK TUBE CORPORATION,  )<br><br>*Plaintiff-Intervenor*,  )<br><br>*v.*  )<br><br>UNITED STATES,  )<br><br>*Defendant*,  )<br><br>*and*  )<br><br>SEAH STEEL CORPORATION and HYUNDAI STEEL COMPANY,  )<br><br>*Defendant-Intervenors*.  ) | Consol. Court No. 15-00334 |

**<u>ORDER</u>**

Upon consideration of the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 208-1, the comments opposing the remand redetermination filed by SeAH Steel Corporation, the responses thereto filed in support of the remand redetermination, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the remand redetermination is sustained; and it is further

**ORDERED** that judgment is entered in favor of the United States.

**SO ORDERED**.

_____

Honorable Claire R. Kelly, Judge
U.S. Court of International Trade

Dated: _____, 2022
            New York, New York