IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE
_____

|  |  |  |
|---|---|---|
| STUPP CORPORATION ET AL., | ) | |
| | ) | |
| Plaintiffs and Consolidated Plaintiffs, | ) | |
| | ) | Consol. Court No. 15-00334 |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SEAH STEEL CORPORATION AND HUYNDAI | ) | |
| STEEL COMPANY, | ) | |
| | ) | |
| Defendant-Intervenors and Consolidated | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

## **ORDER**

Upon consideration of the Department of Commerce's final redetermination pursuant to remand, parties' comments, defendant's response, and all other pertinent papers, it is hereby

ORDERED that the Department of Commerce's remand redetermination is sustained in all respects.


Dated: _____, 2022          _____
          New York, New York                                JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
)
STUPP CORPORATION ET AL.,                 )
)
    Plaintiffs and Consolidated Plaintiffs,   )
)    Consol. Court No. 15-00334
               v.                  )
)
UNITED STATES,                            )
)    **<u>PUBLIC VERSION</u>**
            Defendant,             )
)
            and                    )
)
SEAH STEEL CORPORATION AND HUYNDAI )
STEEL COMPANY,                            )
)
    Defendant-Intervenors and Consolidated    )
    Defendant-Intervenors.                    )
_____)

## DEFENDANT'S RESPONSE TO
## <u>COMMENTS REGARDING THE REMAND REDETERMINATION</u>

 

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

<u>s/Claudia Burke</u>
CLAUDIA BURKE
Assistant Director

OF COUNSEL:

<u>s/Robert Ralph Kiepura</u>
ROBERT RALPH KIEPURA
Trial Attorney
MYKHAYLO GRYZLOV        Commercial Litigation Branch
Senior Counsel

Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Tel.: (202) 305-4436
Fax: (202) 353-0461
Email: Robert.kiepura@usdoj.gov


August 15, 2022

Attorneys for Defendant

## TABLE OF CONTENTS

BACKGROUND ....................................................................................................2

ARGUMENT ........................................................................................................2

I. Commerce Provided An Explanation As To Why The Limitations Discussed In Academic Articles Need Not Be Observed When Commerce Uses The Cohen's *d* Test In A Less-Than-Fair-Value Investigation.................................4

II. SeAH's Arguments Provide No Basis for Reversal.........................................9

    A. The Court Should Reject SeAH's Attempt To Introduce New Arguments And New Evidence That SeAH Did Not Present to Commerce ...................................................................................................9

    B. SeAH Conflates The Concepts of Statistical and Practical Significance ......12

    C. SeAH's Criticism of Dr. Cohen's Thresholds Is Misguided ........................18

    D. SeAH's Assertions Regarding The Lack of Discernable Price Differences Are Unsupported And Provide No Basis For Reversal .............20

    E. Neither the Statute Nor Commerce's Practice Require Commerce To Engage In Statistical Analysis In Determining If Prices Differ Significantly ..................................................................................................24

    F. SeAH's Hypotheticals Are Unpersuasive....................................................28

    G. SeAH's Arguments Regarding The Results Of The Application of The Differential Pricing Methodology Are Flawed ...........................................29

CONCLUSION....................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Beker Indus. Corp. v. United States*,
  7 C.I.T. 313 (Ct. Int'l Trade 1984) ...................................................................... 11

*Boomerang Tube LLC v. United States*,
  856 F.3d 908 (Fed. Cir. 2017) ............................................................................ 27

*Home Products Int'l Inc. v. United States*,
  633 F.3d 1369 (Fed. Cir. 2011) .......................................................................... 11

*JBF RAK LLC v. United States*,
  790 F.3d 1358 (Fed. Cir. 2015) ..................................................................... 25, 26

*Mid Continent Steel & Wire, Inc. v. United States,*
  940 F.3d 662 (Fed. Cir. 2019) ............................................................................ 18

*Mid Continent Steel & Wire, Inc. v. United States*,
  No. 21-1747, at 40 (Fed. Cir. 2021) ................................................................... 19

*Mittal Point Lisas Ltd. v. United States*,
  548 F.3d 1375 (Fed. Cir. 2008) ..................................................................... 10, 27

*Russello v United States*,
  464 US 16 ............................................................................................................ 24

*Stupp Corp. v. United States*,
  5 F.4th 1341 (Fed. Cir. 2021) ...................................................................... *passim*

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ............................................................................................. 4

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ............................................................................................ 29

**Statutes**

19 C.F.R. § 351.309(c)(2) ....................................................................................... 27

19 U.S.C. § 1516a(a)(2)(B) ..................................................................................... 11

19 U.S.C. § 1675(a) ................................................................................................. 11

19 U.S.C. § 1677b-1(a) ........................................................................................... 28

19 U.S.C. § 1677f-1................................................................................................ *passim*

19 U.S.C. § 1677f-1(a)................................................................................... 18, 25

19 U.S.C. § 1677f-1(b) .................................................................................. 18, 25

19 U.S.C. § 1677f-1(d)(1)(B)...............................................................18, 19, 24, 25

19 U.S.C. § 1677f-1 (d)(1)(B)(i) ............................................................................ 3

28 U.S.C. § 2637(d)............................................................................................ 27

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

|  |  |  |
|---|---|---|
| STUPP CORPORATION ET AL, | ) | |
| | ) | |
| Plaintiffs and Consolidated Plaintiffs, | ) | |
| | ) | Consol. Court No. 15-00334 |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SEAH STEEL CORPORATION AND HUYNDAI | ) | |
| STEEL COMPANY, | ) | |
| | ) | |
| Defendant-Intervenors and Consolidated | ) | |
| Defendant-Intervenors. | ) | |
| _____ | ) | |

## DEFENDANT'S RESPONSE TO
## COMMENTS REGARDING THE REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to comments of plaintiff,

SeAH Steel Corporation (SeAH), concerning the Department of Commerce's (Commerce)

redetermination in this case, which addresses the U.S. Court of Appeals for the Federal Circuit's

decision in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) (*Stupp*). *Final Results of*

*Redetermination Pursuant to Court Remand*, dated April 4, 2022 (P.R.R. 33),[1] Dkt. No. 208

(*Remand Redetermination*).

For the reasons we explain below, this Court should sustain Commerce's *Remand*

*Redetermination*.

---

[1] P.R.R. stands for public remand record; C.R.R. stands for confidential remand record; P.R. and C.R. stand for public record and confidential record of the underlying investigation, respectively.

PUBLIC VERSION

## BACKGROUND

In *Stupp*, the Federal Circuit affirmed this Court's decision to sustain Commerce's final determination in the less-than-fair-value investigation with respect to most of SeAH's challenges to Commerce's analyses. *Stupp Corp. v. United States*, 5 F.4th at 1344. The Federal Circuit, however, remanded "the issue of whether it was reasonable for Commerce to apply a portion of its analysis – specifically, the 'Cohen's *d* test' – to sales data that may have been of insufficient size, not normally distributed, and lacking roughly equal variances." *Id*. In its opinion, the Federal Circuit relied on certain academic articles, which were not on the administrative record, and remanded for Commerce to "explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." *Id*. at 1360. In that regard, the Federal Circuit expressly invited "Commerce to clarify its argument that having the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test." *Id*.

