UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| STUPP CORPORATION, ET AL., <br><br> Plaintiffs and <br> Consolidated Plaintiffs, <br><br> and <br><br> MAVERICK TUBE CORPORATION ET AL., <br><br> Plaintiff-Intervenors <br> and Consolidated <br> Plaintiff-Intervenors <br><br> v. <br><br> UNITED STATES, <br><br> Defendant <br><br> and <br><br> SEAH STEEL CORPORATION, ET AL., <br><br> Defendant-Intervenors <br> and Consolidated <br> Defendant-Intervenors. | Consol. Court No. 15-00334 |

REPLY OF SEAH STEEL CORPORATION
TO THE RESPONSES BY DEFENDANT AND BY WELSPUN TUBULAR
TO SEAH'S COMMENTS ON FINAL REDETERMINATION ON REMAND

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20036
(202) 774-5500

Attorney for SeAH Steel Corporation

September 28, 2022

Table of Contents

Page

ARGUMENT ............................................................................................................... 2

   A.   Exhaustion of Administrative Remedies ................................................... 2

        1.   Contrary to Defendant's Suggestion, SeAH
             Did Not Agree that a Period of 11 Days
             Would Be Sufficient to Allow It to Comment
             on Commerce's Draft Redetermination ......................................... 2

        2.   While All Parties, including Commerce, Had Access to
             the Relevant Texts Years Before the Remand Was Ordered,
             SeAH Had No Reason to Expect Commerce to Interpret Those
             Texts in the Manner Set Forth in the Draft Redetermination ....................... 4

        3.   SeAH Was Permitted, in Its Comments to this Court,
             to Expand on Comments Arguments Presented to Commerce,
             and to Address Contentions Set Forth in Commerce's Final
             Redetermination that Were Not Mentioned in Its Draft ............................... 5

   B.   The CAFC's Holding in This Case ...................................................... 10

        1.   The CAFC's Rejection of Commerce's Use of
             Cohen's d Was Based on Judicial Notice of Basic
             Statistical Principles, Not Evidence on the Record .................................... 10

        2.   The CAFC's Decision Explicitly Required
             Commerce to Explain Why the CAFC's
             Suggested Hypothetical Example Did Not
             Invalidate Commerce's Use of Cohen's d .................................................. 12

   C.   The Statutory Requirements .............................................................. 13

        1.   Commerce's Own Interpretation of the Relevant
             Statutory Term Requires It to Distinguish
             between Patterns and Chance Occurrences ................................................ 13

        2.   Commerce Cannot Lawfully Assume
             Away the Statutory Requirements ............................................................ 15

   D.   The Different Measures of Effect Sizes .............................................. 17

   E.   The Meaning of Professor Cohen's Text ............................................ 21

Page

    1.    Professor Cohen's Text Makes Clear that the d Statistic
Was Intended Solely in Conjunction with a "t-Test for
Means" for Data that Met the Assumptions of Normality,
Roughly Equal Variances, and Sufficient Data Points ............................... 21

    2.    Professor Cohen's Text Does Not Envision the Use
of the d Statistic when the Variances and Number
of Data Points in the Two Datasets Differ Greatly ................................... 23

    3.    Professor Cohen's Text Does Not Envision
the Use of the d Statistic to Analyze an Entire
Population that Does Not Satisfy His Assumptions .................................... 24

    4.    Professor Cohen's Text Explicitly Relied on the
Mathematical Characteristics of Normal
Distributions to Justify His Proposed Thresholds ....................................... 27

F.    Practical Significance, Statistical Significance,
and the Ability to Draw Logical Conclusions ...................................................... 29

CONCLUSION ............................................................................................................... 31

<u>Table of Authorities</u>

Page

<u>C</u><small>ASES</small>

*ABB, Inc. v. United States*,
   920 F.3d 811 (Fed. Cir. 2019)...................................................................... 2

*Al Tech Specialty Steel Corp. v. United States*,
   661 F. Supp. 1206 (CIT 1987) ..................................................................... 2

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007)................................................................... 2

*Creswell Trading Co. Inc. v. U.S.*,
   15 F.3d 1054 (Fed. Cir. 1994).................................................................. 15

*Globe Metallurgical v. United States*,
   781 F.Supp.2d 1340 (CIT 2017) ................................................................. 8

*Juancheng Kangtai Chemical v. United States*,
   Slip Op. 15–93 (CIT Aug. 21, 2015) .......................................................... 9

*Papierfabrik August Koehler AG v. United States*,
   971 F.Supp.2d 1246 (CIT 2014) ................................................................. 8

*Solvay Solexis v. United States*,
   637 F.Supp.2d 1306 (CIT 2009) ................................................................. 9

*Stupp v. United States*,
   359 F. Supp. 3d 1293 (CIT 2019) ............................................................. 10

*Stupp v. United States*,
   5 F.4th 1341, 1350-51 (Fed. Cir. 2021) ............................................. passim

*Trust Chem v. United States*,
   791 F.Supp.2d 1268 (CIT 2011) ................................................................. 9

<u>S</u><small>TATUTES</small>

19 U.S.C. §1677f-1 ........................................................................... 13, 15

Page

ADMINISTRATIVE DECISIONS

Issues and Decision Memorandum for the Final Affirmative
    Determination in the Less-Than-Fair-Value Investigation
    of Welded Line Pipe from the Korea (Oct. 5, 2015).................................................. 8, 14

ACADEMIC PUBLICATIONS

Cohen, Jacob,
    *Statistical Power Analysis for the Behavioral Sciences* (2d ed.1988) .................... passim

Ellis, Paul,
    *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis,*
    *and the Interpretation of Research Results* (2010) ................................................... 11, 20

Starnes, Yates, and Moore,
    *Statistics through Applications* (2005) ........................................................................... 28

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| STUPP CORPORATION, ET AL., <br><br> Plaintiffs and <br> Consolidated Plaintiffs, <br><br> and <br><br> MAVERICK TUBE CORPORATION ET AL., <br><br> Plaintiff-Intervenors <br> and Consolidated <br> Plaintiff-Intervenors <br><br> v. <br><br> UNITED STATES, <br><br> Defendant <br><br> and <br><br> SEAH STEEL CORPORATION, ET AL., <br><br> Defendant-Intervenors <br> and Consolidated <br> Defendant-Intervenors. | Consol. Court No. 15-00334 |

REPLY OF SEAH STEEL CORPORATION
TO THE RESPONSES BY DEFENDANT AND BY WELSPUN TUBULAR
TO SEAH'S COMMENTS ON FINAL REDETERMINATION ON REMAND

This brief is submitted on behalf of SeAH Steel Corporation to correct errors of fact

and law in the responses filed by Welspun Tubular LLC USA on August 15, 2022, and

amended responses filed by Defendant on September 22, 2022, in response to SeAH's

June 14, 2022, comments on the final redetermination on remand by the U.S. Department

of Commerce dated April 4, 2022, addressing the decision by the Court of Appeals for the

Federal Circuit in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021).

