IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE
_____

| | |
|---|---|
| STUPP CORPORATION ET AL., )<br><br>Plaintiffs and Consolidated Plaintiffs, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>SEAH STEEL CORPORATION AND HUYNDAI )<br>STEEL COMPANY, )<br><br>Defendant-Intervenors and Consolidated )<br>Defendant-Intervenors. )<br>_____) | Consol. Court No. 15-00334 |

## <u>ORDER</u>

Upon consideration of the Department of Commerce's final redetermination pursuant to remand, parties' comments, defendant's response, and all other pertinent papers, it is hereby

ORDERED that the Department of Commerce's remand redetermination is sustained in all respects.


Dated: _____, 2022          _____
            New York, New York                                            JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

|  |  |
|---|---|
| STUPP CORPORATION ET AL., | ) |
| | ) |
| Plaintiffs and Consolidated Plaintiffs, | ) |
| | )   Consol. Court No. 15-00334 |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| SEAH STEEL CORPORATION AND HUYNDAI | ) |
| STEEL COMPANY, | ) |
| | ) |
| Defendant-Intervenors and Consolidated | ) |
| Defendant-Intervenors. | ) |

_____)

## DEFENDANT'S SUR-REPLY TO
## COMMENTS REGARDING THE REMAND REDETERMINATION

<div align="right">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

s/Claudia Burke
CLAUDIA BURKE
Assistant Director

s/Robert Ralph Kiepura
ROBERT RALPH KIEPURA
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

</div>

OF COUNSEL:

MYKHAYLO GRYZLOV
Senior Counsel
Office of the Chief Counsel
    for Trade Enforcement & Compliance
U.S. Department of Commerce

Tel.: (202) 305-4436
Fax: (202) 353-0461
Email: Robert.kiepura@usdoj.gov


October 28, 2022                    Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 3

I.      SeAH Arguments Are Inconsistent With The Procedures for Judicial Review of the
        Agency's Determinations ...................................................................................... 3

        A.      The Court Should Disregard SeAH's New Non-Record Documents.................... 3

        B.      SeAH Failed To Exhaust Administrative Remedies............................................. 6

II.     SeAH's Substantive Arguments Provide No Basis for Reversal ...................................... 9

        A.      Commerce Addressed the Federal Circuit's Hypothetical ................................ 11

        B.      SeAH Conflates The Concepts Of Pattern And Significant Difference .............. 12

        C.      SeAH's Contentions That The Cohen's d Test Can Only Be Used With T-Test
                And That It Cannot Be Used with Entire Population Are Unsupported.............. 13

                1.      Dr. Cohen's Text and Effect Size Based On A Population..................... 15

                2.      Cohen's d Coefficient And The t-Test ................................................. 20

                3.      Cohen's d Coefficient Based On A Full Population Of Data.................. 21

                4.      Cohen's d Coefficient And The Statistical Criteria............................... 26

                5.      Dr. Cohen's Thresholds ...................................................................... 29

        D.      SeAH Conflates Practical and Statistical Significance ...................................... 34

CONCLUSION ................................................................................................................ 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                           **Page(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    616 F. Supp. 2d 1354 (Ct. Int'l Trade 2009) ................................................... 34

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    791 F. Supp. 2d 1327 (Ct. Int'l Trade 2011) ..................................................... 4

*Boomerang Tube LLC v. United States,*
    856 F.3d 908 (Fed. Cir. 2017) .................................................................... 7, 8

*Fieger v. Michigan Supreme Court,*
    553 F. 3d 955 (6th Cir. 2009) ....................................................................... 12

*Fla. Power & Light Co. v Lorion,*
    470 U.S. 729 (1985) ...................................................................................... 3

*Globe Metallurgical v. United States,*
    781 F.Supp.2d 1340 (CIT 2017) ................................................................ 8, 9

*Guangzhou Jangho Curtain Wall Sys. Eng. Co. v. United States,*
    181 F. Supp. 3d 1265 (Ct. Int'l Trade 2016) ............................................. 7, 12

*Home Prods. Int'l Inc. v. United States,*
    633 F.3d 1369 (Fed. Cir. 2011) ..................................................................... 3

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015) ................................................................... 13

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States,*
    322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ................................................... 4

*Mid Continent Steel & Wire, Inc. v. United States,*
    940 F.3d 662 (Fed. Cir. 2019) ......................................................... 10, 31, 34

*Papierfabrik August Koehler AG v. United States,*
    971 F.Supp.2d 1246 (CIT 2014) .................................................................... 8

*SeAH Steel Corp. v. United States,*
    513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) .................................................. 11

*Stupp Corp. v. United States,*
    5 F.4th 1341 (Fed. Cir. 2021) ............................................................... passim

*Tri Union Frozen Prods. v. United States,*
 161 F.Supp. 3d 1333 (Ct. Int'l Trade 2016)...................................................5

*Wash. State Grange v. Wash. State Republican Party*,
 552 U.S. 442 (2008).......................................................................................12

*Wheatland Tube Corp. v. United States,*
 841 F.Supp. 1222 (Ct. Int'l Trade 1993) .......................................................4

**Statutes**

19 U.S.C. § 1677f-1(d) ...............................................................................13, 32

**Regultions**

19 C.F.R. § 351.301.........................................................................................5

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

|  |  |  |
|---|---|---|
| STUPP CORPORATION ET AL, | ) | |
| | ) | |
| Plaintiffs and Consolidated Plaintiffs, | ) | |
| | ) | Consol. Court No. 15-00334 |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SEAH STEEL CORPORATION AND HUYNDAI | ) | |
| STEEL COMPANY, | ) | |
| | ) | |
| Defendant-Intervenors and Consolidated | ) | |
| Defendant-Intervenors. | ) | |

_____)

## DEFENDANT'S SUR-REPLY TO
## COMMENTS REGARDING THE REMAND REDETERMINATION

Pursuant to this Courts October 6, 2022 order, defendant, the United States, respectfully

submits this sur-reply to the reply (SeAH Reply or Reply) filed plaintiff, SeAH Steel

Corporation (SeAH) on September 28, 2022 (ECF No. 236), concerning the Department of

Commerce's (Commerce) and Welspun's responses to SeAH's comments on the remand

redetermination in this case, which addresses the U.S. Court of Appeals for the Federal Circuit's

decision in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) (*Stupp*).  *Final Results of

Redetermination Pursuant to Court Remand*, dated April 4, 2022 (P.R.R. 33),[1] ECF No. 208

(*Remand Redetermination*).

_____

[1] P.R.R. stands for public remand record; C.R.R. stands for confidential remand record; P.R. and C.R. stand for public record and confidential record of the underlying investigation, respectively.

For the reasons discussed in our previous response and discussed below, this Court should sustain Commerce's *Remand Redetermination*.

## INTRODUCTION

As we demonstrated in our response to SeAH's July 14, 2022 comments (Defendant's (Def.) Response, ECF Nos. 229 & 230), Commerce's *Remand Redetermination* fully complies with the Court's order, is supported by substantial evidence, and is in accordance with law. SeAH has failed to demonstrate that it is unreasonable for Commerce to apply a portion of its analysis – specifically, the "Cohen's *d* test" – to the entire population of the respondent's actual U.S. sales data and calculate the actual population parameters (*i.e.*, mean, standard deviation, and effect size) without considering whether such population is of insufficient size (*i.e.*, number of observations), not normally distributed, and lacking roughly equal variances. These statistical criteria (size, distribution and variances of the sample data) are the bases for statistical inferences that the estimated values of the population parameters based on the sampled data are representative of the actual values of the population parameters, when the actual values are unknown. However, Commerce's differential pricing analysis, including the Cohen's *d* test, uses the actual population of U.S. pricing data as opposed to sampled data, and, thus, does not require consideration of statistical criteria that are necessary to determine through statistical inferences the reliability of the results of the Cohen's *d* test or the differential pricing analysis.

In its reply, SeAH redoubles its efforts to obtain a reversal on the basis of non-record materials and new arguments/analysis that SeAH failed to present to the agency for consideration during the remand proceeding. SeAH attempts to obtain a remand on the basis of the new factual information that is not on administrative record as well as new arguments and analyses that were not presented to the agency during the investigation or remand proceedings. SeAH's submission

provides no basis for remand and the Court should sustain Commerce's *Remand Redetermination*.

