UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE CLAIRE R. KELLY, JUDGE

|  |  |
|---|---|
| STUPP CORPORATION, ET AL.,<br><br>　　　Plaintiffs and<br>　　　Consolidated Plaintiffs,<br><br>　　and<br><br>MAVERICK TUBE CORPORATION ET AL.,<br><br>　　　Plaintiff-Intervenors<br>　　　and Consolidated<br>　　　Plaintiff-Intervenors<br><br>　　　v.<br><br>UNITED STATES,<br><br>　　　Defendant<br><br>　　and<br><br>SEAH STEEL CORPORATION, ET AL.,<br><br>　　　Defendant-Intervenors<br>　　　and Consolidated<br>　　　Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Consol. Court No. 15-00334<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

RESPONSE OF SEAH STEEL CORPORATION
TO DEFENDANT'S SUR-REPLY CONCERNING
COMMERCE'S FINAL REDETERMINATION ON REMAND

PUBLIC VERSION

PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER DELETED FROM PAGES 28, 29

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20036
(202) 774-5500

Attorney for SeAH Steel Corporation

November 14, 2022

Table of Contents

Page

ARGUMENT ............................................................................................................ 2

    A.   As the CAFC's Decision Demonstrates, the Court
        May Consider Academic Texts that Are Not Part
        of the Administrative Record to Evaluate Whether
        Commerce's Purported Use of a Statistical Test
        Is Consistent with Normal Statistical Practice ...................................................... 2

    B.   SeAH Did Not Fail to Exhaust Administrative Remedies ................................... 4

        1.   The Court Should Exercise Its Discretion to
               Waive Any Exhaustion Requirement Because
               SeAH Was Not Given an Adequate Opportunity to
               Comment on Commerce's Draft Redetermination........................................ 4

        2.   Because Commerce Failed to Address the
               Impact of Random Factors (such as Exchange-Rate
               Fluctuations) on the Net Prices Used in the
               Differential Pricing Analysis, SeAH Was Not
               Required to Respond to Commerce Position on that
               Issue in Its Comments on the Draft Redetermination ................................. 5

        3.   SeAH Did Raise the Impact of Exchange-Rate
               Fluctuations and Other Random Factors in
               Its Comments on the Draft Redetermination................................................7

        4.   SeAH's Arguments that the Statute Forbids the Creation of
               Dumping Margins from Exchange-Rate Fluctuations Is a Pure
               Question of Law Not Subject to the Exhaustion Requirement ................. 10

    C.   Arguments in Appeals Based on Hypothetical
        Examples Are Not "Disfavored" or Irrelevant .................................................. 11

        1.   Arguments Based on Hypothetical
               Examples Are Not "Disfavored"................................................................ 12

        2.   Defendant's Suggestion that Hypothetical Examples
               Be Disregarded Is Inconsistent with the CAFC's
               Decision, which Explicitly Required Commerce to
               Consider the Impact of Tiny Price Variations on
               the Outcome of the Differential Pricing Analysis.................................... 14

    D.   Defendant's Assertion that Professor Cohen's Text Envisions
        the Use of Cohen's d Statistic for Full Populations Is False .............................. 16

Page

1.  Professor Cohen's Reference to "Population
    Parameters" Refers to Estimates of the Parameters
    for the Population, Not the Calculation of the
    $d$ Statistic Based on a Full Population of Data ............................................. 17

2.  The Chapter of Professor Cohen's Text Describing
    the Use of Cohen's d Only Describes the Use of
    that Statistic in Conjunction with a "t-Test" ................................................. 18

3.  References by Professor Cohen and Other Academics
    to Consideration of "Effect Size" in General Does
    Not Represent an Endorsement of the Use of Cohen's $d$
    when the Required Assumptions Are Not Satisfied ................................... 22

E.  Commerce's Methodology Cannot Distinguish
    "Patterns" from Variations that Occur by Chance ................................................ 24

1.  Defendant's Assertion that Prices Are Not Affected by
    Random Variation Is Refuted by the Record Evidence ............................ 25

2.  The d Statistic Alone Does Not Permit Commerce
    to Determine Whether an Observed Difference
    Constitutes a Pattern or Random Variation ................................................ 30

F.  Rules of Thumb Based on Heights
    and IQs Does Not Provide a Meaningful
    Measure of Variations in U.S. Sales Prices ......................................................... 33

G.  Contrary to Defendant's Claims, a Decision by Judge
    Choe-Groves that Was Made Prior to the CAFC's
    Decision in Stupp Does Not Establish that Commerce's
    Use of Cohen's d Conforms to Statistical Practice ............................................. 35

CONCLUSION ............................................................................................................... 38

Table of Authorities

COURT DECISIONS

*ABB, Inc. v. United States*,
  920 F.3d 811 (Fed. Cir. 2019) ............................................................ 4

*Agro Dutch Industries v. United States*,
  508 F.3d 1024 (Fed. Cir. 2007) ......................................................... 10

*Al Tech Specialty Steel Corp. v. United States*,
  661 F. Supp. 1206 (CIT 1987) ............................................................ 4

*Cath. Health Initiatives v. Sebelius*,
  617 F.3d 490 (2010) ......................................................................... 33

*Corus Staal BV v. United States*,
  502 F.3d 1370 (Fed. Cir. 2007) ........................................................... 4

*Fieger v. Michigan Supreme Court*,
  553 F.3d 955 (6th Cir. 2009) ............................................................ 12

*SeAH Steel Corp. v. United States*,
  513 F.Supp.3d 1367 (CIT 2021) ....................................................... 36

*SeAH Steel Corp. v. United States*,
  539 F.Supp.3d 1341 (CIT 2021) ....................................................... 37

*Stupp Corp. v. United States*,
  5 F.4th 1341 (Fed. Cir. 2021) ............................................. 1, 14, 32, 33

*T.T. International v. United States,*
  439 F. Supp. 3d 1370 (CIT 2020) ..................................................... 10

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) ......................................................................... 13

*Zhaoqing Tifo New Fibre v. United States*,
  60 F.Supp.3d 1328 (CIT 2015) ........................................................... 6

OTHER AUTHORITIES

Algina, James, Keselman, H.J., and Penfield, Randall,
  *An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust*
  *Parameter and Confidence Interval in the Two Independent Groups Case*, 10
  PSYCHOLOGICAL METHODS (2005) ..................................................... 24

Page

Cohen, Jacob, *Statistical Power Analysis for
the Behavioral Sciences* (2d ed.1988) ............................................................... *passim*

E. Barrett Prettyman, Jr.,
*The Supreme Court's Use of Hypothetical Questions at Oral Argument*,
33 CATH. U. L. REV. 555 (1984) .................................................................... 14

Ellis, Paul,
*The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis,* ................... 23, 33

R. Wolf,
*Supreme Court Seeks Answers from "Wild Hypotheticals"*,
USA TODAY, (Oct. 13, 2013) ......................................................................... 14

Starnes, Yates, and Moore,
*Statistics through Applications* (2005) ........................................................ 34

Timothy R. Johnson,
*Oral Arguments and Decision Making in the
United States Supreme Court* (2004) ............................................................ 13

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE CLAIRE R. KELLY, JUDGE

|  |  |
|---|---|
| STUPP CORPORATION, ET AL.,<br><br>        Plaintiffs and<br>        Consolidated Plaintiffs,<br><br>        and<br><br>MAVERICK TUBE CORPORATION ET AL.,<br><br>        Plaintiff-Intervenors<br>        and Consolidated<br>        Plaintiff-Intervenors<br><br>        v.<br><br>UNITED STATES,<br><br>        Defendant<br><br>        and<br><br>SEAH STEEL CORPORATION, ET AL.,<br><br>        Defendant-Intervenors<br>        and Consolidated<br>        Defendant-Intervenors. | Consol. Court No. 15-00334 |

RESPONSE OF SEAH STEEL CORPORATION
TO DEFENDANT'S SUR-REPLY CONCERNING
COMMERCE'S FINAL REDETERMINATION ON REMAND

     This brief is submitted on behalf of SeAH Steel Corporation in response to Defendant's October 28, 2022, sur-reply concerning the final redetermination on remand by the U.S. Department of Commerce dated April 4, 2022, addressing the decision by the Court of Appeals for the Federal Circuit in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021).

