A-580-876
Remand
CAFC 2023-1663
POI:  10/01/2013 – 09/30/2014
**Public Document**
E&C/OIX:  Team

*Stupp Corp. v. United States*
**Court No. 15-00334 (CIT June 16, 2025)**
**Welded Line Pipe from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.      SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (CIT or the Court), in *Stupp Corp. v. United States*, issued on June 16, 2025, as modified

by the Court's June 30, 2025 *Scheduling Order*, consistent with the opinion issued by the U.S.

Court of Appeals for the Federal Circuit (Federal Circuit).[1] This action arises out of the *Final*

*Determination* in the less-than-fair-value (LTFV) investigation of welded line pipe from the

Republic of Korea (Korea).[2]  The period of investigation (POI) is October 1, 2013, through

September 30, 2014.  The Federal Circuit vacated and remanded the Court's decision in *Stupp*

*III*,[3] in which the Court had sustained Commerce's *Final Determination* and differential pricing

analysis, including the Cohen's *d* test.[4]

---

[1] *See Stupp Corp. v. United States*, Court No. 15-00334 (CIT June 16, 2025), ECF No. 271 (*Remand Order*); *see also Stupp Corp. v. United States*, No. 2023-1663, 2025 WL 1178392 (Fed. Cir. April 23, 2025) (*Stupp IV*); and *Stupp Corp. v. United States*, Court No. 15-00334 (CIT June 30, 2025), ECF No. 273 (*Scheduling Order*).
[2] *See Welded Line Pipe from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61366 (October 13, 2015) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM), as amended in *Welded Line Pipe from the Republic of Korea: Amended Final Determination of Sales at Less Than Fair Value*, 80 FR 69637 (November 10, 2015) (*Amended Final Determination*).
[3] *See Stupp Corp. v. United States*, 619 F. Supp. 3d 1314 (CIT February 24, 2023) (*Stupp III*).
[4] *Id*., 619 F. Supp. at 1328.

The Federal Circuit directed Commerce to perform a differential pricing analysis that does not rely on the Cohen's *d* test, consistent with the Federal Circuit's precedential opinion in *Marmen*.[5] The Court remanded this issue to Commerce based on the Federal Circuit's holding in *Stupp IV*.

Pursuant to the Court's *Remand Order*, Commerce has reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis. As a result of our analysis, we revised SeAH's margin calculations from the *Final Determination*, resulting in a revised weighted-average dumping margin for SeAH of 4.55 percent. Moreover, as a result of SeAH's revised weighted-average dumping margin, the revised all-others rate is 5.39 percent.

## II.    BACKGROUND

In the *Final Determination*, unchanged in the *Amended Final Determination*, Commerce calculated an estimated weighted-average dumping margin for SeAH based on the mixed alternative comparison methodology.[6] SeAH challenged the *Final Determination* before this Court, which affirmed several aspects of Commerce's *Final Determination* in *Stupp I*.[7] Upon appeal, the Federal Circuit affirmed each part of *Stupp I* except for the Cohen's *d* test, which the Federal Circuit vacated, in part, in *Stupp II* and remanded for further consideration.[8] On October 8, 2021, the Court remanded *Stupp II* to Commerce.[9]

In its final results of redetermination pursuant to *Stupp II*, Commerce explained how its application of the Cohen's *d* test as part of its differential pricing analysis is reasonable.[10] In

---

[5] *See Stupp IV,* No. 2023-1663, 2025 WL 1178392 at *2 (*Stupp IV*); *see also Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*)).
[6] *See Final Determination*, 80 FR at 69638, unchanged in *Amended Final Determination*, 80 FR at 61367.
[7] *See Stupp Corp. v. United States*, 359 F. Supp. 3d 1293, 1297 (CIT January 8, 2019) (*Stupp I*).
[8] *See Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) (*Stupp II*).
[9] *See Stupp Corp. v. United States*, Court No. 15-00334 (CIT October 8, 2021).
[10] *See* Final Results of Redetermination Pursuant to Court Remand, *Stupp Corp. v. United States*, Court No. 15-00334, dated October 8, 2021, available at https://access.trade.gov/resources/remands/15-00334.pdf.

*Stupp III*, the Court affirmed Commerce's explanation regarding how its application of the Cohen's *d* test as part of its differential pricing analysis is reasonable.[11]

However, in *Stupp IV*, the Federal Circuit held that Commerce failed to demonstrate that SeAH's U.S. pricing data satisfied the statistical assumptions necessary to permit a reasonable application of the Cohen's *d* test in its differential pricing analysis.[12]  Moreover, in *Marmen*, the Federal Circuit held that it is unreasonable for Commerce to use the current Cohen's *d* test as part of its differential pricing analysis when the test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equally and sufficiently numerous.[13]  In doing so, the Federal Circuit held that "Commerce may re-perform a differential pricing analysis, and *that analysis may not rely on Cohen's d test* for data sets like those here {*i.e.*, the data underlying the differential pricing analysis in the *Marmen* investigation that the Federal Circuit found do not conform to the three statistical criteria}," but it also held that Commerce may develop and justify a different analytical approach for evaluating whether price differences among purchasers, regions, or time periods are significant.[14]  Consequently, the Federal Circuit has remanded "to Commerce, which may re-perform a differential pricing analysis without relying on Cohen's *d*."[15]

---

[11] *See Stupp III*, 619 F. Supp. at 1328.
[12] *See Stupp IV*, No. 2023-1663, 2025 WL 1178392 at *2.
[13] *See Marmen*, 134 F.4th at 1348; *see also Stupp IV*, No. 2023-1663, 2025 WL 1178392 at *2.
[14] *See Marmen*, 134 F.4th at 1334 (emphasis added); *see also Stupp IV*, No. 2023-1663, 2025 WL 1178392 at *2.
[15] *See Stupp IV*, No. 2023-1663, 2025 WL 1178392 at *2.