Following remand, on April 4, 2022, Commerce issued its final results of redetermination and filed it with this Court.[2] *See Remand Redetermination.*

## ARGUMENT

Commerce's *Remand Redetermination* fully complies with the Court's order, is supported by substantial evidence, and is in accordance with law. On remand, Commerce explained that the three assumptions or limitations that SeAH claims must apply to the use of the

---

[2] For a full description of the proceedings on remand, we refer the Court to our previous Second Partial Consent Motion to Extend the Time Within Which to File the Remand Results. ECF No. 206 at 2-5.

Cohen's *d* test arise in the context of an analysis that uses samples and serve to ensure that the estimated values calculated based on a sample accurately represents the actual parameter values of the broader complete population of observations. *Remand Redetermination* at 51-52. Such limitations are unnecessary, however, when Commerce's "Cohen's *d* test" uses the entire population of relevant observations rather than a sample of that entire population. *Id*. Thus, these statistical limitations, which are the basis for statistical inferences of the estimated values are not relevant to Commerce's analysis because the analysis is based on the entire population of data as opposed to a sample of such data. *Id*.

The statute, 19 U.S.C. § 1677f-1 (d)(1)(B)(i), directs Commerce to determine whether prices differ significantly among purchasers, regions or time periods. Commerce's analysis determines the practical significance of price differences based on the measure of the effect size by comparing two groups of prices. *Remand Redetermination* at 12-14. The analysis encompasses the entire population of sales of comparable merchandise to each group. Accordingly, when Commerce uses the Cohen's *d* test in its differential pricing analysis, there is no estimate of parameters (mean, standard deviation, and effect size). *Id*. at 15-16. Rather, Commerce calculates the *actual* rather than *estimated* parameters of two groups of sale prices and compares them using the conservative threshold that was derived from the real word observations and "is grossly perceptible and therefore {represents} large differences." *Remand Redetermination,* at 18 (quoting Cohen, Jacob, *Statistical Power Analysis for the Behavior Sciences*, Second Edition, Lawrence Erlbaum Associates (1988) (*Cohen*), at 27).

There is no logical, mathematical, or legal reason to use the assumptions/limitations discussed in academic literature outside of the context of sampling, where such limitations are designed to apply. As discussed in detail below, Dr. Cohen's power analysis considers two

factors: statistical significance and practical significance. Statistical significance is designed to ensure that any observed differences between the test and control groups are not the result of sample error or statistical noise. Practical significance measures whether differences have any real-world meaning. Thus, any concerns regarding sampling only apply to the statistical analysis portion of the calculation. In other words, there is no concern regarding sampling error or randomness when the entire universe of data is being considered. But the practical significance calculation is still valid and necessary. Accordingly, the Court should defer to the agency's technical expertise with respect to this methodological issue and sustain Commerce's reasonable explanation. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009).

I.    **Commerce Provided An Explanation As To Why The Limitations Discussed In Academic Articles Need Not Be Observed When Commerce Uses The Cohen's *d* Test In A Less-Than-Fair-Value Investigation**

On appeal, the Federal Circuit sustained the majority of Commerce's final determination in the less-than-fair-value investigation. *Stupp Corp. v. United States*, 5 F.4th at 1344. However, the Court remanded a portion of the decision "to give Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." *Id.* Following the Federal Circuit's remand, this Court remanded the decision to Commerce to effect the Federal Circuit's instructions. ECF No. 192.

On remand, Commerce explained that the "purpose of the Cohen's *d* test is to evaluate the extent by which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise." *Remand Redetermination* at 10. As a component of the differential pricing analysis, the "Cohen's *d* test evaluates the extent to

which the net prices to a particular purchaser, region, or time period differ from the net prices of all other sales of comparable merchandise." *Id.* at 41.

To determine whether the average price of the comparable merchandise in the test group is significantly different from the average price of comparable merchandise in the comparison group, Commerce uses the "Cohen's *d* coefficient." *Remand Redetermination* at 11. The "Cohen's *d* coefficient is a recognized measure of effect size which gauges the extent of the difference between the means of two groups" and that it "'quantifies the size of the difference between two groups, and may therefore be said to be a true measure of the significance of the difference.'" *Remand Redetermination* at 11 (internal citation omitted).

There are two separate concepts and measurements when analyzing whether the means of two sets of data are different. *Id.* The first measurement, "when these two sets of data are samples of a larger population, is whether this difference is statistically significant" and it "will determine whether this difference rises above the sampling error (or in other words, noise or randomness) in selecting the sample." *Id.* at 12. The second measurement "is whether there is a practical significance of the difference between the means of the two sets of data, as measured by an 'effect size' such as the Cohen's *d*." *Id.*

According to Dr. Ellis, statistically significant and practically significant results are not the same: "A statistically significant result is one that is unlikely to be the result of chance. But a practically significant result is meaningful in the real world." *Id.* (quoting Ellis, Paul D., *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results*, Cambridge University Press, 2010 (*Ellis*)(P.R.R 15; C.R.R. 8)). Dr. Ellis states:

> It is quite possible, and unfortunately quite common, for a result to be statistically significant and trivial. It is also possible for a result to be

statistically nonsignificant and important.  Yet scholars, from PhD candidates to old professors, rarely distinguish between the statistical and the practical significance of their results.

*Id.* at 13 (*quoting Ellis,* at 4 (P.R.R 15; C.R.R. 8).

When effect size is applied in a situation that involves samples, certain assumptions or limitations must be satisfied to ensure that the difference between two samples is statistically significant, in other words, it "rises above the sampling error (or in other words, noise or randomness) in selecting the sample." *Id.* at 12. The assumptions or limitations discussed in the academic literature referenced in the *Stupp* decision appear in the context of sampling. *Id.* at 15-16. The three assumptions or limitations at issue—the sufficient number of observations, normality of distribution, and the degree of variance in a sample—ensure that the sample represents a broader population with a reasonable degree of probability. *Id.* at 13. When the results of the analysis are based on sampled observations, the analysis must consider the statistical significance of the results. *Id.* In other words, that the results based on the sample are not a reflection of noise, randomness, or sampling error, but, rather, accurately represent the broader population. *Id.* In addition, results based on sampled observations must also consider the practical significance of the results. *Id.* at 12, 15-16.

In contrast, when the analysis is based on the entire population of relevant data, as is the case here, no samples, potential sampling errors, or estimates of effect sizes are involved. *Id.* at 15-16. Accordingly, there is no need to consider the statistical significance. *Id.* The effect size, which is measured by the Cohen's *d* test, is the basis for Commerce's determination of whether prices in a test group differ significantly from prices in a comparison group. *Remand Redetermination* at 12. When the entire population is considered, Commerce uses the *actual* effect size in its analysis rather than an *estimate* of the effect size that was based on samples. *Id.*

at 14.  It is critical to understand that Commerce's differential pricing analysis uses the Cohen's *d* test to measure the *practical* significance of the difference in the actual real-world pricing, rather than *statistical* significance.  *Id*. at 12.