<u>ARGUMENT</u>

A.   *Exhaustion of Administrative Remedies*

  1.   *Contrary to Defendant's Suggestion, SeAH*
       *Did Not Agree that a Period of 11 Days*
       *Would Be Sufficient to Allow It to Comment*
       *on Commerce's Draft Redetermination*

As noted in our initial comments, the Court has the discretion to decide whether to require exhaustion of administrative remedies in appeals of antidumping determinations.[1] When determining whether to exercise that discretion, the Court has stated that it considers whether a party had a "sufficient opportunity" and "practical ability … to have its arguments considered by the administrative body."[2]  In this case, SeAH was allowed less than 11 days to comment on a draft redetermination that Commerce had taken more than four months to prepare.

In response, Defendant asserts that the time allowed by Commerce was sufficient, because the final deadline set by Commerce "was only seven hours less than SeAH requested in its *last* extension request."[3]  Defendant's suggestion is, however, grossly misleading.

As we have recounted previously, SeAH made multiple requests to Commerce for extensions of the deadline for comments on the Draft Redetermination.  SeAH initially asked for an extended schedule that would allow 14 days for the parties to submit factual information to "rebut, clarify, or correct the information" included in Commerce's draft

---

[1] *See ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019); *Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007).

[2] *See Al Tech Specialty Steel Corp. v. United States*, 661 F. Supp. 1206, 1210 (CIT 1987).

[3] *See* Defendant's Amended Response at 9-10 (emphasis added).

redetermination, and an additional period of at least 14 days to comment on any such information and on the new analysis in Commerce's draft redetermination.[4]  After that request was rejected,[5]  SeAH asked that the deadline for comments be extended 10 days (until March 25).[6]  In response, Commerce extended the deadline by one day.[7]  Finally, SeAH, in some desperation, filed a request for an extension of three business days, from Thursday, March 16, to Monday, March 21.[8]  In response, Commerce chose not to allow the full extension requested by SeAH, but instead shortened the extension by seven hours, setting the deadline at 10 a.m. on March 21.[9]

Notably, Defendant's response ignores this history.  Instead, it mentions only that the deadline set by Commerce "was only seven hours less than SeAH requested in its last extension request."  The clear suggestion is that SeAH has no grounds for claiming that the deadline set by Commerce was inadequate, when SeAH "agreed" to a deadline that was only a few hours longer.  But that suggestion is false.  The full history, which Defendant has chosen to omit, demonstrates that SeAH did not agree that the short extension allowed by Commerce was sufficient.

---

[4] *See* SeAH's March 9, 2022, Letter (PRRD-15).

[5] *See* Letter to J. Winton, March 10, 2022 (PRRD-17).

[6] *See* SeAH's March 10, 2022, Letter (PRRD-18).

[7] *See* Letter to All Interested Parties, March 11, 2022 (PRRD-19), and File Memorandum, March 14, 2022 (PRRD-20) (correcting typographical error in March 11 letter).

[8] *See* SeAH's March 14, 2022, Letter (PRRD-21).

[9] *See* Letter to All Interested Parties, March 15, 2022 (PRRD-22).

> 2. *While All Parties, including Commerce, Had Access to*
> *the Relevant Texts Years Before the Remand Was Ordered,*
> *SeAH Had No Reason to Expect Commerce to Interpret Those*
> *Texts in the Manner Set Forth in the Draft Redetermination*

Defendant also asserts that SeAH should not have needed additional time because, unlike Commerce and the other parties, SeAH was already familiar with all of the statistical texts referenced in the Draft Redetermination, since all of those texts had been cited by SeAH in its arguments to this Court and to the CAFC.[10]  It should be noted, however, that SeAH had already included copies of nearly all of the materials cited in its arguments to this Court and the CAFC in the joint appendix filed with this Court.[11]  Commerce therefore already had access to nearly all of those documents years before the CAFC made its decision.  Commerce's instructions requiring SeAH to submit those documents on the record of the remand proceeding was nothing more than a formality.

Furthermore, there is no basis to Defendant's assertion that SeAH's familiarity with the relevant texts meant that it did not need time to respond to the Draft Redetermination. The Draft Redetermination dismissed the texts cited by SeAH on the grounds that they described the use of Cohen's *d* for very different purposes than Commerce's Differential Pricing Analysis.[12]  The Draft Redetermination then went on to make claims about statistical analysis that (in our view) are contrary to both mathematical logic and basic statistical practice.  The Draft Redetermination also contained a detailed analysis of the

---

[10] *See* Defendant's Amended Response at 10.

[11] SeAH's briefs before the CAFC referenced one article that had not been included in the joint appendix submitted to this Court.  At oral argument, the CAFC requested that SeAH submit a copy of that article.  The next day (May 5, 2021), SeAH filed a motion to amend the joint appendix to include that article, which the CAFC granted on May 14.

[12] *See* Draft Redetermination at 19-25.

effect of the Differential Pricing Analysis on Commerce determinations in investigations over two full years.[13]

It is, unfortunately, much easier to formulate misleading and illogical arguments than to debunk them. Commerce took 99 days to come up with the misstatements of statistical principles and practices set forth in its Draft Redetermination. The 11 days that Commerce allowed SeAH to refute them was plainly insufficient.

> 3. *SeAH Was Permitted, in Its Comments to this Court, to Expand on Comments Arguments Presented to Commerce, and to Address Contentions Set Forth in Commerce's Final Redetermination that Were Not Mentioned in Its Draft*

In our initial comments, we demonstrated that the relatively small, random fluctuations in the exchange rates actually used by Commerce in this case could, by themselves, lead to a finding of a pattern under Commerce's Differential Pricing Analysis. Both Defendant and Welspun object that SeAH failed to exhaust its administrative remedies on this issue.[14]

In fact, we raised the issue of the effect of exchange rates on observed U.S. prices in our comments before Commerce and to this Court to demonstrate that the observed U.S. prices could be affected by random factors. The argument was meant to support our broader position that Commerce could not properly consider only the size of the difference between two sets of U.S. prices, without also considering the possibility that the observed price differences might arise from random fluctuations.

---

[13] *Id.,* at 56 and Attachments 1 and 2.

[14] *See* Defendant's Amended Response at 27-28; Welspun's Response at 26.

Commerce's Draft Redetermination had not addressed whether random factors could affect U.S. prices.[15]  In our comments on the Draft, we pointed out various ways in which U.S. prices might be affected by random factors, including random fluctuations in exchange rates.[16]  We also provided an extensive discussion explaining why an analysis that was focused solely on the *d* statistic as a measure of effect size could be "fooled" by randomness.[17]

In response to these arguments, the Final Redetermination expressly held that randomness could not have affected SeAH's prices:

> A company's pricing behavior in a market economy has nothing to do with chance, including the U.S. prices established by SeAH during the POI. A company's pricing behavior is foundationally based on corporate strategies and goals, including maximizing profit, within the bounds of supply and demand in the marketplace. Thus, the differences in a company's prices do not reflect chance, but the company's market research, corporate practice and priorities, resulting in deliberative pricing decisions. This is further supported by record evidence, which

---

[15] The Draft Redetermination addressed randomness only as a possible source of error in sampling, which it deemed irrelevant to an analysis of an entire population.  *See* Draft Redetermination at 12 and 18-19.