## ARGUMENT

I.    **SeAH Arguments Are Inconsistent With The Procedures For Judicial Review Of The Agency's Determinations**

A.    **The Court Should Disregard SeAH's New Non-Record Documents**

Even though approximately 1,700 pages of new factual information that SeAH had introduced before the Federal Circuit were added to the record, SeAH now contends that the Court should take judicial notice of *additional* new factual information that is not on the record, which SeAH first referenced and discussed in its comments to this Court.  SeAH Reply at 11. SeAH's basis for this contention is their assertion that the Federal Circuit took judicial notice of certain documents and that SeAH is simply asking the Court to take judicial notice of documents which "provide further confirmation of statistical practice" and to rebut what SeAH characterizes as false claims made by Commerce.  *Id.* at 10.  However, SeAH also acknowledges—as it must— that the Federal Circuit affirmed this Court's decision to sustain Commerce's decision to reject certain portions of SeAH's case brief during the initial proceedings before Commerce.  *Id.* at 10.  Beyond this, there is no dispute that the additional documents SeAH asks the Court to take judicial notice of were not on the record before Commerce.  *Id.*

It is well-established that when reviewing an agency decision, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Home Prods. Int'l Inc. v. United States*, 633 F.3d 1369, 1379 (Fed. Cir. 2011) (quoting *Fla. Power & Light Co. v Lorion*, 470 U.S. 729, 743 (1985).

Although the question before the Court is whether Commerce's methodology is reasonable, rather than whether it is supported by substantial evidence, the question of whether

the methodology is reasonable must be evaluated within the confines of information that was on the administrative record at the time the agency made its decision. *Cf. Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F. Supp. 3d 1308, 1334 (Ct. Int'l Trade 2018) ("There might be instances in which a lack of record data makes a methodological flaw unavoidable, but even in such a situation, *the Department's method must be reasonable and adequately explained based on the record evidence that exists and the choices that the evidence makes available*.") (emphasis added); *Wheatland Tube Corp. v. United States*, 841 F.Supp. 1222, 1248 (Ct. Int'l Trade 1993) ("The Department's methodology, *based on the Court's review of the record*, was a reasonable way to proceed *based on information at the Department's disposal* and has a satisfactory record reliability.") (emphasis added); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1335 (Ct. Int'l Trade 2011) ("As the antidumping statute is silent on this question, the Court will uphold Commerce's reasonable methodology *if it comports with reasonable reading of the administrative record.*") (emphasis added). In answering the question of whether the agency's methodological explanation was reasonable, the Court should not consider new non-record factual information that SeAH introduced for the first time in its comments to the Court, because such information was not on the record before the agency when it made its decision. Furthermore, judicial notice of additional non-record academic literature is not appropriate.

While the Federal Circuit decision in *Stupp* cited to several academic texts, the Court did not indicate that it had taken judicial notice of those texts. *Stupp*, 5 F.4th at 1357-60. The Federal Circuit also concluded that Commerce had properly rejected any reference to such information in SeAH's case brief. *Id.* at 1348-51. Additionally, this Court has previously addressed this issue and found that academic texts regarding the Cohen's *d* test "are not the

proper subject of judicial notice." *Tri Union Frozen Prods. v. United States*, 161 F.Supp. 3d

1333 (Ct. Int'l Trade 2016). In its Reply, SeAH failed to explain how these academic texts,

interpretations of which generated a considerable amount of dispute, constitute facts that are not

subject to reasonable dispute because they are either "generally known" or "can be accurately

and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R.

Evid. 201(b). Furthermore, Commerce instructed SeAH to submit all information that SeAH

itself had introduced before the Federal Circuit, portions of which the Federal Circuit discussed

and referenced in remanding this issue. October 29, 2021 Letter to All Interested Parties, P.R.R.

1 at 1. However, SeAH now asks the Court to consider further additional materials. There is no

requirement in regulation to permit these additional materials and the concept of judicial notice

should not be stretched that far.

     Additionally, SeAH further contends that "while Commerce gave other parties an

opportunity to rebut those texts, it did not allow SeAH *any* opportunity to supplement the

materials referred to by the CAFC." SeAH Reply at 11 (emphasis in the original). Interested

parties other than the original submitter of the information were given an opportunity to rebut,

clarify or correct information that SeAH submitted. *Cf.* 19 C.F.R. § 351.301(c)(v). There is no

requirement that SeAH be afforded an opportunity to "supplement" its initial submission.

Moreover, according to SeAH, other interested parties submitted information that merely

"duplicated materials already included in SeAH's submission." SeAH's Comments at 6 (Dkt.

Entry 216). Commerce properly reopened the record for the limited purpose of adding

information that SeAH already had introduced before the Federal Circuit. *Stupp*, 5 F.4th at 1350

("Commerce is entitled to broad discretion regarding the manner in which it develops the record

in an antidumping investigation.").

Finally, SeAH argues that, while the Federal Circuit directed Commerce to consider the new materials on remand, it "did not instruct Commerce to dissect those particular texts." SeAH Reply at 10. Nothing in the Federal Circuit's decision in *Stupp* prohibited Commerce from reopening the record for the limited purpose of adding the academic literature that SeAH re-introduced in its submission to the Federal Circuit, and which the Federal Circuit referenced in its decision. *Stupp*, 5 F.4th at 1350 ("Commerce is entitled to broad discretion regarding the manner in which it develops the record in an antidumping investigation."). Nor does the Federal Circuit decision in *Stupp* instruct Commerce not to examine such information to analyze whether the statistical criteria discussed therein are relevant to the application of Cohen's *d* to the entire population of relevant pricing data in the context of the differential pricing analysis. *Stupp*, 5 F.4th at 1360. There is simply no legal basis for SeAH's argument on this point.

## B. SeAH Failed To Exhaust Its Administrative Remedies

We have already addressed SeAH's failure to exhaust its administrative remedies in our response. Def. Response at 26-28. However, in its reply, SeAH contends that it exhausted its administrative remedies with respect to its newly submitted "detailed calculation" regarding currency fluctuations and its argument regarding a statutory requirement that "{f}luctuations in exchange rates should be ignored." SeAH Reply at 8. In SeAH's view, these arguments either constitute a permissible expansion of arguments it made before the agency during the remand proceeding or, alternatively, a permissible new argument that could not have been raised in comments on the draft remand redetermination. SeAH Reply at 8-9. SeAH argues that it can raise new arguments that were not raised before Commerce because Commerce's draft remand redetermination did not discuss currency fluctuations and that Commerce first discussed the issue in the final *Remand Redetermination*. SeAH Reply at 8. SeAH's argument is misplaced.

It is true that neither the Federal Circuit's decision in *Stupp* nor the draft remand redetermination reference the currency fluctuations. However, this is not a situation in which SeAH was precluded from raising an argument regarding currency fluctuations in its comments on the draft remand redetermination. Commerce's application of the Cohen's *d* test is the same in the underlying investigation, in the draft remand redetermination, and in the final *Remand Redetermination*. *See Boomerang*, 856 F.3d at 913 (holding that that parties failed to exhaust their administrative remedies, when they failed to raise all arguments with respect to an issue in the proceeding). SeAH raised the issue of currency fluctuations in its comments on the draft remand redetermination through a perfunctory reference to a hypothetical seller that "may, for example, set its U.S. prices for all sales based on a fixed amount in a foreign currency, and then calculate U.S. prices using daily exchange rates that fluctuate randomly." SeAH Cmts. at 19.

SeAH failed to develop this argument during the administrative proceeding and did not point Commerce to relevant facts apart from describing an imaginary seller in its hypothetical argument.[2] By not developing its argument, SeAH prevented Commerce from being the initial decision maker with respect to the detailed contentions it raises now and, thus, failed to exhaust its administrative remedies. *See Guangzhou Jangho Curtain Wall Sys. Eng. Co. v. United States*, 181 F. Supp. 3d 1265, 1283 (Ct. Int'l Trade 2016). Further, SeAH's current argument that Commerce's application of the Cohen's *d* test is inconsistent with the statute could have been raised both during the underlying investigation or in its comments on the draft remand redetermination, but SeAH failed to do so.