PUBLIC VERSION

<u>ARGUMENT</u>

A.   *As the CAFC's Decision Demonstrates, the Court*
    *May Consider Academic Texts that Are Not Part*
    *of the Administrative Record to Evaluate Whether*
    *Commerce's Purported Use of a Statistical Test*
    *Is Consistent with Normal Statistical Practice*

In its sur-reply, Defendant again objects to citations in our initial comments to certain academic materials that were not formally placed on the record of Commerce's remand proceeding.  According to Defendant, such materials cannot be considered by the Court, because they are not part of the administrative record of the remand proceeding, as defined by Commerce.[1]

Defendant's argument is, however, contrary to the CAFC's decision ordering the remand in this case to Commerce.  As we have explained previously, the CAFC's decision itself referred to numerous academic texts that were not part of the administrative record in order to assess whether Commerce's use of Cohen's *d* was consistent with normal statistical practice.[2]  The CAFC's decision therefore stands for the proposition that, when an agency purports to be using a statistical test in accordance with widely-adopted statistical practice, the courts may consider non-record academic materials to evaluate that claim.

In our reply brief, we described the CAFC's decision as taking "judicial notice" of the academic materials.  Defendant's sur-reply objects to the use of that term, because the CAFC did not explicitly state that it was taking "judicial notice" of the materials it cited. But Defendant's hair-splitting does not change the fundamental point:  The CAFC clearly

---

[1] *See* Defendant's Sur-Reply at 3.

[2] *See* SeAH's Reply Brief at 10-11.

did consider academic texts that were not part of the administrative record in order to evaluate the consistency of Commerce's use of Cohen's *d* with normal statistical practice. Like the CAFC, the Court plainly is permitted to consider those materials to understand the statistical principles at issue in this case.

As a final matter, we note that most of the references to additional academic texts in our initial comments were intended to demonstrate the falsity of assertions made for the first time in Commerce's redetermination that were not themselves supported by any evidence.[3]  As Defendant apparently concedes, SeAH was not given any opportunity to provide evidence on those issues in its comments to Commerce.[4]  While Commerce may have the authority to define the administrative record, it cannot properly use that authority to deprive parties of *any* opportunity to present evidence on the issues in the proceeding. Defendant's insistence that Commerce could do so is, in the end, an argument that Commerce may lie with impunity on factual matters in remand proceedings.

---

[3] For example, at page 7 of our June 14, 2022, initial comments, we cited two academic texts to refute Commerce's unsupported and false claim that "overlap" is not a measure of effect size.  At pages 8 to 9 of our initial comments, we cited two academic texts to refute the false suggestion by Commerce that the only source of statistical principles relevant to this case are the texts explicitly cited by the CAFC.  At page 25 of our initial comments, we cited an academic text to refute Commerce's false claim that random factors could not affect the actual prices charged by SeAH.

[4] *See* Defendant's Sur-Reply at 5.  *See also* Letter to All Interested Parties (Oct. 29, 2021) (PRRD-1); and SeAH's Reply Brief at 11.

B.   *SeAH Did Not Fail to Exhaust Administrative Remedies*

1.   *The Court Should Exercise Its Discretion to
Waive Any Exhaustion Requirement Because
SeAH Was Not Given an Adequate Opportunity to
Comment on Commerce's Draft Redetermination*

As noted in our initial comments, the Court has the discretion to decide whether to require exhaustion of administrative remedies in appeals of antidumping determinations.[5] When determining whether to exercise that discretion, the Court has stated that it considers whether a party had a "sufficient opportunity" and "practical ability … to have its arguments considered by the administrative body."[6]  In this case, SeAH was allowed less than 11 days to comment on a draft redetermination that Commerce had taken more than four months to prepare.

In its previous response, Defendant argued that the time allowed to SeAH was sufficient, because it was only "was only seven hours less than SeAH requested in its *last* extension request."[7]  As we have explained previously, that argument is grossly misleading, since it ignores the fact that SeAH's "last" extension request was made only after two previous requests were denied by Commerce.[8]  After being chastised by the Court,[9] Defendant has now apparently withdrawn that argument.  Importantly, Defendant's sur-

---

[5] *See ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019); *Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007).

[6] *See Al Tech Specialty Steel Corp. v. United States*, 661 F. Supp. 1206, 1210 (CIT 1987).

[7] *See* Defendant's Amended Response at 9-10 (emphasis added).

[8] *See* SeAH's Reply Brief at 2-3.

[9] *See* Transcript of September 21, 2022, Telephone Conference (ECF No. 240).

PUBLIC VERSION

reply makes no attempt to explain why the limited time allowed to SeAH to comment on the draft redetermination was sufficient.

As a final matter, we note that there was no reason Commerce could not have allowed SeAH additional time to prepare comments on the draft redetermination. Redeterminations on remand are not subject to strict statutory deadlines. And, while the Court had (at Commerce's request) established a deadline of 150 days for filing the redetermination, SeAH had indicated that it would agree to an extension of that deadline if Commerce had given it additional time to comment on Commerce's draft.[10] In such circumstances, there was no rational reason for Commerce's insistence that SeAH file its comments less than 11 days after the draft redetermination was released. To the extent necessary, the Court should exercise its discretion to waive any exhaustion requirement in order to ensure that SeAH is given the fair opportunity to comment that Commerce precluded.

>    2.    *Because Commerce Failed to Address the Impact of Random Factors (such as Exchange-Rate Fluctuations) on the Net Prices Used in the Differential Pricing Analysis, SeAH Was Not Required to Respond to Commerce Position on that Issue in Its Comments on the Draft Redetermination*

In its initial comments to this Court, SeAH objected to Commerce's factual claim that observed prices could not be affected by random factors. As part of that general argument, SeAH demonstrated that Commerce's assertion was contradicted by the evidence on the

---

[10] *See* SeAH's March 9, 2022, Letter at 2 ("In this regard, we note that we will agree to a modification of the scheduling order regarding the deadline for the final remand redetermination at the U.S. Court of International Trade to accommodate the additional administrative procedures requested herein.") (PRRD-15).

record, which showed that: (1) SeAH had reported certain movement expenses as a single amount in Korean Won based on the average cost for the entire 12-month investigation period; (2) Commerce deducted those Korean Won expenses from SeAH's initial price to determine the net price used for purpose of the Differential Pricing Analysis; (3) the exchange rates used by Commerce for those conversions fluctuated from day to day; and (4) Commerce's conversion of the Korean Won movement expense using varying exchange rates would, by itself, generate a finding of a Cohen's *d* of more than 0.8 for every single quarter of the period.[11]

Defendant objects to SeAH's presentation of factual information regarding the exchange rates used in Commerce's calculations, and the impact of those exchange rates on Commerce's calculations.  But the exchange rates are not new factual information. Furthermore, as Defendant admits, Commerce's draft redetermination did not address the possibility that random factors (such as exchange rate variations) might affect the net prices used in Commerce's Differential Pricing Analysis.[12]

This Court has held that the exhaustion requirement does not apply when an issue is not addressed in Commerce's preliminary determination.[13]  In this case, Commerce addressed the issue of the impact of random factors (including exchange-rate fluctuations) for the first time in its final redetermination.  Accordingly, there is no basis for the Court to disregard SeAH's arguments responding to Commerce's discussion of that issue.

---

[11] *See* SeAH's Initial Comments (June 14, 2022) at 24-28.

[12] *See* Defendant's Sur-Reply at 9.

[13] *See Zhaoqing Tifo New Fibre v. United States*, 60 F.Supp.3d 1328, 1344 (CIT 2015).

3.   *SeAH Did Raise the Impact of Exchange-Rate
      Fluctuations and Other Random Factors in
      Its Comments on the Draft Redetermination*

Defendant admits, reluctantly, that SeAH's comments to Commerce on the draft

redetermination did raise the issue that an exporter's prices could vary randomly due to

variations in exchange rates, and that these variations could lead to a false positive under

Commerce's Differential Pricing Analysis.[14]  But Defendant claims that SeAH's

presentation of the issue in those comments was "perfunctory" and "hypothetical."[15]  As a

result, Defendant contends that the Court should refuse to consider the expanded

arguments presented in SeAH's initial comments to this Court.

In reality, SeAH's argument to Commerce regarding the impact of exchange rates on

an exporter's prices — and the meaning of that impact for the Differential Pricing

Analysis — was absolutely clear.  SeAH contended that the observed prices for an exporter

could be affected by a number of random factors, including variations in exchange rates.