On August 19, 2025, Commerce released its Draft Redetermination to interested parties.[16] On September 16, 2025, Commerce received comments from the petitioner[17] and SeAH.[18] Commerce responds to these comments below.

After considering the comments raised by interested parties, Commerce has made no changes to the Draft Redetermination with regard to its revised differential pricing analysis for these final results of redetermination. As a result, the estimated weighted-average dumping margins for SeAH and all other producers and exporters remain 4.55 percent and 5.39 percent, respectively.[19]

## III.    ANALYSIS

### I.    Commerce's Application of the Cohen's *d* Test

As discussed above, in *Stupp IV*, the Federal Circuit held that Commerce did not sufficiently explain how its use of the Cohen's *d* test for SeAH was reasonable in light of concerns raised by the Federal Circuit in *Stupp III*, when the data groups being compared "to satisfy the statistical assumptions necessary to permit a reasonable application of Cohen's *d* {test} in a differential pricing analysis: 'normal distributions, equal variability, and equal and sufficiently numerous data.'"[20] Specifically, the Federal Circuit found, "{h}ere, as in *Marmen*, it is undisputed that SeAH's U.S. pricing data fails to satisfy the statistical assumptions necessary to permit a reasonable application of {the} Cohen's *d* {test} in a differential pricing analysis,"

---

[16] *See* Draft Results of Redetermination Pursuant to Court Remand, *Stupp Corp. v. United States*, Court No. 15-00334 (CIT June 16, 2025), dated August 19, 2025 (Draft Redetermination).

[17] The petitioner in this proceeding is Welspun Tubular LLC (Welspun).

[18] *See* Welspun's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand in Stupp Corp. v. United States, Consol. Court No. 15-00334," dated September 16, 2025 (Welspun's Draft Redetermination Comments); *see also* SeAH's Letter, "Comments of SeAH Steel Corporation on Draft Redetermination on Remand in Consolidated Court No. 15-00334," dated September 16, 2025 (SeAH's Draft Redetermination Comments).

[19] *See* Memorandum, "Calculation Memorandum for the Draft Results of Redetermination for SeAH," dated August 15, 2025 (SeAH Draft Calculation Memorandum).

[20] *See Stupp IV*, No. 2023-1663, 2025 WL 1178392 at *7 (internal citation omitted).

and remanded to the CIT to remand Commerce to "re-perform a differential pricing analysis that does not rely on {the} Cohen's *d* {test}."[21]  In *Marmen*, the Federal Circuit had previously held that it is unreasonable for Commerce to use the Cohen's *d* test as part of its differential pricing analysis when the test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equal and sufficiently numerous data, and that Marmen's U.S. sale prices did not meet these criteria.[22]  In doing so, the Federal Circuit held that "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here {*i.e.*, the data underlying the differential pricing analysis in the *Marmen* investigation that the Federal Circuit found do not conform to the three statistical criteria}," but it also held that Commerce may develop and justify a different analytical approach for evaluating whether price differences among purchasers, regions, or time periods are significant.[23]

Following the Federal Circuit's decision in *Marmen*,[24] Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Act, to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[25]  To comply with the Federal Circuit's holding in *Marmen*, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[26]  Additionally, and concurrent with

---

[21] *Id.*
[22] *See Marmen*, 134 F.4th at 1334.
[23] *Id*. (emphasis added).
[24] *Id*., 134 F.4th at 1348.
[25] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).
[26] *See, e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM at 2-5.

this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings. In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly. Accordingly, for these final results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to the Federal Circuit's decision in *Marmen*, and in accordance with this Court's *Remand Order*, Commerce reconsidered and discontinued its application of the Cohen's *d* test as part of its differential pricing analysis, and, in the alternative, applied the "price difference test," as detailed below.