Effect size, as used in Commerce's Cohen's *d* test, is well-suited to such tasks to determine whether prices differ significantly.  As discussed earlier, "the purpose of the Cohen's *d* test is to determine the significance of the difference in the prices between a given purchaser, region, or time period and all other sales of the comparable merchandise." *Remand Redetermination* at 17.  The "Cohen's *d* coefficient is calculated as the ratio of the difference in the mean prices of the test and comparison groups, and the variance of the underlying prices, such that the variance serves as the 'yardstick' by which to measure the significance of the difference." *Id*.  Commerce further explained that Dr. Cohen established thresholds for evaluating the magnitude of the effect size which are "easy to grasp" and "are sufficiently grounded in logic for Cohen to hope that his cut-offs 'will be found to be reasonable by reasonable people.'" *Id*. (quoting Ellis at 32).  These thresholds "are derived from real-world observations where the observed effect size is 0.2, 0.5 or 0.8 and are not dependent on the statistical criteria cited by the CAFC." *Id*. at 17-18.  In its analysis, Commerce uses the largest 0.8 threshold for effect size, as a conservative standard, "to determine that the observed price differences are significant since this threshold is 'grossly perceptible and therefore {represents} large differences.'" *Id*. at 18 (quoting Cohen, at 27).  Commerce could have also used the medium 0.5 threshold as it "is conceived as one large enough to be visible to the naked eye," however, "Commerce elected to use the most conservative, large threshold to provide the strongest evidence that the observed prices differed significantly." *Id*.

Because these thresholds are operational and not based on a statistical analysis, the concerns about the statistical criteria do not undermine the usefulness of the thresholds. *Id.*

There is no logical or mathematical reason for applying the limitations discussed in the context of statistical samples (which are dependent upon certain statistical assumptions) in a situation where Commerce calculates the exact *actual* mean and standard deviation of each test and comparison group based on the entire population of relevant observations. If the entire population of relevant observations is considered, it is irrelevant whether prices in each comparison group satisfy the statistical criteria. For example, if an exporter made only two sales of a particular product to a particular customer during the period of investigation, all sales of this product to this customer will be necessarily limited to only two observations or sales. The mean of the sale prices to such customer is mathematically accurate and precise and is not an estimate based on a subset—a sample—of the prices to that customer. Similarly, the mean of the sale prices to a customer with two hundred observations is just as accurate and precise as the mean price to the customer with two observations, as neither value is an estimate of the mean price to either customer but represents the actual value of that parameter for each customer. The statistical significance of the mean price calculated for either customer is not relevant because the calculated value is not an estimate of the actual value of the mean of the full population of sale prices. The mean represents an average price charged by the exporter to a particular customer, which is compared to an average price charged to all other customers.

Commerce compares the mean of the two sale prices to this customer to the mean of all other sale prices of comparable merchandise to all other customers to determine whether there is a significant difference between the means of these two groups of prices. *Remand Redetermination* at 12, 14-15. Both means are mathematically accurate and contain no

distortions. *Id.* at 65. The significance of the difference in these two means, when gauged relative to the actual standard deviations of the same two populations of sale prices—the calculated Cohen's *d* coefficient—is interpreted based on a conservative threshold derived from real-world observations, which is "grossly perceptible and therefore {represents} large differences." *Id.* at 18 (quoting Cohen, at 27). SeAH has articulated no logical, mathematical, or legal reason that requires Commerce to apply assumptions or limitations underlying the use of samples in a completely different context, where samples are not used. Because Commerce's explanation is reasonable, this Court should defer to the agency's expertise and sustain Commerce's explanation.

## II. **SeAH's Arguments Provide No Basis for Reversal**

### A. **The Court Should Reject SeAH's Attempt To Introduce New Arguments And New Evidence That SeAH Did Not Present to Commerce**

SeAH asks that "if the Court were to find that certain arguments were not 'exhausted' before the agency, we request that the Court exercise its discretion to permit those arguments to be presented." *Id.* SeAH complains that if it failed to make arguments to Commerce, it was because the "less than two weeks to prepare and submit its comments on Commerce's draft" was insufficient *Id.*

The record evidence demonstrates that SeAH received sufficient time to comment on Commerce's draft results of redetermination. First, there is no requirement either in the statute or Commerce's regulations to provide interested parties with a specific amount of time to comment on a draft redetermination. Second, Commerce provided SeAH with a reasonable amount of time that is commensurate with the length of Commerce's analysis. The draft redetermination was released on March 8, 2022, and consisted of 33 pages of narrative (including 24 pages of analysis and 9 pages of background information) and referenced two one-

page attachments that listed Commerce's prior determinations in calendar years 2015 and 2021.

P.R.R. 14; P.R.R. 16.  The agency set the deadline for submitting comments on the draft

redetermination as March 15, 2022.  *Id.* at 33.  Commerce extended the deadline for submitting

comments until 10 a.m. on Monday, March 21, 2022, which was only seven hours less than

SeAH requested in its last extension request.  *Compare* P.R.R. 21 *with* P.R.R. 22; *see also* ECF

No. 206, at 2-5.

  SeAH had ample opportunity to submit comments and, in fact, submitted extensive

comments to the agency within the extended time limit.  Moreover, unlike other interested

parties and Commerce—which had to review a large volume of new factual information that

SeAH had submitted in support of its argument—SeAH did not need to familiarize itself with the

new factual information that SeAH referenced in its brief to the Federal Circuit and subsequently

submitted on the record during the remand.  By SeAH's own admission, the only information

that other interested parties submitted consisted of two excerpts that "duplicated materials

already included in SeAH's submission."  SeAH Br. at 6.  Nevertheless, SeAH still failed to

make all of its arguments to Commerce and may not do so now.  *See Mittal Point Lisas Ltd. v.

United States*, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008) (holding that plaintiff's failure to raise an

argument in its comments on draft remand precluded it from raising it "de novo" before the

Court).

  In addition, SeAH tries to thwart the normal process for judicial review of antidumping

determinations by inviting this Court to effectively engage in a *de novo* review.  Specifically,

SeAH seeks a reversal of Commerce's determination based on various non-record materials.

The "other authorities" section in the table of authorities of SeAH's brief lists ten documents, six

of which are not on the record of this proceeding.[3]  SeAH Br. at iii-iv.  In other words, 60

percent of the "other authorities" that SeAH uses to support its arguments are not on the record

on this proceeding.  Neither Commerce nor the other interested parties have had access to or an

opportunity to examine or comment upon these non-record materials during the remand

proceeding.  SeAH's reliance on non-record evidence is a tacit admission that even with the

addition of more than 1,700 pages of new factual information submitted during the remand

proceeding, the evidence on the record still does not support SeAH's contentions.

Because this Court reviews Commerce's determinations based on the agency record, the

Court should strike all references to these non-record materials from the judicial record.  *See*

*Home Products Int'l Inc. v. United States*, 633 F.3d 1369, 1379 (Fed. Cir. 2011) (judicial review

of Commerce's determinations is on the administrative review already in existence, but carving

out a narrow exception for situations involving new evidence that indicates that the original

record may have been tainted by fraud).  "Because the record of a determination conducted under

19 U.S.C. § 1675(a) is listed as a determination reviewable on the basis of administrative record

described in 19 U.S.C. § 1516a(a)(2)(B)," this Court explained, "it follows that the

administrative record for our review is limited to the information that was presented to or

obtained by the agency making the determination during the particular review proceeding for

which section 1516 authorizes judicial review."  *Beker Indus. Corp. v. United States*, 7 C.I.T.

313, 316 (Ct. Int'l Trade 1984).  By seeking a reversal of Commerce's determinations based on

---

[3] The only sources listed in the "other authorities" section of SeAH's brief that are on the record are: (1) Cohen, Jacob, *Statistical Power Analysis for The Behavioral Sciences* (2d ed.1988); (2) Ellis, Paul, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results* (2010); (3) Karris, Steven, *Mathematics for Business, Science and Technology* (3d ed. 2007); and (4) Starnes, Yates, and Moore, *Statistics through Applications* (2005).  The rest of the "other authorities" that SeAH references are not on the administrative record and, thus, should be removed from the judicial record and disregarded by this Court.

newly inserted materials that are not part of the administrative record, SeAH is effectively

"seeking *de novo* review through the back door." *Id.* at 317. This is particularly inappropriate

here, where the Federal Circuit remanded the matter for Commerce to consider relevance of

certain limitations discussed in additional materials that the Federal Circuit considered or

referenced.