[16] SeAH's comments on the Draft Redetermination stated that:

> Nevertheless, it is obvious that sales prices may be affected by factors other than the identity of the customer, the timing of the sale, or the geographic region in which the sale is made. A seller may, for example, set its U.S. prices for all sales based on a fixed amount in a foreign currency, and then calculate U.S. prices *using daily exchange rates that fluctuate randomly*....  In such circumstances, it is possible that random variations in prices may distort comparisons of the prices for sales to different customers, time periods, or regions, especially when there are only a small number of data points in the groups being compared.

SeAH's Comments on Draft Redetermination at 19-20 (emphasis added).

[17] *See id.* at 6-13 and 17-20.

demonstrates, for example, that SeAH is involved to a high degree in market research. Accordingly, SeAH's implication that its, or any company's, prices are determined by chance, and that this would invalidate the results of Commerce's Cohen's *d* test without further statistical analysis to account for such chance or random fluctuations, is without merit.[18]

Significantly, the Final Redetermination's argument on this point had not been presented in Commerce's Draft Redetermination. In order to refute it, we provided, in our comments to this Court, a detailed calculation showing just how the random fluctuations in the actual exchange rates used by Commerce could, by themselves, give rise to a finding of a "large" Cohen's *d* for all of the sales during the period.[19]

Commerce's Final Redetermination also claimed that it was permitted to consider price differences that arose purely from random fluctuations as evidence of a "pattern." Thus, Commerce's Final Redetermination stated:

> Third, as discussed above, "random fluctuations" or chance are not considered as a factor to discount a respondent's reported prices or price adjustments. The purpose of the Differential Pricing Analysis is to determine whether the A-to-A method is the appropriate comparison methodology to calculate a company's weighted-average dumping margin. Accordingly, all U.S. prices and adjustments used to determine the net U.S. price for comparison with the normal value are relevant for determining whether those net U.S. prices differ significantly. While some of these values may not be fully under the control of the seller (*e.g.*, exchange rates or how long a customer takes to pay for the merchandise), each of these values are used for calculating the net U.S. price for comparison with the normal value; therefore, they are also relevant to the examination of whether these same U.S. prices differ significantly.[20]

---

[18] Final Redetermination at 45 (footnote omitted).

[19] *See* SeAH's Initial Comments at 22-28.

[20] Final Redetermination at 58-59.

Again, the Final Redetermination's argument on this point had not been presented in Commerce's Draft Redetermination.

In our comments to the Court, we presented two arguments that responded to Commerce's claim: *First*, we pointed out that Commerce's own definition of the term "pattern" required it to determine whether observed price differences were "beyond something that occurs by chance."[21] *Second,* we pointed out that the statute expressly provides that "Fluctuations in exchange rates shall be ignored."[22]

Defendant and Welspun contend that SeAH failed to exhaust administrative remedies with respect to the detailed calculation we presented to refute Commerce's claim that SeAH's U.S. prices could not be affected by randomness, as well as our reference to the statutory requirement that "Fluctuations in exchange rates shall be ignored." However, it is well-established that, when an agency's final decision is based on contentions that were not made previously, parties are allowed to challenge those contentions on appeal with arguments that were not presented during the administrative proceeding.[23] In this case, the arguments in question were presented to refute claims that Commerce made in its Final

---

[21] *See* SeAH's Initial Comments at 21, quoting Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Welded Line Pipe from Korea (Oct. 5, 2015) at 20.

[22] *See* SeAH's Initial Comments at 28, quoting 19 U.S.C. § 1677b-1(a).

[23] *See, e.g.*, *Papierfabrik August Koehler AG v. United States*, 971 F.Supp.2d 1246, 1256, n.14 (CIT 2014) (exhaustion of argument concerning construction of regulations not required where party "could not have opposed the Department's construction of the regulations, which did not appear until the Department issued the Final Results."); *Globe Metallurgical v. United States*, 781 F.Supp.2d 1340, 1357 (CIT 2017) (exhaustion not required where "issue of Commerce's treatment of ... expense ratios first manifested itself in the Final Results.").

Redetermination, but not in the Draft Redetermination.  As a result, the exception to the exhaustion requirement plainly applies to SeAH's arguments.

As a separate matter, it should be noted that SeAH's comments on Commerce's Draft Redetermination had argued that the Differential Pricing Analysis could be misled by random fluctuations in exchange rates.[24]  The discussion of exchange rates in our comments to the Court provided a more detailed and concrete demonstration of that point, in order to refute Commerce's suggestion that such random processes could not affect SeAH's prices.  In this regard, it is well-settled that a party is permitted on appeal to expand upon arguments made during the agency proceeding.[25]

In this case, Commerce was fairly on notice that SeAH was arguing that random fluctuations in exchange rates could improperly give rise to a "false positive" finding of a pattern under Commerce's DPA.  Commerce explicitly responded to that claim in its Final Redetermination.  In our initial comments to this Court, we demonstrated that Commerce's response to our argument was contrary to the evidence.  Despite having 60 days to respond to the analysis presented in our comments, neither Defendant nor Welspun have identified any flaws in our calculations.  Unable to answer the substance of our arguments, they seek to have those arguments ignored on baseless procedural grounds.  The Court should reject that effort.

---

[24] *See* note 16, above.

[25] *See, e.g.*, *Juancheng Kangtai Chemical v. United States,* Slip Op. 15–93 at 42 (CIT Aug. 21, 2015); *Trust Chem v. United States,* 791 F.Supp.2d 1268, n.27 (CIT 2011); *Solvay Solexis v. United States,* 637 F.Supp.2d 1306, 1309 n. 2 (CIT 2009).

B.   *The CAFC's Holding in This Case*

1.   *The CAFC's Rejection of Commerce's Use of Cohen's d Was Based on Judicial Notice of Basic Statistical Principles, Not Evidence on the Record*

Both Defendant and Welspun object to citations in our initial comments to certain academic materials that were not formally placed on the record of Commerce's remand proceeding.[26]  Their arguments are, however, based on a misrepresentation of the task assigned to Commerce by the CAFC decision.

The CAFC's decision in this case did not hold that Commerce's use of Cohen's *d* was inconsistent with evidence on the record.  As the Court may recall, SeAH attempted to refer to various academic texts in its case brief in the original investigation in this case. Commerce rejected that request, and required SeAH to submit a redacted brief with all references to the academic texts expunged.  On appeal, both this Court and the CAFC upheld Commerce's rejection of SeAH's case brief.[27]  Consequently, when the CAFC issued its decision, it could not have been relying on academic texts that were already on the record.