In a footnote, SeAH's cites two court opinions in support its contentions that it should not be required to exhaust administrative remedies, but the facts in those cases are different. SeAH

---

[2] SeAH also made another perfunctory reference to currency fluctuations in another hypothetical example. R.P.R. 30 at 27, n. 52.

Reply at 8, n.23.  In *Papierfabrik*, this Court rejected defendant-intervenor's argument regarding failure to exhaust, "because Koehler, during the administrative review, opposed the position taken by defendant-intervenor on the rebates at issue in this case and *specifically discussed the effect of the regulations*."  *See Papierfabrik August Koehler AG v. United States*, 971 F.Supp.2d 1246, 1256, n.14 (CIT 2014) (*Papierfabrik*) (emphasis added).  Furthermore, "Kohler could not have opposed the Department's construction of the regulations, which did not appear until the Department issued the Final Results."  *Id*.  In contrast, here, SeAH could have made all arguments regarding the potential effects of currency fluctuations in commenting on the draft remand redetermination, which used the identical methodology as the final *Remand Redetermination*.  In its comments on the draft remand redetermination, SeAH made a perfunctory reference to currency's fluctuations, but failed to develop its argument and, thus, failed to exhaust its administrative remedies.  *See Boomerang*, 856 F.3d at 913.

Similarly, this Court's decision in *Globe Metallurgical* involved different facts.  In *Globe Metallurgical v. United States*, 781 F.Supp.2d 1340, 1357 (Ct. Int'l Trade 2017), new factual information was placed on the record *after* the preliminary results and was used for the first time in the final results.  This Court explained: "It was *after* the *Preliminary Results* that FACOR's financial statements first appeared on the administrative record, and the debate in the case briefs was whether those financial statements should be used at all" and "Respondents ultimately lost that issue." *Id.* (emphasis in the original).   "Importantly," the Court explained, "it was only after Commerce issued the *Final Results* that Respondents had the opportunity to review the specific methodology Commerce applied to calculate FACORS's SG&A expense ratio."  In contrast, here, no new factual information was added to the record after the draft remand redetermination was released and the differential pricing methodology remained the same throughout the

8

proceeding.  Although Commerce addressed SeAH's comments regarding the draft remand redetermination in the final *Remand Redetermination*, Commerce did not change its methodology, including the application of the Cohen's *d* test.  Thus, unlike the plaintiffs in *Globe Metallurgical*, SeAH had an opportunity to make its arguments regarding currency fluctuations both during the underlying investigation in its case brief and during the remand proceeding in its remand comments.

II.     **SeAH's Substantive Arguments Provide No Basis for Reversal**

On remand, Commerce explained that the three statistical criteria that SeAH claims must apply to the use of the Cohen's *d* test arise in the context of an analysis that uses sampled data. *Remand Redetermination* at 51-52.  These statistical criteria serve to ensure that the estimated values calculated based on sampled data accurately represent the actual parameter values of the broader complete population of data.  *Id*.  Such limitations are unnecessary, however, when Commerce's "Cohen's *d* test" uses the full population of relevant data rather than a sample of that full population.  *Id*.  Thus, these statistical criteria, which are the bases for statistical inferences that the estimated values represent the actual values of the population parameters, are not relevant to Commerce's analysis because the analysis is based on the full population of data and actual values of the population parameters.  *Id*.  Sampled data and the accompanying statistical criteria are used to come up with an estimate of values that reasonably represent the actual population when the full population is unknown or it is not feasible to analyze the full population of data.  There is no logical, mathematical, or legal reason to utilize the statistical criteria discussed in academic literature outside of the context of sampling, where such limitations are designed to apply because statistical inferences are not relevant to the actual values of the full population of data.

As a practical matter, each time a sample is taken of a population, the observations selected will differ, and consequently the estimated values of the population parameters will differ, which may or may not be found to be representative of the actual values of the population parameters based on statistical inferences; however, when the same parameters are based on the full population of data, the calculated values will always be identical with each calculation because the population data does not change. SeAH has failed to demonstrate that Commerce's explanation is unreasonable. *Stupp*, 5 F.4th at 1353 ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests or numerical cut offs is reasonableness, not substantial evidence.") (citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019)).

Finally, this Court has already sustained substantially a similar explanation that the sample size, sample distribution and statistical significance are not relevant to Commerce's analysis:

> Commerce chose the Cohen's *d* test "to evaluate the extent to which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise." *Commerce explained that application of the Cohen's d test was appropriate because "the U.S. sales data . . . reported to Commerce constitute{} a population. As such, sample size, sample distribution, and the statistical significance of the sample are not relevant to Commerce's analysis."* Commerce determined that of the fixed small, medium, and large thresholds of the Cohen's *d* test, 0.2, 0.5, and 0.8, respectively, application of the 0.8 large threshold was reasonable and consistent with its statutory authority because the large threshold was the strongest indicator that the difference between the mean of the test group and mean of the comparison group was significant. *Commerce's application of the Cohen's d test to determine whether there was a significant pattern of differences was reasonable. Commerce did not need to consider sample size, sample distribution, and the statistical significance of the sample.*

*See SeAH Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1382-83 (Ct. Int'l Trade 2021) (emphasis added, internal citations omitted) (SeAH's motion for reconsideration is pending).

10

### A.  <u>Commerce Addressed The Federal Circuit's Hypothetical</u>

SeAH contends that the Federal Circuit expressed concern about Commerce's application of the Cohen's *d* test to test groups that contain prices that hover around the same value.  SeAH Reply at 12.  SeAH contends that "Importantly, Commerce's Redetermination does not appear to dispute the conclusion that the CAFC's example would generate a false-positive 'passing' result under the Cohen's *d* test."  *Id*.[3]  SeAH is mistaken.

Commerce expressly addressed the Federal Circuit's hypothetical in its redetermination and demonstrated that the hypothetical described by the Federal Circuit does not result in the application of the alternative methodology.  Remand Redetermination at 55-58.  It is important to understand that Commerce's differential pricing analysis, of which the Cohen's *d* test is a component, operates as a switch that determines whether an alternative comparison methodology applies instead of a standard comparison methodology.  In the hypothetical presented by the Federal Circuit, the application of Commerce's differential pricing methodology results in margin calculations that are based on the standard comparison methodology.  Remand Redetermination at 58 ("The conclusion for SeAH's hypothetical example, when the Differential Pricing Analysis is applied properly, *is the same as for the CAFC's hypothetical example* and for Commerce's "extreme" example, *i.e., it does not result in the application of the alternative calculation methodology*.").  "In light of the results of the application of Commerce's Differential Pricing Analysis to each of these hypothetical examples," Commerce explained, "we find that SeAH's purported concerns about the so-called 'false positives' are exaggerated and are contrary to how Commerce's Differential Pricing Analysis operates."  *Id*.

---

[3] The Federal Circuit referenced the term "false positives" only once in its opinion in the context of summarizing SeAH's arguments.

SeAH contends that it offered another hypothetical, which "expanded" the Federal Circuit's hypothetical, in its initial comments to this Court. SeAH Reply at 12. However, as we explained in our response to SeAH's initial comments, even though SeAH presented other hypotheticals during the remand proceeding, this new hypothetical was not presented to the agency. Def. Response at 28-29. SeAH prevented the agency from being the initial decision maker with respect to the facts described in SeAH's hypothetical and, thus, SeAH failed to exhaust its administrative remedies. *Guangzhou*, 181 F. Supp. 3d at 1283. Additionally, litigation based on hypotheticals is disfavored except in certain circumstances in the First Amendment context. *See Fieger v. Michigan Supreme Court*, 553 F. 3d 955, 961 (6th Cir. 2009); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

Even if SeAH could demonstrate that there might be a rare situation with unusual, hypothetical facts that could lead to an unusual outcome that differs from the normal outcome under the methodology, it would not be sufficient to demonstrate that the methodology, as a whole, is unreasonable. One party could modify a hypothetical to fit its desired conclusion, while another party could also modify that same hypothetical to fit the opposite conclusion. The standard for evaluating the methodology is the overall reasonableness of the approach and the underlying concepts based upon the record before the agency—not perfection under all hypothetical circumstances.