Thus, SeAH's comments on the draft redetermination argued that:

> The Draft Redetermination claims that concerns about small numbers
> of data points are relevant only when analyzing samples drawn from a
> larger population. However, that assertion assumes that random
> processes can only affect sampling errors (*i.e.*, the possibility that a
> sample is not representative of the population as a whole). It ignores
> the possibility that, for the entire population as a whole, the observed
> outcomes are likely to vary with some degree of randomness, and that
> within-group variations may outweigh between-group differences,
> especially when the population consists of a small number of data
> points. If the outcomes within a population are themselves the result of
> a random process, the mean and standard deviation of the population
> are likely to vary with each additional iteration, often by a considerable
> amount, until a sufficient number of iterations have occurred.

---

[14] *See* Defendant's Sur-Reply at 7.

[15] *Id.*

PUBLIC VERSION

> We understand that the Department has asserted in the past that sellers are unlikely to set their prices using random number generator. Nevertheless, it is obvious that sales prices may be affected by factors other than the identity of the customer, the timing of the sale, or the geographic region in which the sale is made. A seller may, for example, set its U.S. prices for all sales based on a fixed amount in a foreign currency, and then calculate U.S. prices using daily exchange rates that fluctuate randomly. Or, a seller may set its prices using a formula tied to published commodity prices (for example, the published price of hot-rolled steel) which also appear to fluctuate randomly. Even when there is no precise formula tying prices to random factors, the prices may be determined by negotiations in which the negotiators consider random factors. In such circumstances, it is possible that random variations in prices may distort comparisons of the prices for sales to different customers, time periods, or regions, especially when there are only a small number of data points in the groups being compared.[16]

It was absolutely clear, therefore, that SeAH's argument was focused on the possibility that random factors, including variations in exchange rates, could cause observed differences in U.S. prices, and that Commerce's failure to limit the use of Cohen's *d* to situations meeting the assumptions laid out by Professor Cohen could lead to false positive results.

A review of Commerce's final determination confirms that Commerce fully understood the logic of SeAH's argument, but rejected it on factual grounds.  Thus, Commerce's final determination summarized SeAH's argument as follows:

> Although Commerce has previously stated that an exporter is unlikely to set its prices randomly, prices may be impacted by more than the identity of the purchaser, timing of the sale or the region in which the sale is made. For example, foreign exchange rates or input prices may fluctuate randomly. Further, individual negotiations between parties may introduce other random factors. Accordingly, random price variations may distort the comparison of prices between

---

[16] SeAH's Comments on Draft Redetermination at 17-20 (footnotes omitted) (PRRD-30, CRRD-29).

different purchasers, regions or time periods especially when there is a small number of sales in the groups being compared.[17]

Commerce then set forth its response:

Instead of addressing the substance of the Draft Results, SeAH attempts to conflate and misrepresent the purpose of the different steps of Commerce's Differential Pricing Analysis and asserts that it is subject to chance or random fluctuations which allegedly require the application of certain limitations inherent to statistical analysis of samples, such as demonstrating a normal distribution, equal variances, and a sufficient sample size. However, SeAH's contentions are misplaced. Commerce's dumping analysis examines the entire universe of data or population of prices of a respondent, including all of its sales of subject merchandise in the U.S. market and the Differential Pricing Analysis examines all U.S. sales used in Commerce's dumping analysis. A respondent does not set its prices based on random chance (such as flipping a coin or throwing dice), but rather prices its goods based on market conditions, pricing strategies and arm's-length negotiations with its customers.[18]

Further, as explained above, a respondent does not set its pricing by a chance occurrence or in a random manner. Accordingly, SeAH's concerns about chance or randomness in the context of evaluating the difference in prices between two groups are misplaced.[19]

A company's pricing behavior in a market economy has nothing to do with chance, including the U.S. prices established by SeAH during the POI. A company's pricing behavior is foundationally based on corporate strategies and goals, including maximizing profit, within the bounds of supply and demand in the marketplace. Thus, the differences in a company's prices do not reflect chance, but the company's market research, corporate practice and priorities, resulting in deliberative pricing decisions. This is further supported by record evidence, which demonstrates, for example, that SeAH is involved to a high degree in market research. Accordingly, SeAH's implication that its, or any company's, prices are determined by chance, and that this would invalidate the results of Commerce's Cohen's d test without further

---

[17] Final Redetermination at 39 (footnote omitted).

[18] *Id.* at 41.

[19] *Id.* at 45.

statistical analysis to account for such chance or random fluctuations, is without merit.[20]

It is clear, therefore, that Commerce rejected SeAH's argument about the possible impact of exchange rates and other random factors not because it disagreed with SeAH's claim that randomness could invalidate the results of the Differential Pricing Analysis, but instead because Commerce asserted that observed prices could not be affected by random factors. Commerce had not made such an assertion in its draft redetermination. As a result, SeAH had no reason to believe that Commerce would rely on such an assertion in its final determination — especially when, as discussed more fully below, Commerce's assertion was contrary both to basic economic logic and to the evidence on the record.

> 4. *SeAH's Arguments that the Statute Forbids the Creation of Dumping Margins from Exchange-Rate Fluctuations Is a Pure Question of Law Not Subject to the Exhaustion Requirement*

As a separate matter, Defendant also objects to SeAH's argument that the statute does not allow Commerce to find dumping based on fluctuations in exchange rates.[21]  However, that is a purely legal argument concerning the proper interpretation of the statute. As such, it is not subject to the exhaustion requirement.[22]

---

[20] *Id.*

[21] Defendant's Sur-Reply at 6.

[22] *See, e.g.*, *Agro Dutch Industries v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (exhaustion not required for "pure questions of law"); *T.T. International v. United States,* 439 F. Supp. 3d 1370, 1377 (CIT 2020) (exhaustion not required where "the issue involves 'a pure question of law not requiring further factual development'").

PUBLIC VERSION

C.   *Arguments in Appeals Based on Hypothetical*
     *Examples Are Not "Disfavored" or Irrelevant*

In our initial comments, we presented calculations based on the actual exchange rates used by Commerce in its calculations, which demonstrated that the variations in exchange rates alone were sufficient to produce a "positive" finding under Commerce's Differential Pricing Analysis, even when there were no other variations in prices or expenses.[23]  In addition, we also demonstrated that Commerce's response to the hypothetical question posed by the CAFC was inadequate, because it failed to consider how the Differential Pricing Analysis could inflate and create dumping margins when the hypothetical was expanded to two products.

Defendant has not attempted to rebut the arithmetic of the examples set forth in our initial comments.  Furthermore, it has not attempted to show that the conclusions drawn from those examples was incorrect.  In particular, Defendant has not attempted to refute our demonstration show that the actual exchange-rate fluctuations in this case could, by themselves.  It also has not attempted to refute our demonstration that the Differential Pricing Analysis can inflate or create dumping margins — in a manner that would constitute a "meaningful difference" under the standards that Commerce applies — when variations in prices are insignificant.  Instead, Defendant contends that our calculations should be disregarded simply because they are "hypothetical."  The case law does not, however, support their contention.

---

[23] *See* SeAH's Initial Comments at 24-27.

1.   *Arguments Based on Hypothetical
     Examples Are Not "Disfavored"*

In its Sur-Reply, Defendant contends that our arguments based on numerical

examples should be disregarded, because "litigation based on hypotheticals is disfavored

except in certain circumstances in the First Amendment context."  Defendant cites two

decisions to support its extraordinary claim:  a 2009 decision by the 6th Circuit in *Fieger v,*

*Michigan Supreme Court,* and a 2008 decision by the U.S. Supreme Court in *Washington*

*State Grange v. Washington State Republican Party*.[24]

But of the cases cited by Defendant are irrelevant:  *Fieger* addresses Constitutional

standing — that is, whether a party can show the requisite harm to satisfy the Article III

"case or controversy" requirement.[25]  *Washington State Grange* involved a "facial

challenge" to the constitutionality of a statute that had never been implemented, and that

---

[24] *See* Defendant's Sur-Reply at 12.