### i.    Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether SeAH's sales of the subject merchandise from Korea to the United States were made at less than normal value (NV), Commerce compared the constructed export price (CEP) to the NV as described in the "Constructed Export Price" and "Normal Value" sections of the *Preliminary Determination*.[27]

### 1.    Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average export prices (EPs) (or CEPs) (*i.e.*, the average-to-average (A-to-A) method) unless Commerce determines that another method is appropriate in a particular situation. In an LTFV investigation, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the average-

---

[27] *See Welded Line Pipe From the Republic of Korea: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 80 FR 29620 (May 22, 2015) (*Preliminary Determination*), and accompanying Preliminary Determination Memorandum (PDM) at 11-13.

to-transaction (A-to-T) method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here.  Commerce will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

Section 777A(d)(1)(B) of the Act permits Commerce to use an alternative, A-to-T method as the basis for a weighted-average dumping margin if the two requirements provided for in section 777A(d)(1)(B)(i) and (ii) of the Act, the "pattern" requirement and the "meaningful difference" requirement, respectively, are met.  The purpose of section 777A(d)(1)(B) of the Act is to address Commerce's concerns that dumping may be masked:

> Section 229 of the bill {*i.e.*, the Uruguay Round Agreements Act} adds new section 777A(d) to implement the provisions of the Agreement regarding the use of average normal values and export prices for purposes of calculating dumping margins. Although current U.S. law permits the use of averages on both sides of the dumping equation, Commerce's preferred practice has been to compare an average normal value to individual export prices in investigations and reviews. In part, the reluctance to use an {A-to-A} methodology has been based on a concern that such a methodology could conceal "targeted dumping."[28]

---

[28] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 316, 103d Cong., 2d Session (1994), at 842.

Accordingly, when Commerce determines whether the subject merchandise is being sold in the United States at less than NV, and the weighted-average dumping margin calculated based on A-to-A comparisons cannot account for masked, or "targeted," dumping, section 777A(d)(1)(B) of the Act provides Commerce with an alternative comparison methodology, *i.e.*, the A-to-T method, to address such distortions to ensure an accurate weighted-average dumping margin.

The differential pricing analysis used here examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POI based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser,

region, or time period is within two percent of the weighted average net price to all other purchasers, regions, or time periods.  If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test.  The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POI.  If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method.  If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POI.  Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences.  In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method.  If the difference between the two calculations is meaningful, then this demonstrates

9

that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

### 2.    Results of the Differential Pricing Analysis

For SeaH, based on the results of the differential pricing analysis, Commerce finds that 47.95 percent of the value of U.S. sales pass the price difference test,[29] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce determines that the A-to-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method.  Thus, for these final results of redetermination, Commerce is applying the A-to-T method to calculate the weighted-average dumping margin for SeAH.

## IV.    INTERESTED PARTY COMMENTS

On August 19, 2025, Commerce issued its Draft Redetermination and provided interested parties an opportunity to comment.[30]  Commerce received comments from the petitioner and SeAH.[31]  The petitioner supports the revisions Commerce made to its differential pricing analysis in the Draft Redetermination.[32]  SeAH's arguments contesting Commerce's use of the price

---

[29] *See* SeAH Draft Calculation Memorandum at 2.
[30] *See* Draft Redetermination.
[31] *See* Welspun's Draft Redetermination Comments; *see also* SeAH's Draft Redetermination Comments.
[32] *See* Welspun's Draft Redetermination Comments.

difference test and discontinuation of the "mixed method" are addressed below.  After

considering SeAH's comments, we made no changes to our calculations in the Draft

Redetermination and continue to use the revised differential pricing analysis for these final

results of redetermination.

**Comment 1:   Commerce's Price Difference Test Is A "Reasonable Indicator" That Prices
               Differ Significantly**

The following is a verbatim executive summary of argument submitted by SeAH.  For

further details, *see* SeAH's Draft Remand Comments at 10-12.

> The Draft Redetermination treats price differences between each test and base
> group as "significant" if the average price to each group differ by more than two
> percent.  The two-percent test was used by {Commerce} in one previous case, {*CFS
> from Korea Final*}, where {Commerce} demonstrated that the dumping margins
> for the respondents in question would be *de minimis* even if the two-percent test
> were applied to identify targeted dumping.  Almost immediately after that decision,
> {Commerce} rejected further use of the two-percent test, finding that the test is not
> "a reliable indicator" that ... targeted dumping has occurred...."  In the absence of
> reasoned explanation, {Commerce} is bound by that conclusion.[33]

**Commerce's Position:**  We disagree with SeAH that Commerce cannot use the price difference

test simply because Commerce had previously determined that the P/2 test was not a "reliable

indicator" that targeted dumping has occurred.

Commerce has not adopted the P/2 test as part of the differential pricing analysis.  The

P/2 test and the price difference test are not equivalent to each other.  The P/2 test examined

whether the weighted-average U.S. prices of allegedly "targeted" sales were two percent lower

than the weighted-average U.S. prices of non-targeted sales with the stated aim of identifying

"targeted dumping."  As discussed below, the P/2 test was the basis for the petitioner's targeted

dumping allegation in *CFS from Korea Final*.[34]  Given Commerce's lack of experience at that

---

[33] *See* SeAH Draft Redetermination Comments at 2 (internal citations omitted).