### B.   SeAH Conflates The Concepts Of Statistical And Practical Significance

SeAH's central contention is that certain statistical assumptions, such as the number of

observations in a sample, normality of distribution, and degree of variance, must apply whenever

the Cohen's *d* test is used regardless of whether the entire population is considered or only a

sample of the broader population. However, SeAH has failed to substantiate these contentions.

First, with respect to the academic literature, SeAH acknowledges that "none of the texts

discusses anything like Commerce's DPA {differential pricing analysis}." SeAH Br. at 7.

Neither Dr. Cohen, Dr. Ellis, or Mr. Coe opined on the application of the concept of effect size to

examine whether prices differ significantly among purchasers, regions or time periods under the

antidumping statute. Nor could one reasonably expect an academic author to be omniscient to

describe all possible applications of his or her concepts, including the situation addressed by

Commerce in the Cohen's *d* test. Nonetheless, these academics did describe the general

principles behind both the concept of effect size and its place in research and data analysis which

Commerce has applied in its differential pricing analysis. Commerce has followed these

principles in conceptualizing and applying the Cohen's *d* test.

Second, we disagree with SeAH's assertion that "{n}one of the texts explicitly addresses

the use of Cohen's *d* when an entire population, and not just a sample, is being analyzed." SeAH

Br. at 7. Dr. Cohen presents his general formulation of effect size as the difference in the

"population means" of groups A and B, divided by "the standard deviation of either population (since they are assumed equal)," mathematically expressed as

$$d = \frac{m_A - m_B}{\sigma}$$

where

$$\sigma = \sigma_A = \sigma_B$$

*See Cohen* at 20 (equation 2.2.1); *see* also *Cohen* at 27. This is distinct from Dr. Cohen's description of the "t-test" or the "power analysis" "where two samples, each of n cases, have been randomly and independently drawn from normal populations." *See Cohen* at 19. When "there is no longer a common within-population σ," (in other words, the standard deviation of group A and group B are not equal), then Dr. Cohen provides for an alternative calculation of the denominator of effect size as used by Commerce to calculate the Cohen's *d* coefficient in this investigation.

$$\sigma' = \sqrt{\frac{\sigma_A^2 - \sigma_B^2}{2}}$$

*See Cohen* at 44 (equation 2.3.2) (C.R.R. 12; P.R.R. 8).

Subsequently, Dr. Cohen explicitly delineates the situation where effect size is based on full populations, as just described, and where effect size is based on sampled data:

> {W}e redefine our {effect size} index, *d*, so that its elements are sample results, rather than population parameters, and call it $d_s$. For all tests of the difference between means of independent samples,

$$d_s = \frac{\bar{x}_A - \bar{x}_B}{s}$$

*See Cohen* at 66 (equation 2.5.1) (C.R.R. 12; P.R.R. 8). Dr. Cohen then defines the denominator of the effect size when based on sample data

13

$$s = \sqrt{\frac{\sum(x_A - \bar{x}_A)^2 + \sum(x_B - \bar{x}_B)^2}{n_A + n_B - 2}}$$

*See Cohen* at 67 (equation 2.5.2) (C.R.R. 12; P.R.R. 8).

Contrary to SeAH's unsupported assertion, *see* SeAH Br. at 7, as described above, Dr.

Cohen distinguishes between the general situation of determining effect size based on full

populations of data, and further the specific application of effect size along with statistical

significance. Although the purpose of Dr. Cohen's text "is to provide a self-contained

comprehensive treatment of statistical power analysis from an 'applied' viewpoint" (*see Cohen*

at 1 (C.R.R. 12; P.R.R. 8)) where effect size is one element of Dr. Cohen's power analysis, as

part of that analysis based on sampled data, Dr. Cohen states that "{g}enerally, we can define the

effect *in the sample* (ES$_s$) using sample statistics in the same way as we define it for the

population… ." (*see Cohen* at 17 (C.R.R. 12; P.R.R. 8) (emphasis in original)). Further, the

equations used by Dr. Cohen demonstrate the differences between the calculation of effect size

based on populations and the estimation of effect size based on sampled data. Dr. Cohen's

equations 2.2.1, 2.2.2 and 2.3.2 denote the values for the populations' parameters used to

calculate the actual effect size, whereas Dr. Cohen's equations 2.5.1 and 2.5.2 provide the

equivalent formulas using the estimated values based on sampled data. Accordingly, SeAH's

assertion that "Professor Cohen's text … is intended for use only with a specific test of statistical

significance" is meritless.

Further, the other academic literature supports this same conclusion. Dr. Ellis states that

the "best way to measure an effect is to conduct a census of an entire population but this is

seldom feasible in practice." *See Ellis* at 5 (C.R.R. 15; P.R.R. 8). Dr. Ellis provides formulas

which may be used to estimate the effect size when the actual value of effect size of the

populations is not known.  *See Ellis* at 10 and Notes 8 and 9 (C.R.R. 12; P.R.R. 8).  Further, Dr. Ellis also draws a sharp distinction between the statistical significance and the practical significance of a result, even when that result is based on sampled data.  *See Remand Redetermination* at 11-14.  Like Dr. Cohen, Dr. Ellis refutes SeAH assertion that effect size is dependent on a statistical analysis.

Mr. Coe also recognizes the unique and distinct nature of effect size in that it "is an important tool in reporting and interpreting effectiveness."  *See Coe* at 1.  "Moreover, by placing the emphasis on the most important aspect of an intervention - the size of the effect - rather than its statistical significance (which conflates effects size and sample size), it promotes a more scientific approach to the accumulation of knowledge."  *Id.*   Thus, a full review of the academic literature reveals the SeAH's contention is misguided.

Third, SeAH asserts that "Commerce itself has not identified any texts that support its proposed use of Cohen's *d.*"  *See* SeAH Br. at 7.  Even the most cursory review of Commerce's *Remand Redetermination* demonstrates that SeAH's assertion is baseless.

As an initial matter, the antidumping duty statute does not specify how to determine whether prices differ significantly.  *Remand Redetermination* at 9.  Consistent with the statute, Commerce focuses on "the pricing behavior to the test group separate from the pricing behavior to the comparison group."  *Id*. at 15.  Further, "the sales to the test group and the sales to the comparison group are not sampled and each constitutes separate populations of sale prices, each of which represents *all of the sales* of the comparable merchandise to each group" and "the sales to each of these two groups, the test and comparison groups, themselves constitute *the full population of data* in the context of the calculation of the mean, standard deviation, and Cohen's d coefficient for the purpose of the pattern requirement."  *Id*. (emphasis added).

Commerce's approach is consistent with the academic literature. Dr. Ellis, for example, explains that using the entire population is the best way to measure an effect size, but it is usually not feasible, which leads to the use of an estimate of the effect size based on sampled data. *Id*. at 13 (citing Ellis at 5). However, with rare exceptions not applicable here,[4] such an approach is feasible in antidumping proceedings.