Instead, the CAFC took judicial notice of various principles of statistical analysis, as reflected in the academic texts it cited.  The CAFC did not instruct Commerce to dissect those particular texts.  Instead, it directed Commerce to explain how its use of Cohen's *d* was consistent with normal statistical practice, as reflected in those texts.

---

[26] *See* Defendant's Amended Response at 11; Welspun Response at 19.

[27] *See Stupp v. United States*, 359 F. Supp. 3d 1293, 1300-01 (CIT 2019), and 5 F.4th 1341, 1350-51 (Fed. Cir. 2021).

In the remand proceeding, Commerce instructed SeAH to place all of the texts referenced by the CAFC on the record of the remand.  And, while Commerce gave other parties an opportunity to rebut those texts, it did not allow SeAH *any* opportunity to supplement the materials referred to by the CAFC.[28]

In our initial comments (and in this reply), we have relied primarily on the texts that were previously placed on the record of the remand proceeding.  We have supplemented those references on a few points to provide further confirmation of statistical practice and to rebut false claims that Commerce made in response to our arguments and that are not supported by evidence on the record.[29]  Like the CAFC, the Court plainly is permitted to take judicial notice of those materials to understand the statistical principles at issue in this case.

---

[28] *See* Letter to All Interested Parties (Oct. 29, 2021) (PRRD-1).

[29] For example, at page 7 of our initial comments, we cited two academic texts to refute Commerce's unsupported and false claim that "overlap" is not a measure of effect size.  At pages 8 to 9 of our initial comments, we cited two academic texts to refute the false suggestion by Commerce that the only source of statistical principles relevant to this case are the texts explicitly cited by the CAFC.  At page 25 of our initial comments, we cited an academic text to refute Commerce's false claim that random factors could not affect the actual prices charged by SeAH.

Finally, we note that the article by Professor Cohen that is discussed at page 12 of our initial comments is summarized in Professor Ellis's text (which is part of the record).  *See* Ellis, Paul, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results* 41 (2010) (CRRD-15, PRRD-8).  Furthermore, Cohen's textbook (which is part of the record) also provides the same basic information.  *See* Cohen, Jacob, *Statistical Power Analysis for the Behavioral Sciences*, at 13 and 26-27 (2d ed.1988) (CRRD-12, PRRD-8).

    2.    *The CAFC's Decision Explicitly Required*
           *Commerce to Explain Why the CAFC's*
           *Suggested Hypothetical Example Did Not*
           *Invalidate Commerce's Use of Cohen's d*

In its decision, the CAFC expressed a separate concern that Commerce's simplistic application of its Cohen's $d$ test could generate arbitrary results when applied to data with a small number of observations or small price differences.[30]  Importantly, Commerce's Redetermination does not appear to dispute the conclusion that the CAFC's example would generate a false-positive "passing" result under the Cohen's $d$ test.  However, the Redetermination asserted that any harm caused by that false positive would be ameliorated by the "meaningful difference" test, since the minor price differences generated by the CAFC's hypothetical example would result in insignificant difference in the dumping margins under the different comparison methodologies.[31]

In our comments on Commerce's Draft Redetermination, we provided an example showing how, when the CAFC's hypothetical is expanded to consider two products, Commerce's use of Cohen's $d$ can generate a "false positive" finding of a pattern when none truly exists, and that such a "false positive" can increase the dumping margins significantly.  In our initial comments to this Court, we showed that the increase in dumping margins caused by such a "false positive" would be more than sufficient to change a *de minimis* dumping margin into an affirmative determination of dumping.[32]  We also provided a supplemental calculation showing that the impact of the "false positive"

---

[30] *See Stupp,* 5 F.4th at 1358-59.

[31] *See* Final Redetermination at 31.

[32] *See* SeAH's Initial Comments at 29.

would more than account for the actual change observed in SeAH's dumping margin due to the application of Commerce's methodology.[33]

Neither Defendant nor Welspun have identified any flaws in the arithmetic of the CAFC's example or in the modified example we prepared to show how consideration of two-products invalidates Commerce proposed defense to the CAFC's example.  Instead, they object only to the fact that our calculations are hypothetical, and do not reflect actual sales by SeAH.[34]  That concern should, however, be taken up with the CAFC, which expressly directed Commerce to explain why the results suggested by the CAFC's hypothetical example did not invalidate Commerce's methodology.[35]

    C.   *The Statutory Requirements*

        1.   *Commerce's Own Interpretation of the Relevant*
            *Statutory Term Requires It to Distinguish*
            *between Patterns and Chance Occurrences*

The statute provides that, before Commerce may depart from the normal "average-to-average" comparison methodology, it must find that "there is a *pattern* of {U.S. prices} that differ significantly among purchasers, regions, or periods of time."[36]  Defendant and Welspun contend that the statutory provision does not explicitly require Commerce to

---

[33] *Id.* at 30-33.

[34] *See* Defendant's Amended Response at 28.

[35] *See Stupp,* 5 F.4th at 1358-59.

[36] 19 U.S.C. §1677f-1(d)(1)(B)(i) (emphasis added).

distinguish between "patterns" that meet the statutory requirements and price differences that arise by chance.[37]

Their arguments are, however, contrary to Commerce's own interpretation of the term "pattern." According to Commerce,

> a 'pattern of prices that differ significantly among purchasers, regions or time periods' means that the Department is examining the extent to which the prices, when ordered by purchaser, region or time period, exhibit differences which have meaning, which have or may have influence or effect, which are noticeably or measurably large, and which may be *beyond something that occurs by chance....*"[38]

That definition necessarily requires that a distinction be drawn between "differences which have meaning" and differences "that occurs by chance."

Defendant asserts that Commerce's definition of "pattern" is modified by a further statement that Commerce examines "whether from the extent of these price differences one can reasonably make a conclusion about the characteristics of the exporter's pricing behavior."[39] But nothing in that statement changes the fundamental point: As Commerce itself has stated, a "pattern" must be more than "something that occurs by chance."

---

[37] *See* Defendant's Amended Response at 24 ("The antidumping statute does not specify how Commerce may determine that a pattern exists and whether prices differ significantly, let alone require a particular sequence in Commerce's analysis or use of statistical techniques."); Welspun's Response at 25 ("Simply put, Commerce is under no obligation to determine whether the significant price differences identified by the Cohen's *d* test may have occurred by chance or at random.").

[38] *See* Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Welded Line Pipe from Korea (Oct. 5, 2015) at 20 (emphasis added) (PR-406).

[39] *See* Defendant's Amended Response at 24.