## B. SeAH Conflates The Concepts Of Pattern And Significant Difference

SeAH contends that the statute requires Commerce to establish existence of a pattern (as opposed to a chance occurrence) and that Commerce is required to demonstrate that the price difference it measures represents the pattern. SeAH at 15. According to SeAH, when the Cohen's *d* test is applied to an exporter's pricing data, large price differences may simply occur by chance. *Id*. SeAH's argument is misguided.

12

Exporters do not set their prices by random chance.  Rather, exporters set prices through deliberate pricing decisions that are based on market research and consideration of various factors that affect the market.  *Remand Redetermination* at 41.  SeAH's contention that the Cohen's *d* test does not properly demonstrate the existence of a *pattern* misunderstands the purpose of the test, which only evaluates whether the prices to one group differ significantly from the prices of all other sales of comparable merchandise.  *Remand Redetermination* at 42. The existence of a pattern is determined separately by the ratio test, which both this Court and the Federal Circuit have already affirmed.  *Id*; *Stupp Corp. v. United States*, 5 F.4th at 1355 ("For those reasons, we hold that Commerce's ratio test reasonably implements the statutory requirement that Commerce determine whether there is 'a pattern of export prices' 'differ{ing} significantly among purchasers, regions, or periods of time' before selecting the average-to-transaction method. 19 U.S.C. § 1677f-1(d)(1)(B)(i).").  Lastly, whether the observed price difference is the result of exchange rate fluctuations or some other market conditions or company-specific factors, Commerce is not obligated to identify or account for the reasons behind the existence of a pattern of prices that differ significantly.  *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) ("Section 1677f-1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods").

### C.   SeAH's Contentions That The Cohen's *d* Test Can Only Be Used With T-Test And That It Cannot Be Used With Entire Population Are Unsupported

When the difference in the means is the basis for a statistical analysis (*i.e.*, the acceptance or rejection of the null hypothesis[4]), SeAH asserts that Dr. Cohen intended for the *d* coefficient

---

[4] The null hypothesis tests whether a certain condition is true.  In testing the difference in the means, the standard null hypothesis examines whether the difference in the means is equal to

to be used solely in conjunction with "The t Test for Means" which requires that data be normally distributed, with roughly equal variances and equal sample sizes. SeAh Reply at 21-23. Dr. Cohen focused on a statistical power analysis, which uses "effect size" as one of its parameters. *Cohen* at 4 (CRR-12, PRR-8). As Dr. Ellis explained, "an effect size refers to the magnitude of the result as it occurs, or would be found in the population" and "effect sizes exist in real world." *Ellis* at 4-5 (CRR-15, PRR-8). Put differently, effect sizes exist in populations and can be found outside of the statistical power analysis. In its differential pricing analysis, Commerce does not use a statistical power analysis (which is unnecessary since the population values are known and no samples or statistical estimates are involved), but it does use the concept of "effect size" to measure magnitude of the difference between two groups of prices and determine whether the prices between the two groups differ significantly.

Dr. Cohen's text as well as the other academic literature which discuss effect size, including Dr. Cohen's *d* coefficient, support Commerce's position that effect size is a parameter of a full population of data, and is not simply an adjunct to a statistical analysis. This includes, for example, an analysis based on the t-test when considering the difference between two means. *See, e.g.*, *Ellis* at 4-5 ("An effect size refers to the magnitude of the result as it occurs, or would be found, in the population. Although effects can be observed in the artificial setting of a laboratory or sample, effect sizes exist in the real world."); *Cohen* at 9 ("effect size" means "the *degree* to which the phenomenon is present in the population") (emphasis in the original). Of course, if the full population data is unknown (which is not the case in Commerce's use of the

---

zero, *i.e.*, there is no difference. *Cohen* at 19 ("$H_0$: $m_A - m_B = 0$"). Although the null hypothesis tests whether the difference is zero, the standard goal of testing the null hypothesis is to proof that the difference is not zero, such as in finding that a new medicine is safe or effective to combat a given disease. The effect size measures how much of a difference exists in the comparison.

Cohen's *d* test and more broadly in Commerce's differential pricing analysis and dumping calculations), then it would be necessary to estimate the parameters for a full population of data through sampled data taken from such population, which would be a less precise approach with some inherent limitations. *Ellis* at 5 ("The best way to measure an effect is to conduct a census of an entire population, but this is seldom feasible in practice.").

Although the academic literature contains technical language and concepts, the general concept of effect size for the difference in the means is quite straightforward as "standardizing the raw effect size" (*i.e.*, the difference in the means) "by dividing it by the (common) standard deviation of the measures in their respective populations." *Cohen* at 20. When Commerce determines the effect size in its Cohen's *d* test, it calculates the actual mean and standard deviation of each population of U.S. sale prices (*i.e.*, the U.S. prices in the test group and the U.S. prices in the comparison group). Because Commerce's application of the Cohen's *d* test is based on the full populations of U.S. prices in each test and comparison group, contrary to SeAH arguments, there are no statistical tests, such as the t-test, or statistical power analysis relevant to Commerce's approach in the differential pricing analysis.

SeAH's arguments, *see* SeAH Reply at 21-29, can be divided into five groups, which are addressed below.

1. Dr. Cohen's Text And Effect Size Based On A Population

SeAH makes two incorrect assertions regarding the Dr. Cohen's text:

*Nothing in Professor Cohen's text* refers to the calculation of an effect size using 'full' data for an entire population." SeAH Reply at 26 (emphasis added).

*{N}othing in Professor Cohen's text* describes the use of the *d* statistic to evaluate the data for an entire population." *Id*. at 27 (emphasis added).

SeAH is wrong.  As discussed in detail below, Dr. Cohen presents effect size as a parameter of the populations which defines whether a phenomenon exists in the population.  Further, Dr. Cohen's descriptions of effect size as a population parameter are in contrast to when the effect size is estimated based on an analysis of data sampled from these populations.  Dr. Cohen discusses effect size in the context of a full population, generally in its role as part of a statistical power analysis, and specifically in its role when examining the difference in the means.

The purpose of Dr. Cohen's text, *Statistical Power Analysis for the Behavioral Sciences*, is "to provide a self-contained comprehensive treatment of statistical power analysis from an 'applied' viewpoint" where the "power of a statistical test is the probability that it will yield statistically significant results." *Cohen* at 1.  In general, the result that is sought is based on a test of the null hypothesis, "*i.e.*, 'the hypothesis that the phenomenon to be demonstrated is in fact absent" but whereas a researcher "typically hopes to 'reject this hypothesis and thus 'prove' that the phenomenon in question is in fact present." *Id*. (internal citations omitted).  "In circumstances where two populations are being compared, the null hypothesis usually takes the form 'the difference in the value of the relevant parameters is zero,' a specific value." *Id*. at 10.

"*The power of a statistical test of a null hypothesis is the probability that it will lead to the rejection of the null hypothesis* … {and} depends upon three parameters: the significance criterion, the reliability of the sample results, and the 'effect size,' that is, the degree to which the phenomenon exists." *Id*. at 4 (emphasis in the original).  The first of these parameters, the significance criteria, "represents the standard of proof that the phenomenon exists, or the risk of mistakenly rejecting the null hypothesis." *Id*.  The second parameter, "{t}he reliability (or precision) of a sample value is the closeness with which it can be expected to approximate the relevant population value … {and} may or may not be directly dependent upon the unit of

16

measurement, the population value, and *the shape of the population distribution*.  However, it is always dependent upon the *size of the sample*."  *Id*. at 6 (emphasis added).  The third parameter, the "effect size," indicates "'the *degree* to which the phenomenon is present in the population,' or 'the degree to which the null hypothesis is false.'"  *Id*. at 9-10 (emphasis in the original).

"To this point, *the phenomenon in the population* under statistical test was considered as either absent (null hypothesis true) or present (null hypothesis false).  The absence of the phenomenon implies some *specific value for a population parameter*."  *Id*. at 8 (emphasis added).  "By the above route, it can now readily be made clear that when the null hypothesis is false, it is false to some specific degree, *i.e.*, the effect size (ES) is some specific nonzero *value in the population*. The larger this value, the greater the degree to which the *phenomenon under study* is manifested."  *Id*. at 10 (emphasis added).