[25] As the 6th Circuit explained in *Fieger,*

> Article III' s "case and controversy" requirement is not satisfied, and a
> court therefore has no jurisdiction, when the claimant lacks standing,
> that is, "a sufficiently concrete and redressable interest in the dispute."
> ...Thus, "[s]tanding is the 'threshold question in every federal
> case.'"....
>
> Whether a party has standing is a question of law that we review de
> novo....  *While litigation based on hypotheticals is disfavored, it is*
> *allowed under certain circumstances in the First Amendment context.*
> ... "Litigants ... are permitted to challenge a statute not because their
> own rights of free expression are violated, but because of a judicial
> prediction or assumption that the statute's very existence may cause
> others not before the court to refrain from constitutionally protected
> speech or expression."

*Fieger v. Michigan Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009) (citations omitted,
emphasis added).

PUBLIC VERSION

might have been implemented in a manner that was consistent with Constitutional requirements.[26]

Defendant has not suggested that SeAH has not suffered actual harm from Commerce's conduct, and it has not contended that Constitutional standing does not exist in this appeal.  Furthermore, SeAH is not challenging the Constitutionality of antidumping laws that have never been implemented.

Significantly, none of the cases cited by Defendant involved the use of "hypothetical" examples to illustrate the absurdity of an agency interpretation.  And, contrary to Defendant's suggestion, the use of hypothetical examples to illustrate logical errors is a common tool not only of Law School teaching, but also of appellate argument.[27]  In these

---

[26] As the Supreme Court explained,

> Respondents object to I–872 not in the context of an actual election, but in a facial challenge. Under *United States v. Salerno*, ... a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," i.e., that the law is unconstitutional in all of its applications.... While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a " 'plainly legitimate sweep.' ".... Washington's primary system survives under either standard, as we explain below. In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases.... The State has had no opportunity to implement I–872, and its courts have had no occasion to construe the law in the context of actual disputes arising from the electoral context, or to accord the law a limiting construction to avoid constitutional questions.

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-450 (2008) (footnotes omitted).

[27] *See, e.g.*, Timothy R. Johnson, *Oral Arguments and Decision Making in the United States Supreme Court* (2004) at 49 ("Another way for the justices to determine the ramifications of choosing one decision over another is for them to pose hypothetical

*(footnote continued on following page)*

circumstances, Defendant's objection to the numerical examples presented in our previous briefs should be understood as an admission that, despite having had months to look over the figures we presented, Defendant has no substantive answer.

>   2.   *Defendant's Suggestion that Hypothetical Examples Be Disregarded Is Inconsistent with the CAFC's Decision, which Explicitly Required Commerce to Consider the Impact of Tiny Price Variations on the Outcome of the Differential Pricing Analysis*

In its decision, the CAFC expressed a concern that tiny variations in prices could result in a finding that sales "passed" both the Cohen's *d* test and Ratio Test under the Differential Pricing Analysis.[28]  The CAFC therefore instructed Commerce to address that possibility.[29]  Consequently, whether or not arguments based on hypothetical examples are "disfavored," Commerce was required in this case to consider the example described by the CAFC, and this Court is required to consider whether Commerce's response adequately addressed the CAFC's concern.

In its final redetermination, Commerce did not dispute that tiny price variations could lead to the results predicted by the CAFC.  Instead, it held that such tiny price variations could not affect the dumping margins, because the difference between the average-to-average and the average-to-transaction results would not constitute a "meaningful

---

*(footnote continued from previous page)*
questions during oral arguments.").  *See also* R. Wolf, *Supreme Court Seeks Answers from "Wild Hypotheticals"*, USA TODAY, (Oct. 13, 2013); E. Barrett Prettyman, Jr., *The Supreme Court's Use of Hypothetical Questions at Oral Argument*, 33 CATH. U. L. REV. 555 (1984).

[28] *See Stupp*, 5 F.4th at 1357-60.

[29] *Id.* at 1360.

difference" under the standard applied by Commerce.[30]  In addition, Commerce rejected

SeAH's modification of the CAFC's example, which showed that the Differential Pricing

Analysis could inflate dumping margins by 1.67 percent, on the grounds that an increase in

the dumping margin from zero to 1.67 percent would also not constitute a "meaningful

difference."[31]

In its Sur-Reply, Defendant contends that Commerce's final redetermination both the

hypothetical example presented by the CAFC and the modified example presented by

SeAH based on Commerce's reasoning.[32]  But Defendant's argument is misplaced.  An

increase from zero to 1.67 percent may not move the results across the negligibility

threshold.  But, as we have explained previously, an increase of 1.67 percentage points

from 0.34 percent to 2.01 percent would move the margins across the negligibility

threshold and therefore constitute a "meaningful difference."

In fact, the application of the Differential Pricing Analysis in this investigation

increased SeAH's dumping margin by "only" 0.56 percentage points.  But, that increase

changed SeAH's margin from a *de minimis* 1.97 percent to an above *de minimis* 2.53

percent — which resulted in an affirmative determination of dumping in a situation in

which the average-to-average methodology would have resulted in a negative

determination.  Consequently, there is no basis for Commerce's claim that the "meaningful

difference" test would prevent findings of dumping even when its Differential Pricing

Analysis increased dumping margins by 1.67 percent.

---

[30] *See* Final Redetermination at 31.

[31] *See* Final Redetermination at 58-60.

[32] *See* Defendant's Sur-Reply at 11.

     *D.*    *Defendant's Assertion that Professor Cohen's Text Envisions*
            *the Use of Cohen's d Statistic for Full Populations Is False*

In its sur-reply, Defendant asserts that our arguments have been based on the "conclusion{} that effect size does not exist with respect to a population."[33]  That is, of course, a gross distortion of our actual position.  We have never denied that it is possible to measure an effect for a full population.  Indeed, our reply brief provided an example of just how such a calculation might be made.[34]

But the fact that it is possible to calculate an effect for a full population does not mean that Cohen's *d* is an appropriate measure of that effect size. It certainly does not mean that the rules of thumb that Professor Cohen proposed for assessing whether a calculated *d* is small, medium, or large can properly be applied.  As Professor Cohen made clear, different effect-size indices are used with different statistical tests.[35]  The *d* statistic and the rules of thumb proposed for evaluating the *d* statistic) were never intended as a universal measure.

---

[33] *See* Defendant's Sur-Reply at 26.

[34] As we explained,

> ... Professor Ellis's observation stands for the common-sense observation that, because samples necessarily introduce the risk of sampling error, the most accurate method for measuring characteristics of an entire population is an analysis of the entire population.  If one wants to know the average height of groups of students in a high school, the most accurate method for determining the difference is to take the heights of all students and compute the average for each group from that data.  A "short-cut" method that only measures samples of the student body runs the risk of distortion if the samples selected do not perfectly reflect the population as a whole.

*See* SeAH's Reply Brief at 18-19.

[35] *See* Cohen, Jacob, *Statistical Power Analysis for the Behavioral Sciences* (2d ed.1988) at 13 (PRRD-8, CRRD-12).

PUBLIC VERSION

The question presented in this appeal is not whether it is possible to calculate differences in SeAH's average prices by customer, region, and time period, if one assumes that SeAH's data consists of a "full population."  Instead, the question is whether it is meaningful to translate the observed differences in average prices into values of Cohen's *d*, and then to assess whether the resulting *d* values are "large" using Professor Cohen's proposed rules of thumb, when the assumptions required by Professor Cohen for using the *d* statistic are not satisfied.  Defendant has attempted to turn this appeal into a referendum on effect sizes in general, while ignoring the limitations that widely-adopted statistical assumptions imposes on the use of Cohen's *d* as one possible measure of effect size.  That effort is irrelevant, and it should be rejected.

       1.   *Professor Cohen's Reference to "Population Parameters" Refers to Estimates of the Parameters for the Population, Not the Calculation of the d Statistic Based on a Full Population of Data*

As we have demonstrated previously, Professor Cohen's textbook introduced a number of different measures of "effect size," each of which was intended for use with a different measure of statistical significance.  Professor Cohen's text did not suggest that there was a single measure of effect size that was suitable for use in all situations.  His proposed *d* statistic — and the rules of thumb he suggested for assessing whether a given value of *d* was small, medium or large — was described solely for use in conjunction with a t-Test for means.  And, a t-Test for means requires the assumptions that the two datasets being compared are both drawn from Normal distributions with roughly equivalent variances and sufficient data points.