[34] *See Notice of Final Determination of Sales at Less Than Fair Value:  Coated Free Sheet Paper from the Republic
of Korea*, 72 FR 60630 (October 25, 2007) (*CFS from Korea Final*), and accompanying IDM at Comment 1.

time in addressing section 777A(d)(1)(B) of the Act, Commerce relied on the petitioner's analysis in that investigation.[35]  However, in the following LTFV investigations in which the petitioner submitted a similar targeted dumping allegation, Commerce developed its own analysis to address section 777A(d)(1)(B) of the Act, *i.e.*, the "Nails Test."[36]  As noted by SeAH, Commerce found "that the {P/2} test is not 'a reliable indicator that {obvious} targeted dumping has occurred…'"[37]

In the *Nails from China Final,* Commerce explained:

Prior to {the *CFS from Korea Final*}, {Commerce's} only experience with analyzing targeted dumping in an antidumping duty investigation was the case-specific analysis in the court remand that followed the antidumping investigation of certain pasta from Italy (*see Borden, Inc., Gooch Foods, Inc., and Hershey Foods Corp. V. United States*, Slip Op. 99-50, CIT, June 4, 1999), also referred to as the "Pasta Test."  The petitioner's allegations of targeted dumping in {*CFS from Korea Final*} presented {Commerce} with a host of issues that it had not previously confronted.  Given the short time available in that proceeding to address these issues, {Commerce} stated:

> In the years since the Pasta Test was developed, {Commerce} has had no further experience analyzing targeting and we are examining how the Pasta Test standards and thresholds could be modified in developing a standard practice for addressing targeting allegations. In view of {Commerce's} uncertainty regarding the general applicability of the Pasta Test standards, the overall lack of case precedent on this matter, and the unique circumstances of this case, {Commerce} accepts the petitioner's targeting allegation without endorsing the petitioner's test standards and procedures as a general practice.

*See* {*CFS from Korea Final*} at General Comment 2.

At the same time, {Commerce} signaled its intention to develop a standardized targeted dumping test to replace the P/2 test for application in subsequent investigations. Thus, while allowing the petitioner's targeted dumping allegation to proceed to conclusion in {*CFS from Korea Final*}, {Commerce} simultaneously

---

[35] *Id.*

[36] *See Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008) (*Nails from China Final*), and accompanying IDM.

[37] *See* SeAH Draft Redetermination Comments at 2 (quoting *Nails from China Final* IDM at 23).

announced in {*CFS from Korea Final*} at Comment 2 that it would develop "a new, more standardized test" (*i.e.*, a replacement for the P/2 test) through a proceeding open to public input, which we initiated simultaneously with the publication of {*CFS from Korea Final*}. See {*Targeted Dumping in Antidumping Investigations; Request for Comment*, 72 FR 60651 (October 25, 2007)}.[38]

As such, Commerce introduced a new analysis, what became known as the "Nails Test," to examine whether the statutory requirements under section 777A(d)(1)(B) of the Act were satisfied.[39] Afterwards, Commerce replaced the "Nail Test" with a methodology called the "differential pricing analysis."[40] Specifically, Commerce stated:

> While the Nails test is a statutorily consistent and statistically sound methodology for identifying whether the {A-to-T} method might be appropriate, {Commerce} has continued to seek to refine its approach with respect to the use of an alternative comparison method. Given {Commerce's} experience over the last several years, and based on {Commerce's} further research, analysis and consideration of the numerous comments and suggestions on what guidelines, thresholds, and tests should be used in determining whether to apply an alternative comparison method based on the {A-to-T} method, {Commerce} is developing a new approach for determining whether application of such a comparison method is appropriate in a particular segment of a proceeding pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act. The new approach is referred to as the "differential pricing" analysis, as a more precise characterization of the purpose and application of section 777A(d)(1)(B) of the Act.[41]

After performing the differential pricing analysis since 2013, Commerce has continued to gain experience in addressing the statutory requirements provided under section 777A(d)(1)(B) of the Act. With the issuance of the mandate following *Marmen*,[42] Commerce introduced the price difference test to determine whether prices for comparable merchandise differ significantly among purchasers, regions, or time periods. The price difference test does not stipulate an

---

[38] *See Nails from China Final* IDM at 8-9.

[39] *See*, *e.g.*, *Certain Steel Nails from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances and Postponement of Final Determination*, 73 FR 3928 (January 23, 2008), unchanged in *Nails from China Final* IDM.

[40] *See Differential Pricing Analysis; Request for Comments*, 79 FR 26720, 26722 (May 9, 2014) (*Differential Pricing Analysis*); *see also Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013).

[41] *See Differential Pricing Analysis*, 79 FR at 26722.

[42] *See Marmen*, 134 F.4th at 1343-1348.

absolute value as a threshold (*e.g.*, $5 per kilogram) but a threshold that measures relative differences (*i.e.*, a percentage) on a case-by-case basis by a comparison to case- and product-specific averages dependent upon the customer, region, and temporal data provided by the respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration. In contrast to the P/2 test, the price difference test examines whether U.S. prices differ significantly among purchasers, regions, and time periods. Specifically, the price difference test examines whether the weighted-average U.S. price to a given purchaser, region, or time period is within two percent of the weighted average U.S. price to all other purchasers, regions, or time periods. If the difference between the two weighted-average prices is within two percent of the weighted-average U.S. price to all other purchasers, then the sale prices to the individual purchaser, region, or time period do not differ significantly. Alternatively, if the difference is two percent or greater, or two percent or less, then the sale prices to the individual purchaser, region, or time period do differ significantly.