One of the main advantages of using the entire population is that Commerce calculates the *actual* parameters (mean, standard deviation, and effect size) without having to estimate these parameters through underlying data or estimates. *Remand Redetermination* at 15, 28, 64-65. Thus, when the Cohen's *d* test is applied in the context of the differential pricing analysis, there is no estimation of the parameters (mean, standard deviation, and effect size) of the test or comparison group as the calculation of these parameters is based on the complete universe of sale prices to the test and comparison groups. *Id*. at 15-16.[5]

SeAH's argument that the statistical assumptions or limitations regarding the number of observations, normality of distribution, and similarity of the variances in sampled data, are applicable outside of the context of statistical sampling finds no support in academic literature. Neither the academic literature, mathematical principles, nor logic requires the use of these

---

[4] 19 U.S.C. § 1677f-1 (a)&(b) permits Commerce to use averaging and statistically valid samples under certain circumstances.

[5] SeAH asserts, in a footnote, that it is questionable that Commerce uses the entire population, because Commerce only examines sales during the period of review and only compares such sales for comparable merchandise. SeAH Br. at 7, n. 18. SeAH's contention is misguided. When Commerce calculates a weighted-average dumping margin, the relevant universe or population of sales is limited to sales during the relevant period and to sales of comparable merchandise, which is normally merchandise within the same control number (CONNUM). Using only sales that are relevant to the calculation does not constitute sampling and Commerce's calculations are based on the entire population of *relevant* sales. The issue of whether statistical assumptions might be required in a situation when Commerce decides that it is appropriate to use samples is not presented here.

statistical assumptions when the full population of sales is used, because Commerce determines

the *practical* significance of a price difference between two groups of prices by calculating and

comparing *actual* parameters; thus, statistical assumptions are not relevant. *Remand*

*Redetermination* at 28 & 38.

Dr. Ellis, for example, expressly states that "we can draw no conclusion regarding the

practical significance of a result from the test of statistical significance." *Ellis* at 5 (P.R.R 15;

P.R.R. 8). This is because "the statistical significance of any result is affected by both the size of

the effect and the size of the sample used to estimate it." *Id*. According to Dr. Ellis, the "smaller

the sample, the less likely the result be *statistically* significant *regardless of the effect size*." *Id.*

(emphasis added). In contrast, Commerce uses the Cohen's *d* test to determine the *practical*

significance of price differences *without* using statistical samples or estimates. It is illogical and

unreasonable for SeAH to demand that Commerce must use the Cohen's *d* test in conjunction

with a test of statistical significance when the academic literature indicates that a test of

statistical significance is not suited or relevant for determining practical significance.

SeAH also contends that the differences between normal and non-normal distribution

could have mathematical differences on the calculation of the mean and standard deviation and,

once the statistical assumption of normality is relaxed, it is impossible to "predict" how many

data points will fall within 0.2, 0.5, or 0.8 standard deviations from the mean. SeAH Br. at 10.

However, Commerce's use of the Cohen's *d* test does not "predict" or estimate anything. Rather,

the purpose of the Cohen's *d* test is to determine whether past sales prices differ significantly.

*Remand Redetermination* at 15-16. The means, standard deviations, and Cohen's *d* coefficients

calculated for SeAH are not predictions or estimates with confidence levels or sampling errors

associated with sampled data, but, rather, are the actual values which describe SeAH's pricing behavior.

SeAH also claims that Commerce has an evidentiary burden to demonstrate that the statistical assumptions SeAH advocates do not apply outside of the context of statistical samples. SeAH Br. at 8. SeAH's contentions are misguided. The relevant statutory provision, 19 U.S.C. § 1677f-1(d)(1)(B), does not require the use of statistical analysis, statistically valid samples, or statistical assumptions. *Compare* 19 U.S.C. § 1677f-1(d)(1)(B) with 19 U.S.C. § 1677f-1(a)&(b). Section 19 U.S.C. § 1677f-1(d)(1)(B) does not specify what methodology Commerce must employ in determining whether prices differ significantly. The relevant test for reviewing Commerce's methodological determinations, including numerical thresholds, "is reasonableness, not substantial evidence." Remand Order at 17 (citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019)).

Commerce's methodology is reasonable because it calculates the *actual* parameters of two groups of prices based on the entire population of data, compares the *actual* means (averages) of these two groups and utilizes the widely accepted Cohen's *d* thresholds, which are based on real-world differences that are "grossly perceptible" for determining significance of difference. *Remand Redetermination* at 18.

### C.   SeAH's Criticism of Dr. Cohen's Thresholds Is Misguided

SeAH also seeks to discredit Dr. Cohen's thresholds. First, SeAH asserts that Dr. Cohen's thresholds were intended to be used with specific tests of statistical significance and there may be other thresholds developed by Dr. Cohen. SeAH Br. at 7, n. 8. SeAH asserts, for example, that Cohen's d test "was intended for use *solely* in conjunction with a 't-test.'" SeAH Br. at 9 (emphasis in the original). However, SeAH's cited source only provides the definition

18

of the t-test and does not support the proposition for which it is cited.  This is not surprising because SeAH's contentions are contrary to record evidence.  *See* Ellis at 5 (P.R.R 15; P.R.R. 8).  When no statistical samples are used and actual values can be determined from the entire population, the concept of statistical significance and statistical significance tests are irrelevant.  "It is quite possible, and unfortunately quite common, for a result to be statistically significant and trivial{,}" Dr. Ellis explains, "{i}t is also possible for a result to be statistically nonsignificant and important."  *Ellis,* at 4 (P.R.R 15; P.R.R. 8).  It is incorrect and illogical for SeAH to demand that the test of practical significance be dependent on tests of statistical significance and their underlying assumptions.

Second, SeAH contends that "one can propose an infinite number of thresholds based on an infinite number of 'real-world' observations" and thus, that Commerce must demonstrate that Dr. Cohen's thresholds are a reasonable way to measure whether observed price differences are "large."  SeAH Br. at 11-12.  As an initial matter, the relevant statutory provision, 19 U.S.C. § 1677f-1(d)(1)(B), refers to prices that differ "significantly."  It does not require Commerce to demonstrate that the price differences are "large," as SeAH suggests.  Moreover, Commerce selected the largest, most conservative threshold, which makes the finding of significant difference less likely.  Ellis at 41, Table 2.1 (P.R.R 15; P.R.R. 8) (listing 30 thresholds ranging from the lowest, 0.01, to the highest, 0.8).

Additionally, Commerce explained that, despite some criticism of Dr. Cohen's thresholds, "they are nevertheless widely accepted."  *Remand Redetermination* at 17; *see also Mid Continent Steel & Wire, Inc. v. United States*, No. 21-1747, at 40 (Fed. Cir. 2021) (*Mid-Continent*) ("Cohen's cut-offs provide a good basis for interpreting effect size and for resolving disputes about the importance of one's results."); Ellis at 40 (P.R.R 15; P.R.R. 8) (same).

According to Dr. Ellis, these thresholds "are easy to grasp" and "{y}ou just compare your numbers with his thresholds to get the ready-made interpretation of your result." Ellis at 41 (P.R.R 15; P.R.R. 8).  These thresholds are also sufficiently grounded in logic to "be found reasonable by reasonable people." *Id*.  Commerce reasonably selected the widely accepted 0.8 threshold as a conservative measure to determine that the observed price differences are significant. *Remand Redetermination* at 18.