2.  *Commerce Cannot Lawfully Assume*
    *Away the Statutory Requirements*

The statute grants the Department authority to depart from the normal average-to-average methodology only when certain factual prerequisites are satisfied.[40]  In such circumstances, the ultimate burden of proof for establishing the existence of those prerequisites falls on the Department.[41]

Because the statute, as interpreted by Commerce, requires that patterns be distinguished from chance occurrences, Commerce is required to demonstrate that any price differences it identifies do, in fact, represent patterns.  In its Final Redetermination, Commerce asserted that it did not need to address the possibility that observed price differences arose by chance.  Instead, Commerce claimed that it could simply assume that any "large" price differences must not have been the result of chance.[42]  But nothing in mathematics or in the statistical texts discussed in Commerce's Redetermination supports that view.

The entire thrust of Professor Cohen's work on "effect size," as reflected in his *d* statistic, was to provide a tool for assessing whether an observed effect was the result of some underlying causal relationship or instead the result of chance — in other words, whether the observed data permitted the researcher to reject the "null hypothesis" that the

---

[40] *See* 19 U.S.C. § 1677f-1(d)(1)(B).

[41] *See, e.g.*, *Creswell Trading Co. Inc. v. U.S.*, 15 F.3d 1054, 1060–61 (Fed.Cir. 1994) ("The 'if' clause ... sets forth on its face a statutory condition that Commerce must establish before it may exercise its right to levy a countervailing duty against an investigated party, as opposed to an exception into which that party must prove its actions fall. The ultimate burden of proof is thus upon Commerce to establish by a preponderance of the evidence" that the statutory condition has been satisfied").

[42] *See* Final Redetermination at 45.

observed result was generated by chance.  His proposed tool for that purpose was a concept

he referred to as "power," which he defined as follows:

> The power of a statistical test of a null hypothesis is the probability
> that it will lead to the rejection of the null hypothesis, *i.e.*, the
> probability that it will result in the conclusion that the phenomenon
> exists.[43]

According to Professor Cohen, measuring this "power" required not only consideration of

the "effect size," but also assessment of statistical significance.[44]

Importantly, Professor Cohen demonstrated that the "effect size" (as measured by his

*d* statistic) could be *directly* converted into a measurement of "power."  However, this

conversion depended explicitly on the assumption that the two data sets being compared

were equal size, were drawn from a Normal population, and had equal variance.[45]  When

those criteria were met, the likelihood that the observed effect was not the result of chance

(*i.e.,* that the null hypothesis could be rejected) depended on both the effect size and the

number of data points considered.[46]

In these circumstances, it is not possible to divorce "effect size" (as defined by

Professor Cohen) from the concept of statistical significance.  Instead, both the effect size

and the statistical significance must be considered in order to reach a conclusion whether

the proposed phenomenon exists.  Commerce's failure to consider statistical significance,

---

[43] *See* Cohen at 4.

[44] *Id.* ("The power of a statistical test depends upon three parameters: the significance criterion, the reliability of the sample results, and the 'effect size,' that is, the degree to which the phenomenon exists.").

[45] *Id.* at 27.

[46] *Id.* at 27-39.

or to limit the use of the *d* statistic to the circumstances described by Professor Cohen, confirms that it has not satisfied its statutory burden to show that the observed price differences did not occur by chance.

### D.   The Different Measures of Effect Sizes

Defendant's claim that Commerce's use of Cohen's *d* is consistent with normal statistical practice is based on a fundamental error.  Defendant's argument relies on the assumption that the terms "Cohen's *d*" and "effect size" are equivalent.[47]  Based on that assumption, they suggest that any academic text that endorses consideration of "effect sizes" must also be endorsing the use of Cohen's *d*.  Thus, when Professor Ellis states that "{t}he best way to measure an effect is to conduct a census of an entire population," Defendant's assume that Professor Ellis is endorsing the use of Cohen's *d* — and of Professor Cohen's proposed thresholds — based on an entire population's data.[48]

But, in reality, nothing in Professor Ellis's text suggested that *d* is the only possible measure of effect size, or that *d* can properly be used when conducting a census of an entire population that does not satisfy the assumptions described by Professor Cohen for use of the *d* statistic.  Furthermore, nothing in Professor Ellis's text suggested that the thresholds proposed by Professor Cohen for use with the *d* statistic can be applied when the assumptions described by Professor Cohen for the use of that statistic are not satisfied.

Instead, Professor Ellis's observation stands for the common-sense observation that, because samples necessarily introduce the risk of sampling error, the most accurate method

---

[47] *See, e.g.*, Defendant's Amended Response at 6 ("The effect size ... is measured by the Cohen's d test"); *id.* at 7 ("Effect size, as used in Commerce's Cohen's d test, is well-suited to such tasks to determine whether prices differ significantly.")

[48] *See, e.g.*, *id.* at 5-6 (quoting Ellis at 4); *id.* at 14 (quoting Ellis at 5).

for measuring characteristics of an entire population is an analysis of the entire population. If one wants to know the average height of groups of students in a high school, the most accurate method for determining the difference is to take the heights of *all* students and compute the average for each group from that data.  A "short-cut" method that only measures samples of the student body runs the risk of distortion if the samples selected do not perfectly reflect the population as a whole.

But, whether the survey is conducted for the population as a whole or just for random samples, the outcome of the survey will be a set of figures in units of inches (or millimeters).  The measurement for each student is a number of inches (for example, 5'2" for one student, 5'6" for a second, 5'8" for a third).  The average of the heights are also figures in inches (for example, 5'4" for 13-year-olds and 5'5½" for 18-year-olds).  The difference between those averages is easy to compute.  But the importance of that difference is not apparent simply from the fact that there is a difference for the heights measured in inches.[49]

In this regard, Professor Cohen's textbook observed that it is possible to convert the difference between two datasets into a "dimensionless" figure that is independent of the

---

[49] In this regard, Professor Cohen's the textbook began with the observation that effect sizes arise, natively, in a variety of units of measure (such as dollars, or IQ points), and not as an index (such as the "dimensionless" *d*).  *See* Cohen at 11 ("To this point, the ES has been considered quite abstractly as a parameter which can take on varying values (including zero in the null case). In the previous illustrations, ES was variously expressed as a departure in percent from 50, a departure in IQ units from 100, a product moment *r*, a difference between two medians in dollars, etc.").

actual units of measure.[50]  In this regard, Professor Cohen proposed that such a

"dimensionless" measure of effect size would be useful for two purposes:

> (1)   to allow the preparation of "power" tables that could be used to design
>
> experiments across a range of subjects; and[51]
>
> (2)   to convey the significance of any observed difference more intuitively where the
>
> actual units of measure are arbitrary (such as the points assigned to an option on
>
> a survey of preferences).[52]

---

[50] *Id.* ("{A}s will be seen in Chapter 2, the ES index for differences between population means is standardized by division by the common within-population standard deviation (σ)....").

[51] *Id.* ("However, some generalization is obviously necessary. One cannot prepare a set of power tables for each new measurement unit with which one works. That is, the researcher who plans a test for a difference in mean IQs must use the same power tables as another who plans a test for a difference in mean weights, just as they will use the same tables of t when the research is performed. t is a "pure" (dimensionless) number, one free of raw unit, as are also, for example, correlation coefficients or proportions of variance.").