When approaching a statistical power analysis and research planning (*i.e.*, the purpose of Dr. Cohen's text), where effect size is one of the parameters used in the acceptance or rejection of the null hypothesis, Dr. Cohen prompts the researcher to respond to the question "How large an effect do I expect *exists in the population*?"  *Id*. at 12 (emphasis added).  The researcher may not be able to provide a specific value for the effect size index, and may need to rely on general terms, such as "small" or "large." Even though this convention is arbitrary, "the proposed conventions will be found to be reasonable by reasonable people."  *Id*. at 13 (emphasis added).

As noted by SeAH, SeAH Reply at 21, "{e}ach of the Chapters 2-10 will present in some detail the ES index appropriate to the test to which the chapter is devoted." *Cohen* at 13.[5]  "Each will be translated into alternative forms, the operational definitions of 'small,' 'medium,' and

---

[5] As noted by SeAH, Chapter 2, "The t Test for Means," discusses the application of a statistical power analysis for a difference-in-the-means test, including the measure of effect size as Dr. Cohen's *d* coefficient.

'large' will be presented, and examples drawn from various fields will illustrate the test."  Cohen at 13-14.  Each chapter presents a different statistical test and follows the same layout.  *Cohen* at 17; SeAH Reply at 21-22.

Dr. Cohen concludes his general presentation of power analysis with the recognition that "we can define the effect size in the sample ($ES_S$) using sample statistics *in the same way as we define it for the population*, and a statistically significant $ES_S$ is one which exceeds an appropriate criterion value."  *Cohen* at 17 (emphasis added).  Only at the conclusion of Dr. Cohen's introduction of the statistical power analysis, which includes as one of the parameters the "effect size" as "the *degree* to which the phenomenon is present in the population," does Dr. Cohen note that a researcher may need to estimate the effect size as it exists in a population based on data sampled from that population.

SeAH recognizes that each subsequent chapter of Dr. Cohen's text deals with a different type of statistical test, and chapter 2 concerns the difference in the means and "The t Test for Means."  SeAH Reply at 22-23.  Section 2.1 introduces the statistical test used in the power analysis for examining the null hypothesis for the difference in the means of two independent samples:  the t-test.  *Cohen* at 19.  The reliability of the results of the t-test, as generally discussed in chapter 1, are dependent upon the "the shape of the population distribution" (*i.e.*, the normality and similarity of variances) and the sample size.  *Cohen* at 19.

Section 2 presents the effect size index relevant to the difference in the means, *i.e.*, the *d* coefficient.  In Dr. Cohen's general formulation[6] of "the effect size (ES) we wish to detect," he defines the "*d*" coefficient as the "standardizing of the raw effect size as expressed in the measurement unit of the dependent variable {*i.e.*, the difference in the population means} by

---

[6] This is a general narrative description as represented in equations 2.2.1 and 2.2.2.

dividing it by the (common) standard deviation of the measures *in their respective populations*, the latter also in the original measurement unit." *Cohen* at 20.  Mathematically, Dr. Cohen expressed the effect size as,

$$d = \frac{m_A - m_B}{\sigma}$$

for a one-tailed case, or as

$$d = \frac{|m_A - m_B|}{\sigma}$$

for a two-tailed case, *Cohen* at 20 (equations 2.2.1 and 2.2.2, respectively), where $m_A$ and $m_B$ are the "*population* means" and $\sigma$ is "the standard deviation of either *population* (since they are assumed equal)." *Cohen* at 20 (emphasis added).  Dr. Cohen repeated this definition of effect size in his discussion of the "power tables," where "$\sigma$ is the common within-*population* standard deviation (*i.e.*, $\sigma_A = \sigma_B = \sigma$)." *Cohen* at 27 (emphasis added).  When the within-population standard deviations are not equal, Dr. Cohen states that:

> the definition of *d* will be slightly modified. Since there is no longer a
> common within-population $\sigma$, *d* is defined as above (formulas (2.2.1) and
> (2.2.2)), but instead of $\sigma$ in the denominator, the formula requires the root
> mean square of $\sigma_A$ and $\sigma_B$, that is, the square root of the mean of the two
> variances:

$$\sigma' = \sqrt{\frac{\sigma_A^2 + \sigma_B^2}{2}}$$

*Cohen* at 43-44 (equation 2.3.2).

As cited above, when based on sampled data, "{g}enerally, we can define the effect size *in the sample* ($ES_s$) using sample statistics in the same way as we define it for the population, and a statistically significant $ES_s$ is one which exceeds an appropriate criterion value." *Cohen* at

17 (emphasis in the original).  Dr. Cohen provides an estimation of effect size when the analysis is based on sampled data:

> {a}ccordingly, we redefine our ES index, *d*, so that its elements are sample results, *rather than population parameters*, and call it $d_s$.  For all tests of the difference between means of independent samples,

$$d_s = \frac{\bar{X}_A - \bar{X}_B}{s}$$

> where $\bar{X}_A$ and $\bar{X}_B$ = the two sample means, and
> s = the usual pooled within sample estimate of the population standard deviations, that is,

$$s = \sqrt{\frac{\sum(X_A - \bar{X}_A)^2 + \sum(X_B - \bar{X}_B)^2}{n_A + n_B - 2}}$$

*Cohen* at 66-67 (emphasis added) and equations 2.5.1 and 2.5.2.  As with his introduction of effect size in chapter 1, Dr. Cohen draws a distinction between the effect size based on the populations being compared, and the estimated effect size based on data sampled from each of those populations.

## 2.  Cohen's *d* Coefficient And The t-Test

SeAH states that "{t}he text in which Professor Cohen introduced his *d* statistic actually includes numerous alternative measures of effect size ('ES'), each of which is designed for use with a specific type of test of statistical significance."  SeAH Reply at 21.  Further, Dr. Cohen's *d* coefficient is "intended solely {for use} in conjunction with a 't-Test for Means.'"  SeAH Reply at 21.  Further, SeAH identified the other measures of effect size which Dr. Cohens addresses in his text.  SeAH Reply at 22-23.

SeAH is partially correct.  There is no dispute that there are many formulations of effect size that are application specific.  *Ellis* at 6 ("Effect sizes come in many shapes and sizes.  By

one reckoning there are more than seventy varieties of effect size"); *see also Ellis* at 12-15.  Each formulation of effect size is paired with a specific statistical test that evaluates the reliability of results from a sample, and Dr. Cohen's formulation of his *d* coefficient is purposed for use with the difference of the means.  This does not mean, however, that statistical tests must be employed outside of the context of testing results from samples to ensure that results from a sample reasonably approximate the parameters of the population.  These statistical tests examine the reliability of results based on sampled data and do not measure or define the effect size, which is a distinct parameter of the broader population.  In a situation where the full population is examined, as is the case with the differential pricing analysis, Commerce calculates the actual means and standard deviation for the compared populations to measure the effect size.  If populations are known, then there is no need to test for the reliability of the analysis results (as is the case with the results of samples drawn from the population), because all population parameters are calculated based on actual data from the population.

   3.   Cohen's *d* Coefficient Based On A Full Population Of Data

   SeAH contends that even if Dr. Cohen addresses effect size and even specifically the *d* coefficient in terms of a population, because Dr. Cohen defines the *d* coefficient in the context of its use with the t-test, which is based on sampled data, "population" must really mean "sample." SeAH Reply at 25-26.  SeAH variously concludes that:

> None of the texts {discussed in the Final Redetermination} explicitly addresses the use of Cohen's *d* when an entire population, and not just a sample, is being analyzed.  SeAH Reply at 24-25 (braces in the original).

> Defendant's misinterpretation is based on the assumption that Professor Cohen's term "population parameters" refers to parameters calculated using actual data for the population as a whole.  SeAH Reply at 25.

> Nothing in Professor Cohen's text refers to the calculation of an effect size using "full" data for an entire population.  SeAH Reply at 26.

21

It {*i.e.*, "Professor Cohen's references to 'population parameters'"} was not a description of a calculation of parameters based on data for an entire population.  SeAH Reply at 26.

{N}othing in Professor Cohen's text describes the use of the *d* statistic to evaluate data for an entire population.  SeAH Reply at 27.

Equation 2.2.1 is explicitly described by Professor Cohen as addressing "the two independent *samples* case."  SeAH Reply at 26 (quoting *Cohen* at 20) (emphasis added by SeAH).