In its response, Defendant claimed that references in Professor Cohen's text to "population parameters" indicated that the *d* statistic could be used to compare data that

did not meet the assumptions required for use of a t-Test, as long as the analysis was performed for a full population and not a sample.  In our reply, we demonstrated that Defendant's assertion was false:  In Professor Cohen's text, the term "population parameter" refers to an assumption about the value of a certain parameter for an entire population, and not to an actual measurement of $d$ for a population.  Furthermore, Professor Cohen distinguishes between (1) the use of an *ex ante* assumption about the population as a whole*,* for purposes of designing an experiment, and (2) the *ex post* calculation of the statistical significance of a experimental results.  But nothing in Professor Cohen's text suggests that the $d$ statistic can be used independently of a t-Test.

Defendant's sur-reply claims to refute the arguments made in our initial comments and reply.  It provides a lengthy summary, including various mathematical formulas, purporting to describe the intent of Professor Cohen's "power" analysis.  And it cites texts describing the measurement of "effect size" (but *not* of Cohen's $d$) for an entire population. But, despite its lengthy discussion, Defendant's Sur-Reply simply fails to address the fundamental errors identified in our initial comments and reply brief.

> 2. *The Chapter of Professor Cohen's Text Describing the Use of Cohen's d Only Describes the Use of that Statistic in Conjunction with a "t-Test"*

Chapter 1 of Professor Cohen's textbook (which covers pages 1 to 17 of the text included in the record) discusses the concept of "effect size" in general.  That discussion *does not* refer specifically to the use of the $d$ statistic.  Consequently, Defendant's citation to discussions in those pages of Professor Cohen's text *cannot* support the use of the

proposed $d$ statistic in the manner Commerce has proposed, because the proposed $d$ statistic is not the subject of that Chapter.[36]

As Defendant now concedes, each subsequent chapter of Professor Cohen's text describes a different statistical text and the effect-size index appropriate for use with that test.[37]  Chapter 2 addresses the statistical test known as the "t-Test for Means."  The proposed $d$ statistic is described in that chapter, and not in any other Chapter.  And, as Defendant now concedes, "{t}he reliability of the results of the t-test ... are dependent upon 'the shape of the population distribution' (*i.e.,* the normality and similarity of variances) and the sample size."[38]

Defendant then sets forth mathematical formulas describing the calculation of the $d$ statistic.  And, it follows those formulas with Professor Cohen's statement that:

> Generally, we can define the effect size *in the sample* ($ES_s$) using sample statistics in the same way as we define it for the population, and a statistically significant $ES_s$ is one which exceeds an appropriate criterion value.[39]

Defendant fails to indicate, however, that the quoted passage is found in Chapter 1 of Professor Cohen's text (which describes effect-size indies in general), and not in Chapter 2

---

[36] *See* Defendant's Sur-Reply at 16-18.

[37] *Id.* at 18.

[38] Defendant's Sur-Reply at 18.

Defendant's reply describes this discussion as appearing in Chapter 1 of Professor Cohen's text.  In fact, the discussion appears in *Section 1* of Chapter 2.  *See* Cohen at 19 (PRRD-8, CRRD-12).  Also, the term "shape of the population distribution" does not appear in Section 1 of Chapter 2 of Professor Cohen's text (or, as best we can tell, anywhere in Chapter 2 of his text).

[39] Defendant's Sur-Reply at 19, citing Cohen at 17 (PRRD-8, CRRD-12).  *Id.* at 22.

(which describes the use of the *d* statistic).  Furthermore, as demonstrated at length in our

reply brief, Professor Cohen's discussion of statistical significance "in the sample" at

page 17 refers to the use of effect-size indices in general to assess statistical significance of

the results of an experiment.  The "population" effect size in his text refers to the *estimated*

effect size for the population as a whole used *ex ante* to design an experiment.[40]

Defendant also asserts that the use of the *d* statistic for a full population is described at

page 66 of Professor Cohen's text, where Professor Cohen states that:

> Accordingly, we redefine our ES index, d, so that its elements are
> sample results, rather than population parameters, and call it d$_s$.[41]

However, Defendant's selective quotation omits key context, which demonstrates that

Professor Cohen was discussing the difference between the *ex ante* and *ex post* use of the *d*

statistic in experiments, and not the use of *d* with full populations.  Thus, the actual

passage from Professor Cohen's text is as follows:

> 2.5  THE USE OF THE TABLES FOR SIGNIFICANCE TESTING
> 2.5.1 GENERAL INTRODUCTION.  As noted above in Section 1.5,
> provision has been made in the power tables to facilitate significance
> testing. *Here, our focus shifts from research planning to the appraisal
> of research results, and from the consideration of the alternate-
> hypothetical state of affairs in the population to the palpable
> characteristics of the sample and their bearing on the null hypothesis.*
>
> Accordingly, we redefine our ES index, d, so that its elements are
> sample results, rather than population parameters, and call it d$_s$.[42]

When read in its full context, it is clear that the passage that Defendant has quoted is

intended to differentiate between (1) the *ex ante* use of the *d* statistic to design experiments

---

[40] *See* SeAH's Reply Brief at 27, citing Cohen at 8-10 (PRRD-8, CRRD-12).

[41] Defendant's Sur-Reply at 22, quoting Cohen at 66 (PRRD-8, CRRD-12).

[42] Cohen at 66 (PRRD-8, CRRD-12).

(discussed in the previous portion of Chapter 2 of Professor Cohen's text), and (2) the *ex post* use of the *d* statistic to evaluate the results of experiments (discussed in Section 2.5 of that Chapter).  Read in context, the passage quoted by Defendant simply does not indicate that the *d* statistic can be used on a full population when the requirements for a t-Test are not satisfied.

In this regard, Defendant suggests that the reference in our reply brief to equation 2.2.1 in Professor Cohen's text fails to demonstrate that the *d* statistic cannot be used with full population data.[43]  The argument is absurd.  As the Court may recall, it was *Defendant* that asserted (in its response to our initial comments) that equation 2.2.1 described a calculation where "the values for the populations' parameters" are "used to calculate the actual effect size."  Thus, Defendant's response stated that:

> Dr. Cohen's equations 2.2.1, 2.2.2 and 2.3.2 denote the values for the populations' parameters used to calculate the actual effect size, whereas Dr. Cohen's equations 2.5.1 and 2.5.2 provide the equivalent formulas using the estimated values based on sampled data.[44]

In our reply, we pointed out that Defendant's description of equation 2.2.1 was explicitly contradicted by Professor Cohen's text, which describes formula 2.2.1 (and formula 2.2.2 as well) as addressing the "the two independent samples case."[45]

In their sur-reply, Defendant now claims that, in introducing formula 2.2.1, "Dr. Cohen's reference to the 'two independent samples case' refers to the subject of Chapter 2,

---

[43] *See* Defendant's Sur-Reply at 23.

[44] Defendant's August 15, 2022, Amended Response at 14.

[45] *See* SeAH's Reply Brief at 27, citing Cohen at 20 (emphasis added) (PRRD-8, CRRD-12).  *See also* Cohen at 62 (referring to both equations 2.2.1 and 2.2.2 as calculating "the d of independent samples") (PRRD-8, CRRD-12).

'The t-Test for the Means."[46]  We agree that a t-Test does require a "two independent samples case."  We also agree that everything in Chapter 2 of Professor Cohen's text describes the use of the $d$ statistic in conjunction with a t-Test.  But we never claimed that equation 2.2.1 described the use of the $d$ statistic independently of a t-Test, when the assumptions required for a t-Test are not satisfied.  Instead, that was *Defendant's* claim.  And, it is demonstrably false.  Professor Cohen's text introduces equation 2.2.1 by describing it as being used "for the two independent samples case."[47]  And, he subsequently refers to both equations 2.2.1 and 2.2.2 as calculating "the $d$ of independent samples."[48]  There simply is no basis for Defendant's assertion that Professor Cohen envisioned these formulas to be used apart to evaluate a full population when the requirements for using a t-Test are not satisfied.

> 3. *References by Professor Cohen and Other Academics to Consideration of "Effect Size" in General Does Not Represent an Endorsement of the Use of Cohen's d when the Required Assumptions Are Not Satisfied*

Defendant's also claims that its position that Cohen's $d$ can be used to evaluate a full population is supported by other academic texts (Ellis and Algina).[49]  Once more, the claim is false.