The only common aspect of the P/2 test and the price difference test is the two percent threshold. However, the P/2 test only examines whether prices to alleged "targets" are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales. The price difference test shares the two percent threshold with the arms-length test (with the same four percent band around the price), which is the basis for whether the prices of comparison market sales made to an affiliate are at arm's length.[43] Thus, the price difference test is simply a different test than the P/2 test.

---

[43] *See Preliminary Determination* PDM at 14.

Additionally, Commerce finds that two percent is a reasonable threshold to determine a measure of significance. The CIT has held that the language in section 777A(d)(1)(B) of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[44] A two-percent threshold is a reasonable measure of significance, is used by Commerce in other contexts, and is consistent with other aspects of Commerce's practice in antidumping proceedings. For example, in the arm's-length test conducted pursuant to 19 CFR 351.403(c), Commerce finds that sales between affiliated parties in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers). In fact, Commerce has found that average prices to an affiliated customer that differ by two percent or more, and, therefore, fail the arm's-length test, "differ significantly" from market prices.[45] When the prices to an affiliated customer are to not at arm's length, Commerce finds that such sales are outside of the ordinary course of trade. The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce's margin calculations, *e.g.*, excluded from the calculation of NV.

Further, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other

---

[44] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (CIT 2024) (*Garg Tube*).

[45] *See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value,* 84 FR 6382 (February 27, 2019), and accompanying IDM at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik")).

words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero, whereas an estimated weighted-average dumping margin that is less than two percent, *i.e.*, *de minimis*, results in a determination that sales are not at LTFV.  Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping.[46]  If a weighted-average difference of two percent between U.S. prices and NV is significant enough to warrant an affirmative determination of sales at LTFV, then it is reasonable to conclude that a two-percent price difference is significant within the context of section 777A(d)(1)(B)(i) of the Act.  Furthermore, in an administrative review, the *de minimis* threshold is one half of one (0.5) percent, which suggests that the two percent threshold from investigations is more conservative and indicates a level of significance that is much greater than the level of significance when the assessment of antidumping duties are at issue.[47]

Therefore, Commerce finds that our history of using different tests for different purposes does not preclude us from adopting the price difference test used in these final results of redetermination.

**Comment 2:   Whether Commerce's Differential Pricing Test Is a Reasonable Basis for Determining if a Pattern of Prices Exists**

The following is a verbatim executive summary of the argument submitted by SeAH. For further details, *see* SeAH's Draft Remand Comments at 12-26 (internal citations omitted).

> Under the statute, {Commerce} may depart from the normal "{A-to-A} comparison methodology only if it finds that "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time...."  The plain-meaning of the term "pattern" requires that the observed differences not result from random processes.  Instead,

---

[46] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping...").

[47] *See* 19 CFR 351.106(c) (providing that, in an administrative review, Commerce will treat as *de minimis* any weighted-average dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries during the relevant period of review, but dumping duties will be collected if the weighted-average dumping margin is 0.5 percent or more).

there must be "A mode of behavior or series of acts that are recognizably consistent." As {Commerce's} own past determinations, a "pattern" within the meaning of the statute requires differences "beyond something that occurs by chance."

Economic theory and the evidence on the record confirm that SeAH's prices for WLP products are affected by random processes. But the two-percent test employed in the Draft Redetermination does not purport to distinguish true "patterns" from random fluctuations. Among other things, the Draft Redetermination's analysis improperly relies on comparisons with an inadequate number of data points — including in its analysis test or base groups consisting of only one transaction. It also treats test-group sales with prices that are fully within the same range as the base-group prices as evidence of a "pattern." And, it fails to account for inconsistencies in the results for sales of different products to the same customer (or in the same region or time period), where the test demonstrates that average prices to the same customer (or in the same region or time period) are sometimes higher, sometimes lower, and most frequently within two percent of the base-group prices for the relevant products.

**Commerce's Position:** We disagree with SeAH and find that it misunderstands how Commerce's differential pricing analysis functions. The price difference test determines whether prices differ significantly; the ratio test determines whether there is a pattern. The ratio test is consistent with the ordinary meaning of the word "pattern," which is "a frequent or widespread incidence."[48] Therefore, more than 33 percent of the value of SeAH's U.S. sales must pass the price difference test before Commerce determines that there is a pattern. As such, if 33 percent or less of the sales value for the U.S. sales pass the price difference test, then Commerce will find that there is no evidence that a pattern exists.

The Federal Circuit has upheld Commerce's ratio test as a reasonable method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act and has held that

---

[48] *See* Pattern, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/pattern (last visited March 11, 2026).

Commerce "has discretion to determine a reasonable methodology to implement the statutory directive."[49]

Moreover, the Federal Circuit has rejected the argument that the statute requires Commerce "to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods{.}"[50] The Federal Circuit agreed with the CIT that there is no intent requirement in the statute and that requiring Commerce to determine the intent of targeted dumping "would create a tremendous burden on Commerce that is not required or suggested by the statute."[51] Neither the ratio test nor the price difference test is required to determine either the reasons why there is a pattern or why prices differ significantly. Therefore, Commerce needs not understand the reason or reasons to justify that there is a pattern of prices that differ significantly.