SeAH further contends that Commerce must demonstrate that prices follow the same normal distribution as the heights of teenage girls or the IQ of students, where the real-world differences on which the thresholds are based were initially observed.  SeAH Br. at 12-15. SeAH is mistaken.  The distribution of prices is irrelevant, because Commerce considers the entire population of prices calculating the actual means of two groups of prices.  If Commerce had calculated the mean of the prices based on a sample of all of the price data, then the distribution of the sample price data would be a factor to establish whether that calculated estimate of the actual mean of all prices was statistically significant.  However, all parameters (mean, standard deviation, and effect size) that Commerce calculates are *actual* parameters.  The Cohen's *d* test simply compares two actual price values to determine whether the price difference between these averages is mathematically significant.

### D.  SeAH's Assertions Regarding The Lack of Discernable Price Differences Are Unsupported And Provide No Basis For Reversal

SeAH contends that the price differences are not "grossly perceptible" when the price data are examined.  SeAH Br. at 15.  Specifically, SeAH contends that "customer (number 102020) analyzed by Commerce's margin calculation program, and the first product (control number 1-03-03-06-1) that was found to pass the Cohen's *d* test for that customer." *Id*.  SeAH contends that it has [  ] sales of CONNUM (the product control number) 1-03-03-06-1 to

customer 102020, with an average price of $[      ], and a standard deviation of [      ].  *Id.*
at 15-16.  The comparison group consisting of U.S. sales of that product to all other customers
included [   ] transactions, with an average price of $[      ], and a standard deviation of
[   ].  *Id* at 16.  The margin calculation program calculated a difference in average prices of
[   ], a pooled standard deviation of detail below [      ], and a Cohen's *d* coefficient of
1.00739.  *Id.*  First, SeAH attempts to demonstrate that the price differences are not "visually
discernible" with three charts.  SeAH Br. at 17, 18, 20.  Second, SeAH contends even though the
period of investigation average prices to customer 102020 were [      ] than the average price to
all other customers, the prices for sales to customer 102020 were [      ] than the prices for
sales to other customers made on the same date.  *Id*. at 18.  As we demonstrate below, SeAH's
contentions lack merit.

     As an initial matter, "visually discernable" may be a practicable tool to use for some
analyses but impossible for others given the nature of the information that is being studied.  For
example, in Dr. Cohen's example of the height of girls of various ages, one can line up a group
of 13-year-old girls and a group of 18-year-old girls, and visibly observe the difference in their
heights.  For other types of information, such as IQs of students (or prices), one cannot visually
see such data, and one may graphically represent such information but with care.

     SeAH's charts do not accurately represent how the Cohen's *d* test operates.  The first
chart represents a *hypothetical* normal "bell curve" distribution of prices, which according to
SeAH shows price differences.  *Id*. at 17.  Although Dr. Cohen uses a similar graphical
representation with respect to sampled data in his discussion of non-overlap, SeAH's graph does
not accurately represent the example in SeAH's argument.  First, the number of observations in
each group, which are the same in the graph, are not the same for SeAH's example.  Further, the

standard deviations in the graph for each group also appear to be identical, whereas the standard deviations for the test and comparison groups in SeAH's example, [                    ] respectively, are not the same.  The only aspect of SeAH graph that is accurate is that the mean prices for each group appear to be at the correct points on the x-axis.  Accordingly, the chart fails to accurately present a usable visualization of prices for control number 1-03-03-06-1.

SeAH's second chart shows prices on individual sales to each customer group spread across various dates, while the third chart shows the frequency of sales to each group on specific dates.  *Id*. at 18-20.  As explained earlier, it is irrelevant how individual prices are distributed in each group of prices when the actual means and the standard deviation are calculated based on the entire population of relevant data.  Likewise, the frequency of sales or how prices of individual transactions compare to each other on any particular date are not relevant to Commerce's analysis by purchaser.  The Cohen's *d* test considers differences by purchaser and differences by time period as separate analyses.  In applying the Cohen's *d* test, for each of the two groups (here defined by purchaser), Commerce calculated the *actual* mean (average) of such prices *for the period of review or investigation* based on the entire population of relevant observations.  Commerce compared these two actual means, and the comparison result has exceeded Dr. Cohen's threshold for the large effect size that represents differences that are grossly perceptible.  This is sufficient for demonstrating that with respect to this customer and product model the average price for the period of investigation differs significantly from average price of comparable merchandise to all other customers.  To illustrate this point, using the same scale as SeAH did in its chart (SeAH Br. at 18), the following chart shows that the difference between the average prices to customer (number 102020) and all other customers is grossly perceptible:

[




].

       To the extent that SeAH contends that on specific dates the relation between individual transaction prices among these two groups moved in a different direction, it is not surprising as prices of individual transactions on a specific date could fluctuate differently from the overall pricing trend.  What is important is that, although Commerce could have decided to compare individual transaction prices on specific dates while ignoring other prices,[6] it did not adopt the methodological approach represented in SeAH's charts.  Rather, Commerce reasonably selected a methodology that calculates the actual *average* price for each customer group *for the period of investigation* as a better measure of the overall pricing behavior.  This is similar to Commerce's

---

[6] Comparing the prices of individual transactions on a specific date, instead of comparing the period of investigation averages, would not automatically make the finding of significant difference more or less likely.

normal methodology of using the average cost for the period of investigation, although costs on each specific date could be lower or higher than the average.

### E. Neither the Statute Nor Commerce's Practice Require Commerce To Engage In Statistical Analysis In Determining If Prices Differ Significantly

SeAH contends that the statute requires Commerce to establish the existence of a pattern—in other words, that the prices are not random. SeAH Br. at 21. SeAH quotes, in part, Commerce's statement that Commerce "is examining the extent to which the prices, when ordered by purchaser, region or time period, exhibit differences which have meaning, which have or may have influence or effect, which are noticeably or measurably large, and which may be beyond something that occurs by chance." *Id* (*quoting* IDM at 20). SeAH fails to quote, however, the second part of this sentence, which states that Commerce examines "whether from the extent of these price differences one can reasonably make a conclusion about the characteristics of the exporter's pricing behavior." IDM at 20 (P.R. 406). SeAH asserts that, before Commerce can find that a pattern exists, it must first demonstrate that the observed effect did not occur by chance even if prices differ significantly—in other words, that the observed effect size is large. SeAH Br. at 21-22. Neither the statute, Commerce's practice, nor even the statistical literature has adopted the approach advocated by SeAH.

The antidumping statute does not specify how Commerce may determine that a pattern exists and whether prices differ significantly, let alone require a particular sequence in Commerce's analysis or use of statistical techniques. 19 U.S.C. § 1677f-1(d)(1)(B). Had Congress intended to restrict Commerce to a statistical analysis in 19 U.S.C. § 1677f-1(d)(1)(B) it would have done so expressly. *See Russello v United States*, 464 US 16, 23 '1983) ("{W}here Congress includes particular language in one section of a statute but omits it in another ... , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion."); *Compare* 19 U.S.C. § 1677f-1(d)(1)(B) with 19 U.S.C. § 1677f-1(a)&(b).

Moreover, both this Court and the Federal Circuit have already sustained Commerce's

methodology for finding the pattern (the ratio test) in this litigation and held that Commerce does

not need to determine a reason for the pattern of prices that differ significantly.  *Stupp Corp. v.*

*United States*, 5 F.4th at 1355 ("For those reasons, we hold that Commerce's ratio test

reasonably implements the statutory requirement that Commerce determine whether there is 'a

pattern of export prices' 'differ{ing} significantly among purchasers, regions, or periods of time'

before selecting the average-to-transaction method. 19 U.S.C. § 1677f-1(d)(1)(B)(i)."); *JBF RAK*

*LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) ("Section 1677f-1(d)(1)(B) does not

require Commerce to determine the reasons why there is a pattern of export prices for

comparable merchandise that differs significantly among purchasers, regions, or time periods").