[52] As Professor Cohen explained,

> The use of *d* is not only a necessity demanded by the practical
> requirements of table making, but proves salutary in those areas of the
> behavioral sciences where raw units are used which are quite arbitrary
> or lack meaning outside the investigation in which they are used, or
> both. Consider, for example, the question whether religious groups A
> and 8 differ in their favorableness toward the United Nations. The
> latter may well be indexed by an ad hoc attitude scale which yields a
> score expressed in points, such that the more points the more favorable
> the attitude. The absolute size of a point is a consequence of
> arbitrariness in the decisions made by the investigator, and/or in the
> scale construction method, and/or in the writing or selection of the
> items. If the A population has a mean of 280 and the B population a
> mean of 270, the question "How large is the effect?" can only be
> answered with "ten points," a generally unsatisfactory answer in the
> absence of a basis for answering the necessarily following question,
> "Well, how large is a point?"

*Id.* at 20-21.

As discussed in our initial comments, Professor Cohen proposed a variety of different effect-size indices that could be used in conjunction with different tests of statistical significance.  The $d$ index was proposed for use with a "t-test," and not for use in conjunction with any other tests of statistical significance.[53]  Instead, Professor Cohen proposed seven different effect-size indices — which he labeled $r, q, g, h\ w, f,$ and $f^2$ — for use in other situations.[54]  And, for each of those indices, Professor Cohen proposed separate thresholds for determining whether an effect was small, medium, or large.[55]

In these circumstances, Defendant's suggestion that the term "effect size" in academic texts can be interpreted to mean "the calculated value of Cohen's $d$" is flatly wrong. Cohen's $d$ is one of many different measures of effect size.  The $d$ statistic is appropriate for use in the specific circumstances described by Professor Cohen — that is, in conjunction with a "t-test" of statistical significance.  And, by the same token, the thresholds Professor Cohen proposed for assessing whether a $d$ value is small, medium, and large also are appropriate only when the requirements for using the $d$ index are satisfied.  In this regard, Commerce itself has admitted that a "t-test" can properly be used only when the data satisfies the assumptions of Normality, equal variances, and sufficient data points.[56] Consequently, the use of Cohen's $d$ when those prerequisites are not satisfied is contrary to statistical practice.

---

[53] *See* SeAH's Initial Comments at 9.

[54] A table summarizing the tests of statistical significance associated with each of the effect-size indices proposed by Professor Cohen is set forth on page 24, below.

[55] *See* SeAH's Initial Comments at 9.  *See also* Ellis at 41 (listing proposed thresholds for each effect-size index described by Cohen).

[56] See SeAH's Initial Comments at 10, citing Final Redetermination at 42-43.

E.   *The Meaning of Professor Cohen's Text*

1.   *Professor Cohen's Text Makes Clear that the d Statistic Was Intended Solely in Conjunction with a "t-Test for Means" for Data that Met the Assumptions of Normality, Roughly Equal Variances, and Sufficient Data Points*

Defendant has claimed that our contention about Professor Cohen's intended use of the *d* statistic is unsupported and contrary to the evidence.  According to Defendant,

> SeAH asserts ... that Cohen's d test "was intended for use *solely* in conjunction with a 't-test.'" SeAH Br. at 9 (emphasis in the original). However, SeAH's cited source only provides the definition of the t-test and does not support the proposition for which it is cited. This is not surprising because SeAH's contentions are contrary to record evidence.[57]

Defendant's assertion does not, however, accurately reflect the citations offered by SeAH or the actual text of Professor Cohen's book.

As we explained in a passage from our initial comments that Defendant has chosen to ignore, "The text in which Professor Cohen introduced his *d* statistic actually includes numerous alternate measures of effect size ('ES'), each of which is designed for use with a specific type of test of statistical significance."[58]  In this regard, Chapter 1 of Professor Cohen's textbook explains that "Each of the Chapters 2-13 will present in some detail the ES index appropriate to the test to which the chapter is devoted."[59]  Chapter 1 then goes on to provide the following explanation of the structure of each of the following chapters:

---

[57] *See* Defendant's Amended Response at 18-19.

[58] *See* SeAH's Initial Brief at 9.

[59] *See* Cohen at 13.  This passage was quoted in footnote 23 on page 9 of SeAH's initial brief.

PLAN OF CHAPTERS 2-10
Each of the succeeding chapters presents a different statistical test.
They are similarly organized, as follows:

*Section 1.* The test is introduced and its uses described.
*Section 2.* The ES index is described and discussed in detail....[60]

Chapter 2 of Professor Cohen's textbook is titled "The t-Test for Means."[61]  Section 2.1 of that Chapter describes the "t-test" and the assumptions of Normality, equal variances, and sufficient data points required for its use.[62]  Section 2.2 of Chapter 2 then introduces the *d* statistic.[63]  Given Professor Cohen's description of his text's organization, it is clear that the *d* statistic introduced in the second section of Chapter 2 (that is, Section 2.2) must be "the ES index appropriate to the test to which the chapter is devoted," which, in the case of Chapter 2, is the "t-test for means."

The remaining chapters mentioned by Professor Cohen (Chapters 3 to 10), all describe different tests for statistical significance.  All of those chapters also identify the effect-size index to be used in conjunction with the test of statistical significance identified in the chapter.[64]  The *d* statistic is not identified as the appropriate effect-size index in any of those chapters.  Instead, the relevant effect size indices are as follows:

---

[60] *Id.* at 17.

[61] *Id.* at 19.

[62] *Id.*  Professor Cohen's text numbered the sections in each chapter first with the chapter number and then with the section number.  Thus, the first section of Chapter 2 is identified as Section 2.1, the first section of Chapter 3 is identified as Section 3.1, and so on.

[63] *Id.* at 20.

[64] *See, e.g.*, *id.* at vii to ix (table of contents for each chapter).

| Chapter | Test of Statistical Significance | Proposed Effect Size Index |
|---|---|---|
| 3 | The Significance of a Product Moment $r_s$ | r |
| 4 | Differences between Correlation Coefficients | q |
| 5 | The Test that a Proportion is .50 and the Sign Test | g |
| 6 | Differences between Proportions | h |
| 7 | Chi-Square Tests for Goodness of Fit and Contingency Tables | w |
| 8 | The Analysis of Variance and Covariance | f |
| 9 | Multiple Regression and Correlation Analysis | $f^2$ |
| 10 | Set Correlation and Multivariate Methods | $f^2$ |

It is clear, therefore, that Professor Cohen envisioned the *d* statistic to be used only in the circumstances described in Chapter 2 of his text, as the effect size index appropriate to the "t-test," just as we claimed in our initial comments. In these circumstances, there is no basis for Defendant's claim that our statement was "contrary to record evidence."