SeAH's conclusions are neither supported by Dr. Cohen's text nor by the other academic literature.  As discussed below, Dr. Cohen and other academic authors describe effect size and Dr. Cohen's *d* coefficient in the context of the full population of data as well as in the context of sampled data.

Dr. Cohen's general description of effect size as a parameter of the power analysis, as recited above, demonstrates that effect size represents "the *degree* to which the phenomenon is present in the population" (*Cohen* at 9) where the "absence of the phenomenon implies some *specific value for a population parameter*" (*Cohen* at 8).  Dr. Cohen's presentation of the *d* coefficient in the context of "the t-test of the means" is also based on the effect size present in the population.  Section 2.1 and equations 2.2.1, 2.2.2 and 2.3.2 each involve the "population means" and "within-population standard deviations."  *See e.g., Cohen* 19-21.

In contrast, Dr. Cohen does explain the calculation of effect size in the context of sampled data in other places.  Dr. Cohen's defines "the effect size in the sample ($ES_s$) using sample statistics in the same way as we define it for the population, and a statistically significant $ES_S$ is one which exceeds an appropriate criterion value."  *Cohen* at 17.  Dr. Cohen, for the significance testing of the *d* statistic, "redefine{s} our ES index, *d*, so that its elements are sample results, rather than population parameters, and call it $d_s$."  *Cohen* at 66.  As recited above, equations 2.5.1 and 2.5.2 prescribe the formulas to calculate the Cohen's $d_s$ coefficient, the

elements of which are based on the means and standard deviations of the sampled data groups rather than on the full populations from which the samples were drawn. *Cohen* at 66-67. Dr. Cohen delineates the effect size and specifically his *d* coefficient between situations where its calculation is based on a full population of data and where its calculation is based on sampled data.

As alleged proof that all of Dr. Cohen's text is limited to the calculation of effect size and specifically the *d* coefficient to sampled data with no reference to population data, SeAH points to Dr. Cohen's statement that "{e}quation 2.2.1 is explicitly described by Professor Cohen as addressing the 'the two independent *samples* case.'" SeAH Reply at 26 (quoting *Cohen* at 20) (emphasis added by SeAH). To the contrary, Dr. Cohen's reference to "the two independent samples case" refers to the subject of Chapter 2, "The t Test for the Means." As presented in section 2.1, this application of Dr. Cohen's power analysis for two samples "to test the null hypothesis that their respective population means are equal." *Cohen* at 19. The subject of Chapter 2 is the power analysis of difference in the means of these two independent samples. The results of the t-test will establish the reliability of the results of the analysis, *i.e.*, whether to accept or reject the null hypothesis, which is based on the assumptions of normality, equal variances and sample size. *Cohen* at 19-20; *Cohen* at 6-8. Moreover, the definitions of Equations 2.2.1 and 2.2.2. expressly describe the components of the formula, $m_A$ and $m_B$ as "population means expressed in the raw (original measurement) unit" and $\sigma$ as "the standard deviation of either population (since they are assumed equal)." *Cohen* at 20.

Effect size, including Dr. Cohen's *d* coefficient, is a parameter based on the full populations of data, and is not limited to a statistical test of sampled data. This conclusion is

supported by the other academic literature.  Dr. Ellis recognizes that effect size may be

calculated based on a full population of data or based on sampled data:

> The best way to measure an effect is to conduct a *census of an entire population* but this is seldom feasible in practice. Census-based research may not even be desirable if researchers can identify samples that are representative of broader populations and then use inferential statistics to determine whether sample-based observations reflect population-level parameters.

> By examining carefully chosen samples, researchers can estimate the magnitude and direction of *effects which exist in populations.*

> The concept of effect size is the common link running through this book. Questions about practical significance, desired sample sizes, and the interpretation of results obtained from different studies can be answered only *with reference to some population effect size.*

*Ellis* at 5-6 (emphasis added).  As with Dr. Cohen, Dr. Ellis recognizes that statistical inference

is required when to determine whether estimated sampled-based results are representative of

population-level parameters.  Yet when relying on sampled-based results, one must rely on an

estimate of the population parameters, such as the mean or effect size.  Dr. Ellis continues:

> When we compare groups on continuous variables (*e.g.*, age, height, IQ) the usual practice is to gauge the difference in the average or mean scores of each group.

> To calculate the difference between two groups we subtract the mean of one group from the other ($M_1$ - $M_2$) and divide the result by the standard deviation (SD) of the population from which the groups were sampled. The only tricky part in this calculation is figuring out the population standard deviation. If this number is unknown, some approximate value must be used instead. When he originally developed this index, Cohen (1962) was not clear on how to solve this problem, but there are now at least three solutions. These solutions are referred to as Cohen's *d*, Glass's delta or Δ, and Hedges' *g*.  As we can see from the following equations, the only difference between these metrics is the method used for calculating the standard deviation:

$$Cohen's\ d = \frac{M_1 - M_2}{SD_{pooled}}$$

$$Glass's\ \Delta = \frac{M_1 - M_2}{SD_{control}}$$

$$Hedges'\, g = \frac{M_1 - M_2}{\text{SD} *_{pooled}}$$

Choosing among these three equations requires an examination of the standard deviations of each group. *Ellis* at 10.

Thus, when the parameters of the two populations are unknown, Dr. Ellis provides alternatives with which to *estimate* the effect size. As noted in the equations above, Dr. Ellis provides different formulations for the "pooled standard deviation" as an estimate for the denominator of the effect size:

For Cohen's *d*:

$$SD_{pooled} = \sqrt{\frac{\sum(X_A - \bar{X}_A)^2 + \sum(X_B - \bar{X}_B)^2}{n_A + n_B - 2}}$$

*Ellis* at 26. Dr. Ellis' equation for the Cohen's *d* coefficient replicates Dr. Cohen's equations 2.5.1 and 2.5.2.

In *Algina*, the authors reiterate the same formulation of the difference in the means between populations and samples as Dr. Cohen:

For two populations, Cohen's ES is

$$\delta = \frac{\mu_2 - \mu_1}{\sigma}$$

where $\mu_j$ is the population mean for the *j*th (j = 1, 2) level of the grouping factor and $\sigma$ is the population standard deviation, assumed to be equal for both levels. The parameter $\delta$ is often estimated by

$$d = \frac{\bar{Y}_2 - \bar{Y}_1}{S}$$

where $\bar{Y}_j$ is the mean for the *j*th level of the grouping factor and *S* is the square root of the pooled variance, which we refer to as the pooled standard deviation.

*Algina* at 318 (CRR 15; PRR 8). Algina also notes that "Cohen used the Latin letter *d* to refer to the population ES. Following more typical practice we use *d* to refer to the sample ES and the

Greek letter $\delta$ to refer to the population ES." *Algina* at 318, n. 1. Similarly, *Algina* follows the normal convention of using the Greek letter $\mu$ to refer to the population mean rather than the Latin letter *m* as in *Cohen*. This supports that Dr. Cohen's equations 2.2.1 and 2.2.2 are based on the full populations of data being compared, and are *not* based on sampled data as alleged by SeAH as inferred by SeAH's reference to "the two independent samples case."

Therefore, multiple texts in the academic literature provide evidence that effect size, including Cohen's *d* coefficient, is a parameter which represents a "phenomenon in the population" that is separate from an estimate of an effect size based on a sample. SeAH's conclusions that effect size does not exist with respect to a population are meritless.

4.  Cohen's *d* Coefficient And The Statistical Criteria

Even if Dr. Cohen's *d* coefficient is based on a full population of data, SeAH variously asserts that the underlying data must met the statistical criteria that is required to establish the reliability of the results based on sampled data because Dr. Cohen's *d* statistic is for use with the t-test:

> Professor Cohen's text makes clear that "population parameters" are *estimated* parameters that are *assumed* to be constant for the population as a whole. SeAH Reply at 25-26 (citing *Cohen* at 8-10) (emphasis in SeAH's reply).

> Professor Cohen's text makes clear that differences in variance will distort the results, but the distortion caused by "moderate" differences may be small *if* the number of datapoints in the two groups being compared is approximately equal. SeAH Reply at 24 (emphasis in the original), subsequently quoting from *Cohen* at 43-44.