As we have discussed previously, Ellis does state that "{t}he best way to measure an effect is to conduct a census of an entire population...."[50]  But Ellis nowhere states that

---

[46] *See* Defendant's Sur-Reply at 23.

[47] *See* Cohen at 20 (PRRD-8, CRRD-12).

[48] *Id.* at 62 (PRRD-8, CRRD-12).

[49] *See* Defendant's Sur-Reply at 24-25.

Cohen's *d* can properly be used when the requirements for a t-Test are not satisfied. Contrary to Defendant's suggestion, Cohen's *d* is not a synonym for "effect size." Rather, Cohen's *d* is one measure of effect size that is suitable for use in certain circumstances (when the requirements for using a t-Test are satisfied) and not in others. While one can measure an effect for a full population by taking a census of the population, one cannot properly describe that effect using Cohen's *d*, and one cannot assess whether the observed effect is small, medium, or large using Professor Cohen's proposed rules of thumb, unless the requirements for a t-Test are satisfied.

Finally, Defendant asserts that the Algina article "reiterate{s} the same formulation of the difference in the means between populations and samples as Dr. Cohen.[51] But, again, Defendant has misrepresented the actual meaning of the text. The "population" parameters referred to by the Algina article represent the assumed *"usual"* mean and standard deviation for the population, not the mean and standard deviation measured based on a census of the full population.[52] And, again, nothing in Algina contemplates the use of

---

*(footnote continued from previous page)*

[50] *See* Ellis, Paul, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results* (2010) at 5 (PRRD-8, CRRD-15).

[51] *See* Defendant's Sur-Reply at 25.

[52] As the Algina article explains,

> The parameter δ has a serious shortcoming because it is defined by using the *usual* population mean and standard deviation. The population mean is the point in the distribution that minimizes the average squared deviation about the point, and the population standard deviation is the square root of the average squared deviation about the mean. Because of the nature of these parameters, we refer to them as least squares parameters, although the term applies most aptly to the mean. These least squares parameters are not robust....

*(footnote continued on following page)*

Cohen's *d* apart from a t-Test, or when the requirements for use of a t-Test are not

satisfied.  Defendant's assertions to the contrary are false.

E.   *Commerce's Methodology Cannot Distinguish*
     *"Patterns" from Variations that Occur by Chance*

As we have explained previously, the statute permits Commerce to depart from the

normal average-to-average transaction only when it finds a "pattern" of U.S. prices that

differ significantly by purchaser, region, or time period.  The statute does not define the

term "pattern."  However, Commerce has made clear that the finding required by the

statute must distinguish between differences that have meaning and those that arise by

chance.  As Commerce has explained,

> a 'pattern of prices that differ significantly among purchasers, regions
> or time periods' means that the Department is examining the extent to
> which the prices, when ordered by purchaser, region or time period,
> exhibit differences which have meaning, which have or may have
> influence or effect, which are noticeably or measurably large, and
> *which may be beyond something that occurs by chance*...."[53]

_____

*(footnote continued from previous page)*
> Whereas there are several criteria for assessing robustness of a
> parameter: qualitative robustness, quantitative robustness, and
> infinitesimal robustness, ... the general notion is that a parameter is not
> robust if a small change in the population distribution can strongly
> affect the parameter. It can be shown that the least squares mean and
> variance are not robust ... when judged by any one of these three
> criteria.

*See* Algina, James, Keselman, H.J., and Penfield, Randall, *An Alternative to Cohen's
Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in
the Two Independent Groups Case*, 10 PSYCHOLOGICAL METHODS 318 (2005) (PRRD-8,
CRRD-15).  In this regard, the Algina article states that it uses "the Greek letter δ to refer
to the population ES." *Id.*, n. 1.

[53] *See* Issues and Decision Memorandum for the Final Affirmative Determination in the
Less-Than-Fair-Value Investigation of Welded Line Pipe from the Republic of Korea
(Oct. 5, 2015) ("Final I&D Memo") at 20 (emphasis added) (PR-423).

The task before Commerce, then, is not simply to examine whether prices vary.  Instead, when it finds that prices vary, it must analyze whether the observed variations are "beyond" something that might have occurred by chance.

Professor Cohen demonstrated that, when applied properly, his $d$ statistic could be used to determine the likelihood that an observed effect represented a real effect, and not a chance fluctuation.  However, his calculations depended not only on the assumption that the data being analyzed was from a Normal distribution, but also on the number of data points in each data set.[54]  When the data is not Normal or when there are an insufficient data points, the $d$ statistic by itself does not permit one to reject the "null hypothesis" and conclude that the observed effect is real, and not simply the result of random variations.

Commerce has asserted that it can simply ignore the possibility that observed differences might reflect random variations because, it claims, SeAH's U.S. sales prices are not affected by random variations.  Defendant's sur-reply repeats that claim.  But the evidence demonstrates that Commerce and Defendant are wrong:  SeAH's prices show variations that can only reflect random factors.  Before Commerce can apply an alternative comparison methodology, it must, under its own definition, make a finding based on evidence that the observed difference does not reflect random variations.

      1.    *Defendant's Assertion that Prices Are Not Affected by Random Variation Is Refuted by the Record Evidence*

In our comments on Commerce's draft redetermination, we made what we thought was an obvious, common-sense point:  SeAH does not have the ability to dictate prices to its customers.  Instead, prices are negotiated in light of market conditions, and may

---

[54] Cohen at 27-39 (PRRD-8, CRRD-12).

therefore vary based on various random factors, including variations in exchange rates.[55]
The point seemed obvious and incontrovertible.

In its final determination, however, Commerce claimed that our "obvious" point was
not correct. According to Commerce,

> A company's pricing behavior in a market economy has nothing to do
> with chance, including the U.S. prices established by SeAH during the
> POI. A company's pricing behavior is foundationally based on
> corporate strategies and goals, including maximizing profit, within the
> bounds of supply and demand in the marketplace. Thus, the differences
> in a company's prices do not reflect chance, but the company's market
> research, corporate practice and priorities, resulting in deliberate
> pricing decisions. This is further supported by record evidence, which
> demonstrates, for example, that SeAH is involved to a high degree in
> market research. Accordingly, SeAH's implication that its, or any
> company's, prices are determined by chance, and that this would
> invalidate the results of Commerce's Cohen's d test without further
> statistical analysis to account for such chance or random fluctuations,
> is without merit.[56]

Defendant's Sur-Reply treats this Commerce explanation as an unrefuted fact.[57]  But
Commerce's explanation is not a fact.  It is an unsupported assertion that is contrary to the
actual evidence on the record.

In our initial comments, we demonstrated how variations in exchange rates (which are
outside SeAH's control and effectively random) can affect the net prices used in
Commerce's "Differential Pricing Analysis."[58]  Defendant has objected to that
demonstration on procedural grounds — based on the absurd proposition that we should

---

[55] *See* SeAH's Comments on Draft Redetermination at 19-20 (footnote omitted).
(PRRD-30, CRRD-29).  *See also* above at 7-10.

[56] *See* Redetermination at 45 (footnote omitted).

[57] *See* Defendant's Sur-Reply at 13 (incorrectly citing Redetermination at 41).

[58] *See* SeAH's Initial Comments at 24-28.

have predicted that Commerce's final redetermination would deny reality and thus refuted Commerce's explanation before Commerce actually made it.[59]  But Defendant has not attempted to refute our actual calculations, which are based on record evidence and demonstrate conclusively that random variations in exchange rates cause variations in the net prices used in Commerce's analysis, and that those variations are sufficient by themselves to generate a "positive" finding from Commerce's Differential Pricing analysis.

Furthermore, Commerce's assertion that prices are not affected by random variations is refuted by the actual pricing data on the record of this proceeding.  For example, in our comments to Commerce (and in out initial comments to this Court), we provided an analysis of the pricing for control number 1-03-03-06-1.  The data indicates that SeAH had a total of 38 U.S. sales of that control number during the relevant period.  The vast majority of those sales — 22 of the 36 — were made to a single customer (customer number 111060) at one location.[60]  The following table summarizes the prices for those sales to that customer:

---

[59] Defendant's Amended Response at 26-28.

[60] *See* SeAH's Comments on Draft Redetermination, Attachment 1 (PRRD-31, CRRD-30).