We also disagree with SeAH that distortions caused when an "inadequate" number of transactions are used are relevant for the price difference test. For the Cohen's $d$ test, Commerce required a minimum of two observations for the test and comparison groups to avoid calculating a value of zero for the group's standard deviation when there was only one observation in a group. However, the price difference test does not require the calculation of a standard deviation. Indeed, there is similarly no such requirement in the arm's-length test that the sales of comparable merchandise to the affiliated customer or to all unaffiliated customers have a minimum number of sales. Moreover, it is possible for there to be one sale to a particular customer, region, or within a particular time period the price of which is significantly different

---

[49] *See Stupp II*, 5 F.4th at 1354; *see also Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020) (*Dillinger France*).
[50] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (non-precedential); and *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345 (CIT 2015).
[51] *See JBF RAK*, 790 F.3d at 1368.

than the prices for all other sales.  Consequently, the fact that the Cohen's *d* test required that there be at least two observations in each test or comparison group because of the calculations necessary in that analysis is not relevant to whether the same requirement exists for the price difference test where the analysis is based on different calculations.

Further, we disagree with SeAH that Commerce must consider alternative methodologies that are based on statistical concepts similar to the Cohen's *d* test and a measure of "effect size." *Marmen* permits Commerce to use another approach in its differential pricing analysis, but did not require that Commerce do so.[52]  Indeed, Judge Stark's additional views in *Stupp IV* indicate that he might have agreed that Commerce "should be permitted to use something quite like Cohen's *d* as a rough, initial 'measur{e} {of} the practical significance of price difference{s}'" if Commerce had not tried to borrow credibility for its test by reference to the academic literature.[53] Here, because the price difference test reasonably determines whether prices differ significantly, SeAH's proposed alternatives are unnecessary.

We disagree with SeAH's suggestion to broaden the definition of "comparable merchandise" in the differential pricing analysis.  The purpose of the requirement for "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" is to determine whether conditions exist in which masked dumping could potentially be occurring when using the A-to-A method. Commerce uses weighted-average U.S. prices which are grouped by CONNUM and other factors such as level of trade that ensure a fair comparison of NV and U.S. price.  Accordingly, Commerce has defined "comparable merchandise" to reflect those averaging groups that are the basis for the comparison of NV and U.S. price.  To "expand" the definition of comparable

---

[52] *See Marmen*, 134 F.4th at 1348.
[53] *See Stupp IV*, 2025 WL 1178392 at 3.

merchandise would deviate from the averaging groups used to compare NV with U.S. price, and, thus, could lead to distortions in the results of the price difference and ratio tests.

We disagree with SeAH that we improperly disregarded the complexity of the data.  In determining whether prices differ significantly for a particular purchaser, region, or time period compared to all other purchasers, regions, and time periods, all prices for the particular purchaser, region, or time period contribute to that determination.  Again, SeAH simply recommends alternative approaches because it does not agree with the results of Commerce's analysis.  SeAH uses a visual diagram as an example to demonstrate that prices do not differ significantly, but a diagram does not determine whether there is a pattern of prices or that prices differ significantly.  As explained above, Commerce's use of the price difference test and ratio test is consistent with our practice, the statute, and Court precedent.  Further, the data used in the price difference test, *i.e.*, U.S. market prices, are similar to the data used in the arm's-length test, *i.e.*, home market prices.  We find that the price difference test reasonably analyzes the question whether prices differ significantly among purchasers, regions, or time periods.

We also disagree with SeAH's suggestion to remove outliers from the comparison group.  Commerce uses the entire universe of sales to determine whether prices for a particular customer, region, or time period differ significantly from all other sales.  As such, each iteration of the price difference test uses the same universe of sales and Commerce does not prejudge whether a price differs significantly.  Moreover, SeAH does not offer any method for determining what would constitute an outlier, but rather merely implies that their alleged presence would distort the results.

As explained above, the price difference test does not measure whether there is a pattern but whether the prices differ significantly.  Although there may be weighted-average sale prices

20

that are above or below two percent of the weighted-average price of all other sales, the price difference test looks at whether the weighted-average sales price to one customer, region, or time period is above or below two percent of the weighted-average price of all other sales to determine whether prices differ significantly.  Commerce then uses the ratio test to determine whether there is a pattern.  We further note that the Federal Circuit has sustained the ratio test as a reasonable interpretation of "a pattern" in section 777A(d)(1)(B)(i) of the Act.[54]

We disagree with SeAH that our redetermination fails to account for inconsistencies in the relationship of prices by customer, region, and time period.  What SeAH describes is:  (1) for the same customer, the prices for some products differ significantly and are higher than other prices; (2) for other products, the prices differ significantly and are lower than other prices; and (3) for the remaining products, the prices do not differ significantly.  Thus Commerce found that about half of the sales to this customer contributed to a pattern and in SeAH's eyes, "that conclusion is plainly illogical."[55]  As SeAH noted in its comments, prices are determined based on complex company, business, and economic conditions where the company tries to maximize revenue.[56]  The fact that some products may be sold at greater profit than others is not illogical, and would result in the price variations SeAH cites.  We find no logic in SeAH's alleged "inconsistencies in the relationship of prices by customer, region, or time period."[57]  When prices differ significantly, that means there are higher priced sales and lower priced sales.  As such, the fact that some sales are above the two percent threshold and some sales are below the two percent threshold contribute to the existence of a pattern.