        To the extent that SeAH implies that Commerce expressed the view that it must

determine whether the price differences did not occur by chance through some test of statistical

significance, SeAH mischaracterizes Commerce's determination.  Commerce expressly stated

that "*randomness is not part of the Department's analysis* as the Department's analysis is based

on the complete universe of U.S. sale prices during the POI, and thus these calculations are not

based on estimated values which would include sampling error (or noise) which is inherent with

analyses based on random samples."  IDM at 20 (P.R. 406) (emphasis added).  As stated above,

Commerce's analyses and results of the Cohen's *d* test do not include any element of "chance" or

sampling error because these results are based on analyses of the full population of SeAH's sale

price data and *not* on a sample of such data.  *Id*. at 20-21.  The record evidence demonstrates that

"SeAH is involved to a high degree in market research" and that "the differences in a company's

prices do not reflect chance, but the company's market research, corporate practice and priorities, resulting in deliberative pricing decisions." *Remand Redetermination* at 41.

SeAH does not put forward any record evidence that detracts from the agency's conclusions. Instead, SeAH dismisses Commerce's analysis as "woefully simplistic" and alludes to a variety of market conditions (including competitors' pricing, reports regarding inputs pricing, currency fluctuations, potential supply shortage, *etc.*) that SeAH must consider in setting pricing and the need to negotiate the pricing with its customers. SeAH Br. at 23. Changes in market conditions (and the need to consider all these factors) do not demonstrate that SeAH sets its prices by random chance (like in a coin toss or a dice throw). However, SeAH's contention that SeAH considers various market conditions only reinforces Commerce's conclusion that "the differences in a company's prices do not reflect chance, but the company's market research, corporate practice and priorities, resulting in deliberative pricing decisions." *Remand Redetermination* at 45.

Further, SeAH contends that "random fluctuations in exchange rates would necessarily have an impact on the observed U.S. prices." SeAH Br. at 25. Again, the statute does not require Commerce to determine the reasons for why prices differ significantly. *JBF RAK*, 790 F.3d at 1368. Furthermore, SeAH's argument rests on an untenable assumption that whenever there is a market factor that is not entirely within the exporter's control, it means that the exporter's prices do not result from a deliberate pricing strategy but rather prices are as random as a coin flip. As Commerce explained, however, "{w}hile some of these values may not be fully under the control of the seller (*e.g.*, exchange rates or how long a customer takes to pay for the merchandise), each of these values are used for calculating the net U.S. price for comparison

with the normal value; therefore, they are also relevant to the examination of whether these same U.S. prices differ significantly." *Remand Redetermination* at 59.

SeAH makes an unsupported assumption that floating currency exchange rates are determined by chance rather than by a variety of factors that influence exchange rates. SeAH Br. at 25, n. 23. SeAH does not cite any record evidence to support its contention but provides yet another quotation from a non-record source. *Id.* SeAH further offers three tables and narrative argument with SeAH's "analysis" of exchange rates and their hypothetical effect,[7] which it did not present before Commerce. SeAH Br. at 24-28. Neither Commerce nor any other interested party had an opportunity to rebut this argument and the supporting new factual information, or even examine it during the remand proceeding.

A party must raise all arguments during administrative proceedings before Commerce so that Commerce has an opportunity to fully develop the record and respond to the argument before it is presented to this Court. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017); *see also* 19 C.F.R. § 351.309(c)(2); 28 U.S.C. § 2637(d); *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008). In its case brief, SeAH presented a scant argument that prices could be affected by factors other than the identity of the customer, time period, or region and made a fleeting reference to a hypothetical customer that sets its U.S. prices in foreign currency and converts it to dollars. SeAH Comments at 19. Commerce fully addressed this argument. *Remand Redetermination* at 59. But SeAH did not

---

[7] SeAH's argument fails to demonstrate that the differences in prices are attributable exclusively or primarily to exchange rate fluctuations. SeAH merely discusses a hypothetical, rather than its actual sales data. SeAH made its U.S. sales through its U.S. affiliate and the U.S. affiliate set the prices of these U.S. sales in U.S. dollars. *See* Section C Questionnaire Response (Part 4), C.R. 67 at 9 & 20 & Appendix C-1 (GRSUPRU field) ("The reported unit price reflects the actual invoice amount (in U.S. dollars) per metric ton for each sale."). Moreover, SeAH reported the vast majority of the expenses for its U.S. sales in U.S. dollars. *Id.* at Appendix C-2.

make an argument before the agency with respect to SeAH's new analysis on pages 24 through 28 of its brief.  SeAH Br. at 24-28.  SeAH therefore failed to exhaust its administrative remedies.

Nor did SeAH make its argument that Commerce's differential pricing analysis is inconsistent with 19 U.S.C. § 1677b-1(a), which provides among other things that fluctuations in exchange rates "shall be ignored."  SeAH Br. at 28.  This argument should likewise be rejected for failure to exhaust administrative remedies, because SeAH did not raise it before the agency during the remand proceeding.  In any event, 19 U.S.C. § 1677b-1(a) does not govern the differential pricing analysis.  Rather it establishes rules for making currency conversions, with which Commerce's calculations fully comply.

**F.    SeAH's Hypotheticals Are Unpersuasive**

SeAH contends that the application of the Cohen's *d* test to data with small price variances could lead to "false positive" results.  SeAH Br. at 28.  SeAH contends that "Commerce misunderstood the intent of our example" and that SeAH intended to "show that Commerce's methodology can increase dumping margins by significant amount."  *Id.*

SeAH's contention that the Cohen's *d* test does not properly demonstrate the existence of a *pattern* misunderstands the purpose of the test, which only evaluates the extent to which the net price to one group differs from the net price of all other sales of comparable merchandise. *Remand Redetermination* at 42.  The existence of a pattern is determined by a different test, the ratio test, which both this Court and the Federal Circuit have already affirmed.  *Id.*

Furthermore, on remand, SeAH has failed to identify a single example from its own data in which a small variance in prices resulted in a significant and unwarranted increase in its dumping margin.  Instead, in its comments to Commerce, SeAH provided three hypothetical examples in support of its contentions.  However, all of SeAH's hypothetical examples failed.

As Commerce explained in reviewing each of the three hypothetical examples, "which were focused on the existence of small price variances in the groups, the ultimate outcome was the application of Commerce's standard comparison methodology." *Remand Redetermination* at 61.

First, outside of the context of the First Amendment, judicial challenges that are based on hypotheticals are disfavored. *See e.g., Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (stating in the context of a facial challenge to a statute "we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."). Even if SeAH could demonstrate that there might be a rare situation with unusual, cherry-picked, hypothetical facts that could lead to an unusual outcome that differs from the normal outcome under the methodology, it would not be sufficient to demonstrate that methodology, as a whole, is unreasonable. All three of SeAH's hypotheticals regarding small price variances rested on speculative events and imaginary data. They all failed.

SeAH does not dispute this. Instead, SeAH asserts that Commerce misunderstood one of its hypotheticals (which resulted in the application of the standard average-to-average comparison methodology) and offers yet another hypothetical (including *four* tables of analysis) that is based on a new set of imaginary data that has nothing do with SeAH's reported data. SeAH Br. at 29-32. The argument based on this new information and analysis was not presented to Commerce during the remand, and, thus, the Court should disregard it.