> 2. *Professor Cohen's Text Does Not Envision the Use of the d Statistic when the Variances and Number of Data Points in the Two Datasets Differ Greatly*

Defendant asserts that Professor Cohen's text includes a formula for calculating the *d* statistic that specifically takes into account the possibility that the two datasets may have different variances. According to Defendant:

> When "there is no longer a common within-population σ," (in other words, the standard deviation of group A and group B are not equal), then Dr. Cohen provides for an alternative calculation of the denominator of effect size as used by Commerce to calculate the Cohen's *d* coefficient in this investigation.[65]

---

[65] *See* Defendant's Amended Response at 13, citing Cohen at 44 (equation 2.3.2).

- 23 -

But that description takes a statement by Professor Cohen out of context to create a misleading impression.

In reality, Professor Cohen's text makes clear that differences in variance will distort the results, but the distortion caused by "moderate" differences may be small *if* the number of datapoints in the two groups being compared is approximately equal.  Thus, in his explanation of the very formula cited by Defendant, Professor Cohen states that:

> For normal populations of unequal variance, the formula for *t* does not follow the tabled values for *t*, that is, this condition constitutes a "failure of the assumptions" (or more properly conditions) under which *t* is generated. However, there is ample evidence for the robustness of the t test despite *moderate* failure of this assumption *provided that sample sizes are about equal....*

> Note that if $\sigma_A \neq \sigma_B$ and it is also the case that $n_A \neq n_B$, the nominal values for *t* and power at a given significance criterion, *a*, may differ greatly from the true values.... Under these conditions ($\sigma_A \neq \sigma_B$ and $n_A \neq n_B$, simultaneously), the values in Tables 2.3 may be greatly in error.[66]

In short, the full context, which Defendant has chosen to omit, demonstrates that the *d* statistic is not robust when the data being analyzed does not satisfy the assumptions of roughly equal variances and roughly equal data points.

> 3.   *Professor Cohen's Text Does Not Envision the Use of the d Statistic to Analyze an Entire Population that Does Not Satisfy His Assumptions*

As noted in our initial comments, "None of the texts {discussed in the Final Redetermination} explicitly addresses the use of Cohen's d when an entire population, and

---

[66] *See* Cohen at 43-44 (In this regard, the terms $\sigma_A \neq \sigma_B$ in Professor Cohen's text refer to the standard deviations of datasets A and B, while the terms $n_A$ and $n_B$ refer to the number of datapoints in each of those datasets.)

not just a sample, is being analyzed."[67]  In response, Defendant claims that Professor

Cohen's text does envision precisely such a use of his effect-size indices.  According to

Defendant,

> Contrary to SeAH's unsupported assertion, see SeAH Br. at 7, as
> described above, Dr. Cohen distinguishes between the general situation
> of determining effect size based on full populations of data, and further
> the specific application of effect size along with statistical significance.
> Although the purpose of Dr. Cohen's text "is to provide a self-
> contained comprehensive treatment of statistical power analysis from
> an 'applied' viewpoint" (see Cohen at 1 (C.R.R. 12; P.R.R. 8)) where
> effect size is one element of Dr. Cohen's power analysis, as part of that
> analysis based on sampled data, Dr. Cohen states that "{g}enerally, we
> can define the effect in the sample (ESs) using sample statistics in the
> same way as we define it for the population…."  (see Cohen at 17
> (C.R.R. 12; P.R.R. 8) (emphasis in original)).  Further, the equations
> used by Dr. Cohen demonstrate the differences between the calculation
> of effect size based on populations and the estimation of effect size
> based on sampled data.  Dr. Cohen's equations 2.2.1, 2.2.2 and 2.3.2
> denote the values for the populations' parameters used to calculate the
> actual effect size, whereas Dr. Cohen's equations 2.5.1 and 2.5.2
> provide the equivalent formulas using the estimated values based on
> sampled data.[68]

A careful review of Professor Cohen's text reveals, however, that Defendant's claim is

wrong — that it takes statements out of context and interprets technical terms used by

Professor Cohen in a manner contrary to his actual definitions.

At bottom, Defendant's misinterpretation is based on the assumption that Professor

Cohen's term "population parameters" refers to parameters calculated using actual data for

the population as a whole.  That assumption is false.  Professor Cohen's text makes clear

that "population parameters" are *estimated* parameters that are *assumed* to be constant for

---

[67] SeAH's Initial Comments at 7.

[68] Defendant's Amended Response at 14.

the population as a whole.[69]  Professor Cohen's text also indicates that statistical calculations using these estimated "population parameters" are appropriate when using "power" analysis to design an experiment, while calculations using "sample" statistics are appropriate when calculating the statistical significance of the results of a completed experiment.[70]  Nothing in Professor Cohen's text refers to the calculation of an effect size using "full" data for an entire population.

The error in Defendant's interpretation can be seen by examining Equation 2.2.1, which Defendant describes as denoting "populations' parameters used to calculate the actual effect size."  In fact, Equation 2.2.1 is explicitly described by Professor Cohen as addressing the "the two independent *samples* case."[71]  Furthermore, both equations 2.2.1 and 2.2.2 are subsequently referred to by Professor Cohen as describing "*d* of independent *samples*."[72]  In other words, Professor Cohen's reference to "population parameters" describes assumptions used in statistical calculations that are applied *to samples*.  It was not a description of a calculation of parameters based on data for an entire population.

The actual difference between the "population parameter" equations 2.2.1, 2.2.2, and 2.3.2 and the "sample" equations 2.5.1 and 2.5.2 in Professor Cohen's text relates to the purpose for which the analysis is performed.  Professor Cohen makes clear that equations 2.2.1, 2.2.2, and 2.3.2 are to be used *ex ante* for "research planning," while equations 2.5.1

---

[69] *See* Cohen at 8-10.

[70] *Id.* at 66.

[71] *Id.* at 20 (emphasis added).

[72] *Id.* at 62 (emphasis added).  In this regard, Professor Cohen also describes the use of formulas 2.2.1 and 2.2.2 to determine the appropriate sample size for experiments.  *Id.* at 53.

and 2.5.2 are to be used *ex post* in the "appraisal of research results."[73]  None of the formulas referenced by Defendant, and none of the technical explanation in Professor Cohen's text, addresses the use of his *d* statistic as a measure of effect size for a population as a whole for data that does not meet the assumptions required for a "t-test."

In short, Defendant's argument is based on a flawed interpretation that is explicitly refuted by the very formulas they cite.  As Professor Cohen made clear, his *d* statistic was intended for use solely in conjunction with a "t-test" and data that met assumptions of Normality, roughly equal variances, and sufficient data points.  And, nothing in Professor Cohen's text describes the use of the *d* statistic to evaluate data for an entire population.

    4.   *Professor Cohen's Text Explicitly Relied on the Mathematical Characteristics of Normal Distributions to Justify His Proposed Thresholds*

As explained in our initial comments, Normal distributions have unique mathematical characteristics.[74]  Statisticians rely on those characteristics to perform calculations that are not possible for non-Normal distributions.