> In short, the full context, which Defendant has chosen to omit, demonstrates that the *d* statistic is not robust when the data being analyzed does not satisfy the assumptions of roughly equal variances and roughly equal data points. SeAH Reply at 24.

> None of the formulas referenced by Defendant, and none of the technical explanation in Professor Cohen's text, addresses the use of his *d* statistic as a measure of effect size for a population as a whole for data that does not meet the assumptions required for a "t-test." SeAH Reply at 27.

26

As Professor Cohen made clear, his *d* statistic was intended for use solely in conjunction with a "t-test" and data that met assumptions of Normality, roughly equal variances, and sufficient data points. SeAH Reply at 27.

SeAH's statements are unsupported by the academic literature. As discussed above, Dr. Cohen identifies the three elements that are constituent components of a power analysis: (1) the significance criteria, (2) the reliability of the results and sample size, and (3) the effect size. *Cohen* at 4-14. The effect size represents the "phenomenon in the population" as discussed above. The statistical criteria identified by SeAH, which SeAH insists must be applied to the data under examination whether a full population or sampled, only impact the reliability of the analysis results based on sampled data. *Cohen* at 6-7 ("Depending upon the statistic in question, and the specific statistical model on which the test is based, reliability may or may not be directly dependent upon the unit of measurement, the population value, and the shape of the population distribution. However, it is always dependent upon the size of the sample."). The effect size, "the *degree* to which the phenomenon is present in the population," *Cohen* at 9 (emphasis in the original), is not dependent upon the statistical criteria, when the full population (as opposed to sample results) is analyzed. SeAH's assertion that the statistical criteria must be applied to the full population is absent from *Cohen*, and, therefore, SeAH's conclusions are meritless.

SeAH makes two references to *Cohen* to support its conclusion that the statistical criteria must be satisfied for the data underlying the effect size, even when that data represents the full populations and not sampled data. SeAH Reply at 24 citing *Cohen* at 43-44 and SeAH Reply at 25-26 citing *Cohen* at 8-10. SeAH also cites to *Cohen* at 43-44 and claims that "differences in the variance will distort the results . . . ." SeAH Reply at 24. However, the distortion cited by SeAH concerns the results of the t-test and the results of the power analysis. SeAH Reply at 24, quoting *Cohen* at 43 ("For normal populations of unequal variance, the formula for *t* does not

follow the tabled values for *t*, that is, this condition constitutes a 'failure of the assumptions (or more properly conditions) under which *t* is generated.  Yet, there is ample evidence for the robustness of the *t* test despite moderate failure of this assumption provided that sample sizes are about equal.'"); SeAH Reply at 24, quoting *Cohen* at 44 ("Note that if $\sigma_A \neq \sigma_B$ and it is also the case that $n_A \neq n_B$, the nominal values for *t* and power at a given significance criterion, $a$, may differ greatly from the true values. Under these conditions ($\sigma_A \neq \sigma_B$ and $n_A \neq n_B$, simultaneously), the values in Tables 2.3 {*i.e.*, Power Tables} may be greatly in error.") (internal citations omitted).  SeAH's alleged distortions do not impact the value of effect size, *i.e.*, the Cohen's *d* coefficient.  Further, there are no assumptions concerning effect size as a "phenomenon in the population." *Cohen* at 8.

Elsewhere, Dr. Cohen does discuss the estimation of effect size based on sampled data which would require an assessment of the statistical criteria.  For example, Dr. Cohen states that "we can define the effect size in the sample ($ES_S$) using the sample statistics in the same way as we define it for the population, and a statistically significant $ES_S$ is one which exceeds an appropriate criterion value." *Cohen* at 17.  Specific to the *d* coefficient for the testing of the difference in the means, Dr. Cohen provides in equations 2.5.1 and 2.5.2 his calculation for the estimated effect size based on sampled data. *Cohen* at 66-67.  As with the t-test, which is based on sampled data, the reliability of the estimated effect size would need to be addressed in the results of such an analysis.  However, Commerce does not rely on "sample statistics" in its differential pricing analysis with the Cohen's *d* test because Commerce's results are based on the full populations of U.S. sale prices in both the test and comparison groups, where the actual value, not an estimation, of the effect size is calculated.

Commerce's Cohen's *d* test is based on the full populations of U.S. prices in the test and comparison groups. Accordingly, the results of Commerce's Cohen's *d* test are not estimates of the mean, standard deviation, and effect size based on sampled data but rather are the actual values of those population parameters. Therefore, the reliability of the calculated results through statistical inferences, which are dependent on the normality of the distribution, variances, and sample sizes of the data within the compared groups, is not necessary or even relevant.

Neither the Cohen's *d* test nor the differential pricing analysis includes a statistical test, such as the t-test, or a statistical power analysis. Such a test or analysis would be misplaced as the purpose of such a test is to support a conclusion that the results of an analysis based on a sample of are representative of the wider populations of data as a whole, such as in the testing of the efficacy and safety of a drug. As noted above, Commerce's analysis and conclusions are based on the full population of U.S. sale prices (as opposed to samples drawn from such populations) in each of the test and comparison groups.

In sum, SeAH has provided no evidence in the academic literature or valid logical argument to support its assertions that the data underlying Commerce differential pricing analysis, including the application of the Cohen's *d* test, must satisfy the statistical criteria which examine the normality of the distribution, similarity of the variances, and sample size of the data.

5. Dr. Cohen's Thresholds

Even if effect size and the *d* coefficient can be based on a population and that population does not need to meet the statistical criteria, Dr. Cohen's thresholds do depend upon the statistical criteria which means that data which is interpreted with Dr. Cohen's thresholds must satisfy the statistical criteria. SeAH states that

> Normal distributions have unique mathematical characteristics {on which statisticians rely}. SeAH Reply at 27.

The mathematical characteristics of Normal distributions allow such distributions to be described solely by their mean and standard deviation.  SeAH Reply at 28.

{A}s we have explained previously, the heights and IQs that Professor Cohen reportedly used as the basis for his thresholds are themselves Normally distributed.  SeAH Reply at 28.

While Professor Cohen claimed to have derived his thresholds from observations of heights and IQs, his text explicitly sought to justify their use by reference to their mathematical significance when applied to data from a Normal distribution.  SeAH Reply at 28, citing

> *Cohen* at 21 ("If we maintain the assumption that the populations being compared are normal and with equal variability, and conceive them further as equally numerous, it is possible to define measures of  nonoverlap (U) associated with *d* which are intuitively compelling and meaningful." (emphasis added))

> Cohen at 25-27 (calculating overlap for small, medium and large thresholds, assuming data is Normally distributed.)

> Cohen at 27 (using assumption of Normality and equal variances to generate "power tables" with the understanding that "Their major use will then be *post hoc*, *i.e.*, to find the power of a test after the experiment has been performed.").

Because the "mathematical characteristics of Normal distributions allow such distributions to be described solely by their mean and standard deviation," and "{t}wo Normal distributions can, therefore, be accurately compared simply by comparing their mean and standard deviation," and "Cohen's *d* is an example of such a comparison," SeAH concludes that the "thresholds suggested by Professor Cohen – for example, that a d of 0.8 is large – were based on precisely that calculation."  SeAH Reply at 28.  However, SeAH's attempts to link various concepts are not supported by what Dr. Cohen said when presenting his proposed thresholds (small, medium and large) as an approach to interpreting the effect size.

As discussed above, the effect size is a unitless index which must be interpreted to provide meaning to the user.  *Ellis* at 32 ("To assess the practical significance of a result it is not

enough that we know the size of an effect. Effect magnitudes must be interpreted to extract

meaning."). Dr. Cohen proposed "{f}or each statistical test's ES index, .... *as a convention*, ES

values to serve as operational definitions of the qualitative adjectives 'small,' 'medium,' and

'large.'" *Cohen* at 12 (emphasis in the original). Dr. Cohen recognized the dangers of such

qualitative categories, such as the definitions being arbitrary and misunderstood, although he

believed that "the proposed conventions will be found to be reasonable by reasonable people."