PUBLIC VERSION

Sales of Control Number 1-03-03-06-1
To Customer 111060



As this data demonstrates, the prices for this product to this one customer varied considerably, sometimes even for sales made on the same day.  For example, the data shows that SeAH had three sales of this single product to this one customer on April 30, 2014.  The net prices (based on Commerce's calculations) ranged from [         ] per ton to [         ] just for sales on that one day.  Prices also varied considerably for sales made on different days of the same month,[61] as well as for sales made in different months of the same quarter.

---

[61] For example, SeAH made multiple sales of this product to customer 111060 on March 13 and March 24.  The unit prices for the March 13 sales were roughly [      ] per ton.  The unit prices for the March 24 sales were roughly [      ] per ton.

*(footnote continued on following page)*

This data is fundamentally inconsistent with Commerce's assertion that the prices are dictated by SeAH and are not affected by random factors. A company that was dictating prices to its customers based solely on "the company's market research, corporate practice and priorities" would not have charged different prices to the same customer for sales on the same day or for sales only a few days apart. The evidence demonstrates, instead, that prices fluctuated randomly, just as SeAH had suggested.

Finally, we note that Commerce's assertion about SeAH's pricing practices reveals a frightening degree of economic illiteracy. The evidence on the record confirms that SeAH is not a monopoly-supplier of welded line pipe. Instead, the petition in this case indicates that SeAH sold its product during the relevant period in competition with 18 U.S. producers, and also faced competition from 12 other Korean producers and 6 Turkish producers, in addition to producers in other countries.[62] Furthermore, the evidence shows that the line pipe offered by these producers was fungible and sold in the same geographic markets.[63] In such market conditions, SeAH simply cannot dictate prices to its customers, because there are numerous other potential suppliers that customers can turn to. Instead, as a matter of basic economics, SeAH must sell at a price set by overall supply and demand in the market. Its prices are, therefore, necessarily affected by random market variations, just as our comments on Commerce's draft redetermination had claimed.

_____

*(footnote continued from previous page)*

Similarly, SeAH made multiple sales of this product to customer 111060 on June 8 and June 27. The unit prices for the June 8 sales were roughly [      ] per ton. The unit prices for the June 27 sales were roughly [      ] per ton.

[62] *See* Petition, Volume I, at 2-5 (listing U.S. producers) and Exhibit I-4 (listing Korean and Turkish producers).

[63] *See id.*, at 20-21.

In these circumstances, the assertion by Commerce that SeAH's prices are not affected by random factors is contrary to the evidence. The evidence confirms that SeAH's actual prices to the same customer in a single region during the same time period varied considerably. The evidence further confirms that exchange rates varied significantly, that those exchange-rate variations necessarily affected Commerce's calculation of the net prices used in its Differential Pricing Analysis, and that the variations in net prices caused by exchange rate fluctuations alone could have generated a "positive" result from the Differential Pricing Analysis. In such circumstances, Defendant's claim that Commerce did not have to consider the possibility that the observed price differences might have arisen from random factors is without merit.

2. *The d Statistic Alone Does Not Permit Commerce to Determine Whether an Observed Difference Constitutes a Pattern or Random Variation*

In its initial response, Defendant accused us of "conflating" the concepts of practical and statistical significance.[64] In their telling, statistical significance has no role when an entire population is being analyzed. Instead, they contend that when an entire population is being analyzed, practical significance, as measured by effect size, is the only concept that matters.[65]

In our Reply, we demonstrated that practical significance, as measured by effect size, is not sufficient to rule out the possibility that observed price differences may have arisen by chance.[66] Defendant has not attempted to refute our argument. Instead, it has simply

---

[64] *See* Defendant's Amended Response at 12.

[65] *See, e.g.*, *id.* at 17.

[66] *See* SeAH's Reply Brief at 29-31.

repeated its accusation, contending not just once, but twice, in two separate sections of its sur-reply, that we have "conflated" the concepts of practical and statistical significance.[67]

It appears, however, that Defendant does not understand the meaning of the word "conflate."  Contrary to their suggestion, we have not confused practical and statistical significance, and we have not attempted to mix them together.  Instead, we have made the point that, in order to distinguish true patterns from random variations, it is necessary to consider both practical and statistical significance.  That point should not be controversial. Indeed, it is made explicitly by Professor Cohen.[68]  Tellingly, Defendant has not identified any statistical literature that indicates that evaluation of effect sizes, by themselves, allow a researcher to rule out the "null hypothesis" that observed differences occurred by chance.

Defendant does contend that Commerce is not required to consider statistical significance when it analyzes Cohen's $d$, because, Defendant claims, Commerce addresses statistical significance through its "Ratio Test."[69]  But it has not cited any academic texts or mathematical principles that support the claim that the Ratio Test can address statistical significance when used in conjunction with Cohen's $d$.  As we have explained at length in our previous submissions, Professor Cohen proposed that the $d$ statistic be used as a measure of effects size only in conjunction with the use of a t-Test to assess statistical

_____

[67] *See* Defendant's Sur-Reply at 11-12 and 34-35.

[68] As explained in our Reply Brief, Professor Cohen used the concept of "power" to describe the determination whether observations would permit a researcher to reject the null hypothesis that observed differences had occurred by chance.  He further explained that "The power of a statistical test depends upon three parameters: the significance criterion, the reliability of the sample results, and the 'effect size,' that is, the degree to which the phenomenon exists."  *See* SeAH's Reply Brief at 16-17, citing Cohen at 4 and 13.

[69] *See* Defendant's Sur-Reply at 13.

significance.  Nothing in Professor Cohen's text suggests that the *d* statistic (and the rules of thumb he propose for evaluating that statistic) have any meaning when the requirements he described are not satisfied.  Furthermore, nothing in Professor Cohen's text suggests that, when effect size is measured with Cohen's *d*, statistical significance can be determined using a test other than a t-Test.[70]  Whatever Commerce may claim to be doing, it is simply not using Cohen's *d* in the manner described by statistical literature.

Finally, Defendant asserts that Commerce's use of the Ratio Test was upheld as reasonable by the CAFC's decision in *Stupp*.[71]  But no one argued in *Stupp* that the Ratio Test was intended as a measure of the statistical significance of observed price variations — *i.e.,* whether observed price differences (as identified using Cohen's *d*) represented a real pattern or a chance fluctuation.  Instead, the issue presented to the CAFC in *Stupp* was whether, in the absence of notice-and-comment rulemaking, Commerce needed to justify its selection of the 33- and 66-percent cut-offs used in the Ratio Test based on substantial evidence in each individual case.[72]  The CAFC held (incorrectly in our

---

[70] In this regard, Professor Cohen demonstrates that, when the data meets the requirements for a t-Test, it is possible to calculate the likelihood that an experiment has found any defined level of statistical significance based solely on the number of data points and the calculated the value of *d*.  *See* Cohen at 27.

[71] *See* Defendant's Reply Brief at 13.

[72] *See Stupp*, 5 F.4th at 1355 ("SeAH is mistaken when it asserts that Commerce must demonstrate the propriety of the ratio test with respect to the particular facts of this case. As discussed above, Commerce's burden in selecting a methodology for detecting patterns of significantly differing export prices is reasonableness as a matter of law, not substantial evidence on the factual record. SeAH was free to make factual arguments regarding why it was inappropriate to apply the ratio test in this case, but it chose not to do so. Instead, SeAH has challenged the appropriateness of the ratio test in the abstract (e.g., by contending that the test and its cutoffs are 'arbitrary') and wrongly attempts to place the burden on Commerce to justify the use of that test as a matter of substantial evidence in light of the facts of this case.")

view) that Commerce was neither required to engage in notice-and-comment rulemaking nor to identify substantial evidence to support its cut-offs.[73]  However, the CAFC did not address the issue whether Commerce could properly use Cohen's *d* with a test of statistical significance other than the t-Test for which it was created.