---

[54] *See Dillinger France*, 981 F.3d at 1325-26.
[55] *See* SeAH Draft Redetermination Comments at 26.
[56] *Id.* at 15-16.  As explained above, Commerce does not examine the reasons why there is a pattern of prices that differ significantly, but the fact that Commerce found that the same customer has prices that differ significantly for some products and not others is not illogical.
[57] *Id.* at 24.

**Comment 3:  "Family-Wise" Error Rate**

The following is a verbatim executive summary of the argument submitted by SeAH.

For further details, *see* SeAH's Draft Remand Comments at 26-27 (internal citations omitted).

> The Draft Redetermination's analysis conducts three distinct tests for price correlations: one by purchaser, one by region, and one by time period. As a matter of mathematics, however, repeated testing of the same data multiples the likelihood of a "false positive" result.  The "standard cure" for this "multiplicity problem" is to apply the Bonferroni correction, establishing the required level of significance for each test by dividing the desired level of significance by the number of tests being performed.  In the context of {Commerce's} analysis, this would require changing the threshold for the determination of significance from two percent to six percent.

**Commerce's Position:**  SeAH's argument relies on a flawed premise.  Commerce's price difference test does not look for statistical correlations.  Instead, the price difference test determines whether the weighted-average net price to a given purchaser or region, or during a specific time period, falls outside of the plus or minus two percent band around the weighted-average net price of sales to all other purchasers, regions, or time periods.  Commerce's price difference test is not a statistical analysis of sampled data where a false positive would indicate a violation of the null hypothesis.  No inferences are drawn that the analyzed data is representative of an unknown value.  As such, SeAH's argument about "family-wise" error, which is relevant to statistical correlation, is not applicable here.

SeAH alleges that Commerce's use of "repeated testing of the same data multiplies the likelihood of a 'false positive' result."[58]  However, there is no multiple counting of the results. When Commerce aggregates the results of the price difference test in the ratio test to quantify the extent of the prices that differ significantly, Commerce eliminates the "overlap" where the price for an individual sale is found to differ significantly by more than one of the "multiple tests," *i.e.*,

---

[58] *Id.* at 26.

by purchaser, region, or time period. In other words, a passed sale will only count in the ratio test once. Thus, there is no possibility for counting the same sale more than once if it is found to be at a price that differs significantly.

**Comment 4:   No Mixed Methodology**

The following is a verbatim executive summary of argument submitted by SeAH. For further details, *see* SeAH's Draft Remand Comments at 28-30 (internal citations omitted).

> In its first decision in the Stupp appeal, the CAFC upheld both {Commerce's} use of the "mixed" methodology when between 33 and 66 percent of U.S. sales "pass" the significant price difference test, and {Commerce's} use of the {A-to-T} methodology for all sales when more than 66 percent of "pass" the significant price difference test. Nothing in the CAFC's decision in its second Stupp decision called that conclusion into question. Instead, the CAFC's decision addressed only the test used by {Commerce} to determine whether observed price differences were "significant." In the absence of some explanation why the change in the test for "significance" also requires a change in the consequences of finding a 33-perccent "pass" rate in the "Ratio Test," {Commerce's} elimination of the "mixed methodology" is beyond the scope of its authority in this proceeding.

**Commerce's Position:**  The statute does not require Commerce to use a "mixed method" as an alternative comparison methodology. While the statute permits Commerce's previous policy that adopted a hybrid version of the A-to-A method and the A-to-T method, Commerce's revision to the differential pricing analysis aligns more closely with the statutory text, which permits Commerce to use the A-to-T method when certain conditions set forth in section 777A(d)(1)(B) of the Act are satisfied. In light of the foregoing, Commerce does not consider it necessary to continue to use the mixed method, particularly when discontinuation of the mixed method enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language that expressly authorizes the use of the A-to-T comparison method when the conditions set forth in section 777A(d)(1)(B) of the Act are satisfied. The Federal Circuit has recognized Commerce's "growing experience" in applying

23

section 777A(d)(1)(B) of the Act as a basis for establishing what ratio justifies the application of an alternative methodology.[59]  Regarding the price difference test, its use is consistent with the statute.  The CIT has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[60]  As such, when Commerce revised its differential pricing methodology in response to *Marmen* and *Stupp IV*, replacing the Cohen's *d* test with the price difference test, Commerce also discontinued the use of the mixed method.

SeAH argues that discontinuing the mixed method is beyond the scope of this remand in the absence of an explanation as to why a change in the test for determining significance would require the elimination of the mixed method.[61]  As an initial matter, the Federal Circuit found that Commerce's use of the Cohen's *d* test in Commerce's differential pricing methodology was unreasonable, and remanded the issue to Commerce, stating that Commerce "may re-perform a differential pricing analysis without relying on Cohen's *d*" and explaining Commerce's discretion in choosing to use the A-to-A method or reperforming its differential pricing methodology, "which may result in the use of the {A-to-T} comparison or a hybrid methodology."[62]  Therefore, while Commerce does not presume to speak for the Federal Circuit, because the Federal Circuit used "may," the Federal Circuit permitted Commerce to reconsider its differential pricing analysis and permitted that the result of the differential pricing analysis could be the use of the A-to-T method.