G. **SeAH's Arguments Regarding The Results Of The Application Of The Differential Pricing Methodology Are Flawed**

In its *Remand Redetermination*, Commerce analyzed the application of its differential pricing methodology in the years 2015 and 2021, and found that "Commerce's actual application of the Cohen's *d* test in the context of the Differential Pricing Analysis resulted in the application of an alternative comparison methodology to a relatively small number of respondents." *Remand*

*Redetermination* at 32.  Specifically, in 2021, Commerce applied its differential pricing analysis to 18 respondents, which resulted in the application of the alternative calculation methodology to only four companies, including SeAH.  *Id*.  In other words, despite SeAH's assertions that Commerce's methodology is so undemanding that it creates "false positives," leading to the unwarranted application of the alternative methodology, the data demonstrates that in 2015 "only 22 percent of respondents with calculated rates had their weighted-average margin calculated based on alternative methodology."  *Id*.  Similarly, in 2021, the most recent year for which the full year data is available, "Commerce applied an alternative comparison methodology for 15 companies (21 percent of the total) and applied the A-to-A method for 58 companies, eight of which had a zero rate."  *Id*.

SeAH does not question the accuracy of these numbers, which demonstrate that in most cases the application of Cohen's *d* test did not result in the application of the alternative calculation methodology.  Instead, SeAH asserts that the "relevance of this analysis is questionable" because the results found for other companies have no bearing on results found for SeAH.  SeAH Br. at 33.  This may be true, but SeAH cannot have it both ways.  On the one hand, SeAH makes a sweeping claim that Commerce's methodology results in "false positives" and attempts to substantiate this claim through hypotheticals, which are not based on SeAH's data.  SeAH Br. at 28-32.  On the other hand, when Commerce analyzed the actual application of its methodology with respect to all companies, including SeAH, refuting SeAH's hypotheticals and speculation, SeAH starts questioning the relevance of this analysis.  SeAH Br. at 33.  Either SeAH must make its case based on its own data (which it failed to do) or, alternatively, it must accept the relevance of data involving the actual application of the differential pricing methodology to other respondents.

Next, SeAH contends that "the two years chosen by Commerce (2015 and 2021) do not represent the 'entire population' of Commerce's determinations."  SeAH Br. at 33; SeAH Comments at 59, n. 56 (C.R.R. 29).  We agree that the two years analyzed by Commerce do not constitute the "entire population" of investigations for the last seven years.  However, SeAH provided a summary of the results of the application of Commerce's methodology in years 2015 through 2021, which demonstrate that the years 2015 and 2021 are not outliers.  The percentages in 2015 and 2021 (21 and 22 percent, respectively) fall roughly in the middle of the range during the seven-year period with the seven-year period average being under 25 percent.  In six out of the seven years for which data are available, the percentage of cases in which the alternative methodology was applied was no higher than 26.47 percent, dropping as low as 18 percent in 2018 and 14 percent in 2019.  The data from the "entire population" (SeAH Br. at 33-34) reinforces Commerce's conclusion that the application of the differential pricing methodology, of which the Cohen's *d* test is a component, resulted in the application of the alternative methodology to a relatively small percentage of respondents.

Because its own analysis of the "entire population" of investigations, in which Commerce applied the differential pricing methodology, does not support its contentions, SeAH makes a complete about face.  SeAH Br. at 34.  After suggesting on page 33 of its brief that the appropriate analysis should consider the "entire population," on the very next page, SeAH inexplicably claims that Commerce's analysis is "skewed" and that the analysis should not consider all investigations in which Commerce applied its differential pricing methodology. SeAH Br. at 33-34.  According to SeAH, Commerce should have excluded from its analysis all cases where Commerce applied its differential pricing methodology in which the resulting

weighted-average dumping margins under both the average-to-average and average-to-transaction methodologies were above *de minimis*.

SeAH's approach of cherry-picking data is unreasonable because it excludes the vast majority of investigations where Commerce applied its differential pricing methodology. SeAH improperly limits its analysis to 59 cherry-picked respondents from the entire seven-year period between 2015 and 2021, whereas in 2021 alone Commerce applied differential pricing to 73 respondents. The mere fact that weighted-average dumping margins under both comparison methods are above *de minimis* does not end Commerce's differential pricing analysis and Commerce could apply an alternative methodology in such a scenario, if appropriate. As Commerce explained, "{w}hen the relative difference between the two rates is at least 25 percent. Commerce finds that the A-to-A method cannot account for such differences, and an alternative comparison methodology based on the A-to-T method may be warranted to calculate a company's weighted-average dumping margin." *Remand Redetermination* at 63-64.

SeAH attempts to distort the analysis by disregarding most investigations in which Commerce applied the differential pricing methodology. SeAH provides a table, in which the column "total investigations" is the sum of Commerce's final determinations in which the agency made negative findings and final determinations in which SeAH contends Commerce would have made a negative finding if it had applied the average-to-average method. SeAH Br. at 35. SeAH's table is misleading, because the "total investigations" column does not represent the total investigations during the relevant years. Out of the total 288 investigations in which Commerce applied the differential pricing methodology during the seven-year period, SeAH's

PUBLIC VERSION

"analysis" excluded 229 final determinations.  When the appropriate "total investigations"[8] value

is used, the total percentage of final determinations in which the application of the average-to-

average comparison methodology would have made the difference in outcome much lower than

what SeAH presents.

| Year | Total Investigations Where Differential Pricing Was Applied (as listed in column C of SeAH's Table on Page 34, but with the correct number of total investigations for each year) (A) | Investigations With Affirmative Findings Where Margin Would Be *De Minimis* Using A-to-A Methodology (as listed in column B of SeAH's table on page 35) (B) | Percent Affirmative Due to Differential Pricing Analysis (C=B/A) |
|---|---|---|---|
| 2015 | 18 | 3 | 16.67% |
| 2016 | 52 | 5 | 9.62% |
| 2017 | 35 | 9 | 25.71% |
| 2018 | 48 | 1 | 2.08% |
| 2019 | 28 | 2 | 7.14% |
| 2020 | 34 | 5 | 14.71% |
| 2021 | 73 | 6 | 8.22% |
| 2015-2021 total: | 288 | 31 | 12.02% |

In other words, the cases in which the application of the average-to-average methodology

would have moved the dumping margin below the *de minimis* threshold account for merely

12.02 percent of total final determinations during the seven-year period.  However, even in this

relatively small number of cases, Commerce's application of the alternative comparison

methodology, which unmasked dumping, was consistent with the statutory requirements.

---

[8] SeAH refers to "total investigations," but these numbers refer to the total number of respondents in investigations to which the differential pricing methodology was applied.  An investigation can involve multiple respondents and depending on the facts of each particular case for some of these respondents differential pricing analysis could result in the application of the average-to-average methodology, while for others it could result in the application of the alternative methodology.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's *Remand Redetermination*.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

s/Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:

s/Robert Ralph Kiepura
ROBERT RALPH KIEPURA
MYKHAYLO GRYZLOV                          Trial Attorney
Senior Counsel                            Commercial Litigation Branch
Office of the Chief Counsel               Civil Division
   for Trade Enforcement & Compliance    U.S. Department of Justice
U.S. Department of Commerce               P.O. Box 480
                                       Ben Franklin Station
                                       Washington, DC 20044
                                       Tel.: (202) 305-4436
                                       Fax: (202) 353-0461
                                       Email: Robert.kiepura@usdoj.gov

August 15, 2022                           Attorneys for Defendant

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 9,980 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Robert R. Kiepura