Defendant has argued that, because our brief refers to the use of the mathematical characteristics of Normal distributions to "predict" the distribution of data, those characteristics have no bearing on the use of Professor Cohen's thresholds to analyze a full population's data.[75]  That suggestion is, however, contrary to the evidence on the record, and inconsistent with basic mathematics.

---

[73] *See id.* at 66.

[74] *See, e.g.*, SeAH's Initial Comments at 10, n. 28

[75] *See* Defendant's Amended Response at 17.

While Professor Cohen claimed to have derived his thresholds from observations of heights and IQs, his text explicitly sought to justify their use by reference to their mathematical significance when applied to data from a Normal distribution.[76] Furthermore, as we have explained previously, the heights and IQs that Professor Cohen reportedly used as the basis for his thresholds are themselves Normally distributed.[77]

The mathematical characteristics of Normal distributions allow such distributions to be described solely by their mean and standard deviation.[78]  Two Normal distributions can, therefore, be accurately compared simply by comparing their mean and standard deviation.[79]  Cohen's *d* is an example of such a comparison:  It describes the difference between two distributions by comparing the means of the two distributions and dividing the result by their pooled standard deviation.  The thresholds suggested by Professor Cohen — for example, that a *d* of 0.8 is large — were based on precisely that calculation.

---

[76] *See, e.g.*, Cohen at 21 ("If we maintain the assumption that the populations being compared are normal and with equal variability, and conceive them further as equally numerous, it is possible to define measures of nonoverlap (U) associated with *d* which are *intuitively compelling and meaningful*." (emphasis added)).  *See also id.* at 25-27 (calculating overlap for small, medium and large thresholds, assuming data is Normally distributed.); *id.* at 27 (using assumption of Normality and equal variances to generate "power tables" with the understanding that "Their major use will then be *post hoc*, *i.e.*, to find the power of a test after the experiment has been performed.").

[77] *See, e.g.*, SeAH's Initial Comments at 13.

[78] *See, e.g., id.* at 8.  *See also* Starnes, Yates, and Moore, *Statistics through Applications* at 117 (2005) (CRRD-23, PRRD-8) ("Normal curves have the special property that giving the mean and the standard deviation completely specifies the curve.").

[79] *See, e.g.*, Starnes, at 116-17 ("Why are the Normal distributions important in statistics? ....  {M}ost important, we will see that many statistical inference procedures are based on Normal distributions.").

As a matter of mathematics, however, it is not possible to accurately describe a generic, non-Normal distribution solely by reference to the mean and standard deviation of the data.  And, as a result, statistical tests, such as Cohen's *d*, that rely solely on the means and standard deviations of the datasets being compared do not accurately capture the differences between the datasets.  It is rather astonishing that, in all of the words Commerce and its counsel have written about the use of Cohen's *d* test, they have never attempted to refute that basic mathematical fact.

### F.   Practical Significance, Statistical Significance, and the Ability to Draw Logical Conclusions

Defendant's Response accuses us of "conflating" the concepts of practical and statistical significance.[80]  In their telling, statistical significance has no role when an entire population is being analyzed.  Instead, they contend that when an entire population is being analyzed, practical significance, as measured by effect size, is the only concept that matters.[81]

A simple thought experiment should, however, be sufficient to demonstrate the error in their claim.  Suppose, for example, that an extremely rare disease is known to have a very high mortality rate — where historical data shows that 83.33 percent (that is, $^5/_6$ths) of patients with that disease die within a year, while 16.67 percent (that is, $^1/_6$th) enjoy spontaneous remission and go on to enjoy a long and full life.  Now, suppose a researcher decides to test the efficacy of a new drug to treat that disease, and measures the efficacy by the average life-expectancy.  The researcher gathers the entire world-wide population of all

---

[80] *See* Defendant's Amended Response at 12.

[81] *See, e.g.*, *id.* at 17.

patients currently suffering from the disease, and finds that there are only six such patients. The researcher then divides this population into a control group of three and a treatment group of three.  After administering the treatment, the researcher finds that all of the patients in the control group and two of the patients in the treatment group have died within a year, but that one of the patients in the treatment group has achieved remission and has gone on to live another 40 years.

There undoubtedly is, on average, a very large effect-size difference between the two groups.  The average life-expectancy in the control group is only 1 year, while the average life expectancy in the treatment group is 14 years.[82]  The Cohen's *d* based on the difference in these averages would be 1.0, which is a "large" difference under Professor Cohen's proposed thresholds.[83]  According to Defendant, that fact alone establishes that there is a "practical difference" that would allow the researcher to conclude that the drug is efficacious.

But, in reality, there is no logical basis for concluding that the drug actually caused the better results of the treatment group.  As indicated above, historical experience had shown that the researcher should expect 1 in 6 patients with the disease to experience spontaneous remission even without treatment.  The data collected by the researcher is consistent with that experience — since 1 in 6 of the patients experienced remission.  The fact that the one patient that experienced remission happened to be in the treatment group *might* actually be a reflection of the efficacy of the drug treatment, but it *might* also have

---

[82] The sum of 1 *plus* 1 *plus* 40 is 42, and 42 divided by 3 is 14.

[83] The standard deviation of the control group is zero, while the standard deviation for the treatment group is 18.38 years, giving a "pooled" standard deviation of 13.  The difference in the average life expectancies of the two groups is also 13 (that is, 14 *minus* 1).

been nothing more than a chance occurrence.  In other words, the results would not be statistically significant, because the results would not permit the researcher to reject the "null hypothesis" that the results occurred by random chance.  Consequently, even though the researcher considered the entire world-wide population of patients suffering with this particular disease, and even though the researcher calculated a "large" effect size, it would not be possible to conclude whether the difference in observed outcomes represented a true pattern or just a chance occurrence.

CONCLUSION

The CAFC instructed Commerce to explain how its use of the rules-of-thumb proposed by Professor Cohen for evaluating his *d* statistic was consistent with statistical practice, when academic texts made clear that *d* has no meaning when the assumptions of Normality, roughly equal variances, and sufficient data points are not met.[84]  In addition, the CAFC gave Commerce the opportunity to support its assertion that Professor Cohen's assumptions can be ignored when the full population, and not just a sample, is being analyzed.[85]

In its Final Redetermination, Commerce has failed to answer the CAFC's questions. Commerce has admitted that its use of Cohen's *d* is consistent with normal statistical practice.  Instead, Commerce's sole justification for its practice is that the heights and IQs on which Professor Cohen based his rules-of-thumb are "real-world observations."  But SeAH's prices are not set based on the heights or IQs of its customers, and the distribution of SeAH's prices is very different from the Normally-distributed heights and IQs that

---

[84] *See Stupp*, 5 F.4th at 1360.

[85] *Id.*

Professor Cohen considered.  In such circumstances, there is no rational basis for Commerce's methodology.

The Court should, therefore, remand this matter to Commerce once more for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
WINTON AND CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20006
(202) 774-5500

Attorney for SeAH Steel Corporation

September 28, 2022