*Cohen* at 12-13. For the *d* coefficient which measures the effect size for the difference in the

means, Dr. Cohen defined the small, medium and large thresholds as effect size indexes of 0.2,

0.5 and 0.8, respectively. As described above, these are qualitative labels which Dr. Cohen has

ascribed to these specific index levels. Consistent with these qualitative categories, Dr. Cohen

provided examples of real-world comparisons which illustrated each of these index levels. For

the "large" threshold, Dr. Cohen identified such comparisons as:

> the mean IQ difference estimated between holders of the Ph.D. degree and typical college
> freshmen, or between college graduates and persons with only a 50-50 chance of passing
> in an academic high school curriculum (Cronbach, 1960, p. 174). These seem like grossly
> perceptible and therefore large differences, as does the mean difference in height between
> 13- and 18-year-old girls, which is of the same size (d = .8).

*Cohen* at 27. Thus, Dr. Cohen's thresholds were not derived based on quantitative analysis of

numerous comparisons, but rather were proposed as reasonable index levels which were then

illustrated with study results which presented the proposed index levels. It is these illustrative

examples which will lead reasonable people to find that Dr. Cohen's proposed conventions to be

reasonable, notwithstanding their known shortcomings. Indeed, the CAFC has held that

Commerce's analysis in this respect is reasonable. *See Mid Continent*, 940 F.3d at 674 (internal

citations omitted) ("The Trade Court described Commerce's rationale for adhering to the 0.8 line

and explained why that rationale is reasonable. In particular, Commerce reasoned that even a

small absolute difference in the means of the two groups can be significant (for the present statutory purpose) if there is a small enough dispersion of prices within the overall pool as measured by a proper pooled variance or standard deviation; the 0.8 standard is 'widely adopted' as part of a 'commonly used measure' of the difference relative to such overall price dispersion; and it is reasonable to adopt that measure where there is no better, objective measure of effect size. We agree with the Trade Court that this rationale adequately supports Commerce's exercise of the wide discretion left to it under 19 U.S.C. § 1677f-1(d)(1)(B).").

SeAH's reliance on its citations to *Cohen* are misplaced as these are unrelated to Dr. Cohen's proposed small, medium and large thresholds. First, SeAH's reliance on Dr. Cohen's calculation of "*d* as Percent Nonoverlap" in section 2.2.1, *Cohen* at 21, does not define Dr. Cohen's thresholds. The percent nonoverlap is a visual and quantitative representation of the magnitude of the effect of the difference between the two populations of data. When it is assumed that both populations are normally distributed and have equal variances, then the area under one of the distribution curves (*i.e.*, the "bell" curve) which is not common to both populations can be calculated as the "percent nonoverlap." The larger the percent nonoverlap, the greater the difference between the two populations and the greater the effect size. This calculation is only possible because of the assumptions of normality and homoscedasticity. *See Remand Redetermination* at 19-20. Further, simply because Dr. Cohen has calculated the percent nonoverlap for each index level that represents his proposed small, medium, and large thresholds (*see* SeAH Reply at 28, citing to *Cohen* at 25-27) does not indicate that these theoretical values are the basis for Dr. Cohen's definition of his qualitative thresholds. Note that the percent nonoverlap is analogous to the concept of "percentile standing," which was also discussed in the *Remand Redetermination*, and which also required that the compared

32

populations be normally distributed with equal variances in order to quantify the percentile

standing.  *See Remand Redetermination* at 20-21.  Neither of these quantitative interpretations of

effect size, *i.e.*, the percent nonoverlap and the percentile standing, form the basis for Dr.

Cohen's qualitative thresholds.

      Further, SeAH's reference to the assumptions of normality and equal variances "to

generate 'power tables'," SeAH Reply at 28, n. 76, is also meritless.  Similar to the calculation of

the *t* distribution, the percent nonoverlap and the power tables, the assumptions of normality and

homoscedasticity are necessary in order to quantify the statistical significance and power of the

analysis.  As noted by SeAH, "normal distributions have unique mathematical characteristics"

which permit statisticians to perform statistical analysis and make statistical inferences.  *See*

*Cohen* at 6 ("Depending upon the statistic in question, and the specific statistical model on which

the test is based, reliability may or may not be directly dependent upon the unit of measurement,

the population value, and *the shape of the population distribution*.") (emphasis added).

However, Commerce's application is not based on sampled data, statistical inferences, or on a

power analysis, and as a result SeAH's argument is without merit.

      In sum, Dr. Cohen proposed his qualitative thresholds of small, medium, and large as a

guide to interpreting the effect size.  These thresholds, as recognized by Dr. Cohen, are arbitrary

values which are not determined by quantitative analysis, as asserted by SeAH, but rather are

illustrated by real-world observations which demonstrated the reasonableness of these

thresholds.  *See Cohen* at 13 ("the proposed conventions will be found to be reasonable by

reasonable people.");  *Ellis* at 40 (On the issue of interpreting the magnitude of an effect, Dr.

Ellis states as an alternative to context and specific knowledge of the population under study:

"Cohen's cut-offs provide a good basis for interpreting effect size and for resolving disputes

about the importance of one's results.");  *Mid Continent,* 940 F.3d at 674 ("the {large} 0.8

standard is 'widely adopted' as part of a 'commonly used measure' of the difference relative to

such overall price dispersion; and it is reasonable to adopt that measure where there is no better,

objective measure of effect size").  Therefore, Dr. Cohen's thresholds are not dependent on the

distributions or variances of the data which is under examination to determine the magnitude of

the difference in the means.

### D.  <u>SeAH Conflates Practical And Statistical Significance</u>

Finally, SeAH conflates practical and statistical significance.  SeAH Reply at 29.  SeAH

suggests that even when the entire population is analyzed, Commerce must evaluate the

statistical significance of the difference.  *Id.*  In making this argument under the subheading

"*Practical Significance, Statistical Significance, and the Ability to Draw Logical Conclusions,*"

SeAH Reply at 29-30, SeAH cites no statute, regulation, court opinion, administrative

determination, or even academic literature, and rests its argument entirely on another

hypothetical that it failed to present to the agency during the remand proceedings.  *Id.*; *see Ad*

*Hoc Shrimp Trade Action Comm. v. United States*, 616 F. Supp. 2d 1354, 1366 (Ct. Int'l Trade

2009) ("Both the Federal Circuit and this court have held that failure to raise a specific argument

in a case brief, even if the general issue is addressed, constitutes a failure to exhaust

administrative remedies.").  Given both the lack of support and the failure to timely present this

argument, it should be disregarded.

Moreover, SeAH's hypothetical misses the mark.  Commerce uses the Cohen's *d* test to

measure the practical significance of differences between two groups of actual prices.  *Remand*

*Redetermination* at 12 ("It is critical to understand that Commerce's Differential Pricing

Analysis uses the Cohen's *d* test to measure the practical significance of the difference in the

actual real-world pricing, rather than statistical significance.").  Statistical significance is not

relevant to determining practical significance.  Dr. Ellis, for example, states that "we can draw no conclusion regarding the practical significance of a result from the test of statistical significance." *Ellis* at 5 (P.R.R 15; P.R.R. 8).  This is because "the statistical significance of any result is affected by both the size of the effect and the size of the sample used to estimate it."  *Id*. According to Dr. Ellis, the "smaller the sample, the less likely the result be *statistically* significant *regardless of the effect size*." *Id.*  (emphasis added).  In contrast, Commerce uses the Cohen's *d* test to determine the *practical* significance of price differences *without* using statistical samples or estimates.  It is unreasonable for SeAH to demand that Commerce must use the Cohen's *d* test in conjunction with a test of statistical significance, *i.e.*, the t-test, when the academic literature indicates that a test of statistical significance is not suited or relevant for determining practical significance.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's *Remand Redetermination*.

<div style="margin-left: 40%;">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

s/Claudia Burke
CLAUDIA BURKE
Assistant Director

s/Robert Ralph Kiepura
ROBERT RALPH KIEPURA
Trial Attorney
Commercial Litigation Branch
Civil Division

</div>

OF COUNSEL:

MYKHAYLO GRYZLOV
Senior Counsel
Office of the Chief Counsel

for Trade Enforcement & Compliance U.S. Department of Justice
U.S. Department of Commerce P.O. Box 480
 Ben Franklin Station
 Washington, DC 20044
 Tel.: (202) 305-4436
 Fax: (202) 353-0461
 Email: Robert.kiepura@usdoj.gov


October 28, 2022    Attorneys for Defendant