> F.   *Rules of Thumb Based on Heights*
>       *and IQs Does Not Provide a Meaningful*
>       *Measure of Variations in U.S. Sales Prices*

As we have explained previously, Professor Cohen claimed that his proposed rules  of thumb for assessing whether a given value of *d* was small, medium, or large were based on observations of heights of teenaged girls and the IQs of different kinds of students.[74] Commerce has asserted that, because Professor Cohen's proposed rules were based on "real-world observed differences," they can be used as a universal yardstick for evaluating effect sizes even when the assumptions required by Professor Cohen for use of the *d* statistic are not satisfied.[75]  Defendant's Sur-Reply repeats that claim:

> ... Dr. Cohen's thresholds were not derived based on quantitative analysis of numerous comparisons, but rather were proposed as reasonable index levels which were then illustrated with study results which presented the proposed index levels. It is these illustrative examples which will lead reasonable people to find that Dr. Cohen's proposed conventions to be reasonable, notwithstanding their known shortcomings.[76]

---

[73] As we explained to the CAFC in our motion for rehearing, it is well-settled that, "{w}hen agencies base rules on arbitrary choices they are legislating, and so these rules are legislative or substantive and require notice and comment rulemaking." *See Cath. Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (2010).  *See also id.* at 496 ("it is impossible to give a reasoned distinction between numbers just a hair on the OK side of the line and ones just a hair on the not-OK side.").

[74] *See, e.g.*, Cohen at 12; Ellis at 41.

[75] *See* Redetermination at 20, 24, and 28.

[76] Defendant's Sur-Reply at 31.

But the fact that Professor Cohen purportedly based his proposed rules of thumb on "real-world observed differences" for heights and IQs does not mean that they provide a reasonable yardstick for evaluating differences in other types of data.

As we have noted previously, SeAH does not set its prices based on the heights and IQs of its customers.  As a result, there is no *a priori* reason to expect a rule of thumb derived from observations of heights and IQs to provide a reasonable yardstick for evaluating differences in SeAH's prices.  In order for Commerce to apply Professor Cohen's proposed rules of thumb to data that does not involve heights or IQs, it must show that the data being analyzed has the same underlying characteristics as heights and IQs.

As we have noted previously, both the heights of teenage girls and IQ scores are Normally distributed.[77]  All Normal distributions share fundamental mathematical characteristics.  Indeed, "all Normal distributions are the same if we measure in units of size σ about the mean μ, as center."[78]  Consequently, it would undoubtedly be mathematically reasonable to extend the thresholds that Professor Cohen derived from his analysis of Normally-distributed heights and IQs to other Normally-distributed data.

But that logic only applies to Normally-distributed data.  It does not apply to non-Normal data, which has very different mathematical characteristics than Normal data.  In this case, SeAH's pricing data did not follow a Normal distribution, and it did not have equal variances or a sufficient number of data points in the groups being compared.[79]

---

[77] *See* SeAH's Initial Comments at 13, citing Starnes, Yates, and Moore, *Statistics through Applications* (2005) at 124, 135.

[78] *Id.*, citing Starnes at 123.

[79] *Id.*, at 14.

Consequently, there is no mathematical reason to expect SeAH's prices to have the same characteristics as the data that Professor Cohen examined when selecting his proposed thresholds.

Defendant's Sur-Reply simply fails to respond to this fundamental point. Defendant claims, instead, that we are arguing only that Professor Cohen's proposed rules of thumb "are determined by quantitative analysis."[80] That is plainly incorrect. While Professor Cohen undoubtedly did provide quantitative analyses to support the reasonableness of his proposed rules of thumb, the rules themselves were purportedly based on observations of heights and IQs. But the fact that his proposed rules of thumb were based on observations of Normally-distributed heights and IQs does not explain why they provide a reasonable yardstick for assessing differences in prices that do not follow a Normal distribution.

> G.   *Contrary to Defendant's Claims, a Decision by Judge Choe-Groves that Was Made Prior to the CAFC's Decision in* Stupp *Does Not Establish that Commerce's Use of Cohen's d Conforms to Statistical Practice*

As explained above, the concept of "practical significance" is not sufficient, on its own, to establish whether an observed variation in prices represents a "pattern" or is instead simply the result of chance. In order to determine that an observed effect represents a "pattern," it is necessary to assess how likely it is that the observed effect might have occurred by chance. Professor Cohen's textbook demonstrates that the *d*

---

[80] Defendant's Sur-Reply at 33.

Defendant also asserts (without any apparent logical support) that "Dr. Cohen's thresholds are not dependent on the distributions or variances of the data which is under examination to determine the magnitude of the difference in the means." *Id.*, at 34.

PUBLIC VERSION

statistic can be used in such an assessment, but only if the datasets being compared meet the assumptions of Normal distribution, roughly equal variances, and sufficient data size.

Defendant's Sur-Reply asserts that "this Court has already sustained substantially a similar explanation that the sample size, sample distribution and statistical significance are not relevant to Commerce's analysis."[81]  In support of that claim, they cite to a decision by Judge Choe-Groves in an appeal of the *third* administrative review of *Oil Country Tubular Goods ("OCTG") from Korea.*[82]  Defendant does note that there is a motion for reconsideration pending in that case.  But it fails to explain the reason for that motion, and why that motion demonstrates that Judge Choe-Groves decision is irrelevant here.

In fact, the decision by Judge Choe-Groves that Defendant has cited was issued on April 14, 2021.[83]  The CAFC's decision in *Stupp* was issued three months later, on July 15, 2021.  Consequently, Judge Choe-Groves's decision could not have considered the implications of the CAFC's holding in *Stupp*, when she issued the decision on which Defendant relies.  SeAH's motion for reconsideration of Judge Choe-Groves's decision asks, *inter alia,* that she revise her decision in light of the CAFC's holding in *Stupp.*

Judge Choe-Groves did have the opportunity to address the significance of *Stupp* in the subsequent appeal of the *fourth* OCTG review.  In that case, Judge Choe-Groves issued a decision on October 19, 2022, holding that:

> In *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), the U.S. Court of Appeals for the Federal Circuit remanded Commerce's use of the Cohen's d test for further explanation because the data Commerce

---

[81] Defendant's Sur-Reply at 10.

[82] *Id.*, citing *SeAH Steel Corp. v. United States*, 513 F.Supp.3d 1367, 1382-83 (CIT 2021).

[83] *See SeAH Steel Corp. v. United States*, 513 F.Supp.3d 1367 (CIT 2021).

PUBLIC VERSION

used may have violated the assumptions of normality, sufficient observation size, and roughly equal variances. *Id.* at 1357–60. The Court addressed Commerce's argument that it does not need to worry about normality because it is using a population instead of a sample, stating that Commerce's argument "does not address the fact that Professor Cohen derived his interpretive cutoffs under the assumption of normality." *Id.*...

In accordance with the U.S. Court of Appeals for the Federal Circuit's decision in Stupp, this Court concludes that use of a population, instead of a sample, does not negate the assumptions inherent to the Cohen's d test. The Court observes that Commerce did not explain whether the data used in its differential pricing analysis met the assumptions associated with the Cohen's d test.... The Court notes that the data cited by Commerce appear to contain a limited number of data points and do not indicate whether they exhibit a normal distribution.... The evidence and arguments before the Court call into question whether the data Commerce used in its differential pricing analysis violated the assumptions of normality, sufficient observation size, and roughly equal variances associated with the Cohen's d test. The Court remands for Commerce to further explain whether the limits on the use of the Cohen's d test were satisfied or whether those limits need not be observed when Commerce uses the Cohen's d test.[84]

In short, Judge Choe-Groves has found that the CAFC's decision in *Stupp* requires further explanation from Commerce on precisely the same issues that the Court is considering in this case.

As a final matter, we would note that Defendant has opposed our request for reconsideration of Judge Choe-Groves's decision concerning the *third* OCTG review, on the grounds that Commerce's remand determination in the present case fully disposes of the concerns raised by the CAFC in *Stupp*.[85]  In other words, Defendant asserts *both* that the Court's review of Commerce's redetermination in this case is governed by Judge Choe-

---

[84] *See SeAH Steel Corp. v. United States*, 539 F.Supp.3d 1341, 1350-51 (CIT 2021).

[85] *See* Defendant United States' October 31, 2022, Response in Opposition to SeAH Steel Corporation's Motion for Reconsideration in *SeAH Steel Corp. v. United States* (Consol. Court No. 19-00086).

PUBLIC VERSION

Groves's decision in the third OCTG review *and* that Judge Choe-Groves's reconsideration of the decision in the third OCTG review is governed by Commerce's redetermination in this case.  Defendant's circular reasoning does not, however, provide a legitimate basis for rejecting SeAH's arguments.

CONCLUSION

For the reasons set forth above, the Court should remand this matter to Commerce once more for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
WINTON AND CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20006
(202) 774-5500

Attorney for SeAH Steel Corporation

November 14, 2022