Moreover, the fact that *Stupp II* upheld Commerce's use of the 33 percent and 66 percent cutoffs in the ratio test for the previous version of Commerce's differential pricing analysis does

---

[59] *See Stupp II*, 5 F.4th at 1355.
[60] *See Garg Tube*, 740 F.Supp.3d at 1366.
[61] *See* SeAH's Draft Redetermination Comments at 28-30.
[62] *See Stupp IV,* No. 2023-1663, 2025 WL 1178392 at *3 n.1.

not prevent Commerce from discontinuing the mixed method. SeAH concedes that Commerce's authority is not constrained only to the significance portion of the differential pricing analysis.[63] As explained above, the mixed method was not statutorily required, and to align more closely with the statute, Commerce has discontinued the mixed method as a matter of policy to simplify the differential pricing analysis. Therefore, Commerce is applying its revised differential pricing analysis, including its discontinuation of the mixed method, consistently, including in these final results of redetermination.[64] To apply only a portion of Commerce's revised differential pricing analysis here would be an inconsistent application of the new policy and methodology.

**Comment 5:   Whether Commerce was Bound to Open the Record**

The following is a verbatim executive summary of argument submitted by SeAH. For further details, *see* SeAH's Draft Remand Comments at 21, 30-31 (internal citations omitted).

> The Draft Redetermination's unexplained change in the minimum number of transactions required for analysis and its elimination of the "mixed methodology" where between 33 and 66 percent of sales "pass" the test for "significant price differences are simply unexplained. At a minimum, {Commerce} is required to provide a reasoned explanation for those changes and to permit the parties to comment on the proffered justifications.

> The Draft Redetermination also fails to provide a reasoned explanation how adoption of the two-percent test of "significance" in conjunction with the "Ratio Test" comports with the statutory requirement that {Commerce} distinguish true "patterns" from random fluctuations. Furthermore, {Commerce} failed to provide sufficient notice to the parties of this proposed change prior to the deadline for submitting new factual information in this case. It would be manifestly unfair for {Commerce} to deny SeAH an opportunity to comment in full on the new methodology — and to provide relevant factual information in support of those comments. Due process requires that SeAH be given an opportunity now to address the issues raised by the new methodology proposed in the Draft Redetermination.

---

[63] *See* SeAH's Draft Redetermination Comments at 29-30.

[64] *See e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping duty Administrative Review; 2022-2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM; *see also SKF USA Inc. v. United States*, 630 F.3d 1365, 1377 (Fed. Cir. 2011) (affirming Commerce's change in practice because of its reasoned explanation); and *Cf. SKF USA, Inc. v. United States*, 254 F.3d 1022 (granting a remand request when an agency has materially changed its policy).

**Commerce's Position:** Commerce has given additional explanation for its changes above. The decision of whether to reopen a record following an order remanding an agency decision is a matter within the agency's discretion.[65] SeAH has had full opportunity to comment on the price difference test and the changes to the differential pricing methodology. Moreover, we note that Commerce granted SeAH's requested extension to submit comments on the Draft Redetermination.[66] The price difference test is not a statistical test, and Commerce did not place any new factual information on the record to establish the price difference test. As such, reopening the record to allow parties to provide new factual information is not required to provide SeAH a full opportunity to comment on Commerce's revised differential pricing analysis. Reopening the record "is not something the court will require simply based on a plaintiff's argument that better information is available."[67] As long as Commerce's revised differential pricing analysis is reasonable, Commerce is permitted to use it to determine whether the statutory requirements to permit the use of the A-to-T method have been met.[68]

## V.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have continued to use the "price difference test" as a part of the revised differential pricing analysis to determine whether prices differ significantly. We have also discontinued the use of the "mixed method" in our application of the revised differential pricing analysis. As a result of these changes, SeAH's estimated weighted-average dumping margin is 4.55 percent, resulting in a revised all-others rate of 5.39 percent.

---

[65] *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012).
[66] *See* Memorandum, "Extension of Deadline for Comments on Draft Results of Redetermination," dated August 26, 2025.
[67] *See Pro-Team Coil Nail Enter. Inc. v. United States*, 587 F. Supp. 3d 1364, 1374 (CIT 2022).
[68] *See Stupp II*, 5 F.4th at 1351-54.

Because SeAH's weighted-average dumping margin and the all-others rate are different from those in the *Final Determination*, we intend to issue a *Timken*[69] notice with the amended final determination should the Court sustain these final results of redetermination.[70]

3/16/2026

X *Chris J Abbott*

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive function and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[69] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).

[70] We note that, because the cash deposit rate calculated for SeAH has been superseded in several subsequent administrative reviews, the rate calculated here will not be applied to SeAH, should the Court sustain these final results of redetermination.